UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Swisher Hygiene Franchise Corp., et al., | ) ) ) | |
| Plaintiffs, | ) ) | CV-15-1331-PHX-DJH |
| vs. | ) ) ) | Phoenix, Arizona March 2, 2018 3:00 p.m. |
| Troy Clawson and Teri Clawson, husband and wife, et al., | ) ) ) ) | |
| Defendants. | ) ) ) | |

_____)

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        A P P E A R A N C E S

2    For the Plaintiffs:

3             Fisher & Phillips
              By: PAVNEET SINGH UPPAL, ESQ.
4                 ALANNA REBECCA BROOK, ESQ.
              3200 North Central Avenue, Suite 805
5             Phoenix, AZ  85012

6             Fisher & Phillips
              By: ANDREW FROMAN, ESQ.
7             101 East Kennedy Blvd., Suite 2350
              Tampa, FL  33602

8
     For the Defendants:
9
              BurnsBarton
10            By: DAVID T. BARTON, ESQ.
                  KATYA MARIE WYCKOFF LANCERO, ESQ.
11            45 West Jefferson Street, 11th Floor
              Phoenix, AZ  85003

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

1

## INDEX OF WITNESSES

2

| WITNESSES FOR THE PLAINTIFFS: | Direct | Cross | Redirect | The Court |
|---|---|---|---|---|
| LANCERO, Katya | 14 | | | 55 |

3

4

5

6

7

## INDEX OF EXHIBITS

8

| EXHIBIT NO.: | DESCRIPTION | RECEIVED: |
|---|---|---|
| 5 | Defendant Troy Clawson's First Supplemental Disclosure Statement dated 4/26/16 | 24 |
| 10 | Plaintiffs' Motion for Sanctions, or, in the Alternative, Motion for Order to Show Cause Why Sanctions Should Not Be Imposed Upon Defendandants (Doc 48) | 16 |
| 11 | Defendants' Verified Response in Opposition to Plaintiffs' Motion for Sanctions, or, in the Alternative, Motion for Order to Show Cause Why Sanctions Should Not Be Imposed (Doc 53) | 16 |
| 15 | 9/6/16 Email from Katya Lancero to Alanna Brook, Re: Swisher v. Clawson, et al. — ESI | 47 |
| 16 | 9/15/16 Email from Katya Lancero to Alanna Brook, Re: Swisher v. Clawson, et al. — ESI | 50 |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  This is case number CV 15-1331, Swisher

2   Hygiene Franchise Corporation and others versus Clawson and

3   others, on for a final pretrial conference and oral argument.

4          Counsel, will you please announce for the record.

5          MR. UPPAL:  Your Honor, good afternoon.  Pavneet Singh

6   Uppal of the law firm of Fisher & Phillips on behalf of the

7   plaintiffs.  Along with me are my colleagues co-counsel Alanna

8   Brook and Andrew Froman.

9          THE COURT:  Good afternoon.

10          MR. BARTON:  Good afternoon, Your Honor.  David Barton

11   from the law firm of BurnsBarton.  Together with me here today

12   is my co-counsel, Katya Lancero -- sorry about that -- and Troy

13   Clawson, our client.

14          THE COURT:  And good afternoon to you.  And let me

15   just explain to you how we are going to proceed this afternoon.

16   I know we are set both for an evidentiary hearing on the second

17   motion and -- the second motion for sanctions and as well as

18   your final pretrial conference.  I unfortunately have a family

19   medical situation that has arisen, and so I'm going to head

20   north this afternoon.

21          My plan is to take about an hour and a half worth of

22   testimony.  Looking at your respective witness lists and

23   exhibit lists, my guess is we're going to have to continue this

24   to another day.

25          And so in the meantime, while we are going through

1    this process, I'm going to give you some additional days that

2    we can continue this matter within the next two weeks, the week

3    of March 5th and the week of March 12th.

4           I don't like to have long breaks in between hearings

5    such as this, and so my preference would be to have this

6    concluded sooner rather than later.

7           And so my sense is that we will not get to any portion

8    of your final pretrial conference today.  We will concentrate

9    on the oral argument and presentment of testimony or evidence

10   if there are those.

11          And since, Mr. Singh Uppal -- and let me know if I'm

12   mispronouncing your last name -- it is your motion, and so how

13   do you wish to proceed?

14          MR. UPPAL:  Your Honor, I'd like to begin by calling

15   our first witness.

16          THE COURT:  You may.

17          MR. UPPAL:  Your Honor, I'd like to call Katya Lancero

18   and have her sworn in.

19          MR. BARTON:  Your Honor, we would object to having

20   Ms. Lancero testify as a witness.

21          THE COURT:  And what is the nature of the objection?

22          MR. BARTON:  She has nothing to add that is not

23   protected by the attorney-client privilege.

24          THE COURT:  And, Mr. Uppal, have you and Mr. Barton,

25   have you discussed this before you came into court?

1      MR. UPPAL:  Your Honor, if you're asking whether we

2  have discussed it by telephone, no, but it has been discussed

3  in that this matter has been briefed in the motions in limine.

4  Suffice it to say we disagree.  I'm ready to present to the

5  Court why the privilege has been waived.

6      THE COURT:  Well, why don't you give me your averment

7  now in terms of why you think the privilege has been waived,

8  and then I can hear from Mr. Barton.

9      MR. UPPAL:  Your Honor, in response to our second

10  motion for sanctions and default judgment, which is at Doc 103,

11  the plaintiffs have filed a response at Doc 105.

12      Your Honor will recall that one of the key issues for

13  the evidentiary hearing that you have noticed is that

14  Mr. Clawson, through his counsel, filed an affidavit stating

15  that he had never actually formulated the Southern Arizona

16  Plan.  That was -- Excuse me.  It wasn't an affidavit.  That

17  was stated in the response to the first motion for sanctions.

18      However, that statement by defendants that the

19  Southern Arizona Plan was never formulated was verified and

20  sworn to under penalty of perjury by defendant Clawson.

21      That is a false statement made under oath, we submit,

22  as part of a fraud on the Court because the Southern Arizona

23  Plan has been found and has in fact been filed with the Court,

24  Your Honor might remember, as part of the summary judgment

25  briefing that was submitted to the Court.

1   In their response to the second motion for sanctions,

2   I would point the Court to Doc 1 -- docket 115 at Page 4, Lines

3   3 through 5.  I'm going to quote what they've written.

4   "Counsel should have written is that Clawson 'never actually

5   ended up finishing a plan for Southern Arizona.'  While Clawson

6   verified the document, defendants' counsel chose the words, and

7   admittedly, should have been more careful in the words chosen."

8   Also, on the first page of the defendants' response at

9   docket 115 at Lines 23 through 25, they write:  "The mistake at

10  issue is one of poor word choice, not fraud.  Counsel should

11  have used the word 'finished' instead of 'formulated' in the

12  legal brief submitted to the Court."

13  So, Your Honor, we have a situation here where

14  plaintiffs are submitting to the Court that defendants, and in

15  particular defendant Clawson, lied in his -- lied in his

16  verification to the Court and an earlier affidavit by claiming

17  that a -- the Southern Arizona Plan had never been formulated.

18  There is no debate that it was formulated because that document

19  exists, and it was found on defendant Clawson's computer.  My

20  expert witness is here to testify about that.  And we've

21  already submitted affidavits to this effect.

22  And the explanation from the other side as to this

23  false verification to the Court is that we didn't commit fraud,

24  our client didn't lie under oath, but, rather, this is,

25  quote-unquote, a mistake by counsel, meaning defense counsel.

1          So you can't on one hand use the attorney-client

2    privilege both as a sword and a shield.  If you're going to

3    state that something that you have done as to which liability

4    will attach to you or sanctions may attach to you is not your

5    fault -- it's the fault of counsel -- you have waived the

6    privilege.  This is no different than essentially asserting an

7    advice of counsel affirmative defense or if an employer is

8    accused of sexual harassment and the employer alleges the

9    Faragher/Ellerth affirmative defense.  The privilege is waived.

10   So we must be allowed to test and confront the witness, which

11   is the counsel who purportedly made the mistake.

12          THE COURT:  And I would -- Let me just understand,

13   Mr. Uppal, that your purpose of calling Ms. Lancero as the

14   first witness is to ask her questions as to understand how the

15   words finished and formulated derived or came about in terms of

16   the explanation?  Is that my understanding?

17          MR. UPPAL:  Yes, Your Honor.  And in part I would

18   submit to the Court that the waiver is broader than that when

19   they assert that this entire what we claim is a fraud on the

20   Court is really just a mistake of counsel.  The waiver is not

21   selective as to what Your Honor has just repeated, but

22   definitely what Your Honor just outlined is the main thrust of

23   what I would like to question under oath counsel about.

24          THE COURT:  All right.  Mr. Barton.

25          MR. BARTON:  If I may, Your Honor?

UNITED STATES DISTRICT COURT

1          THE COURT:  You may.

2          MR. BARTON:  This is vastly different, Your Honor,

3    than the situation where a party pleads as an affirmative

4    defense that the advice of counsel was followed in connection

5    with the conduct of the party.

6          What happened here was a simple admission by our firm

7    and by Ms. Lancero that in drafting the document, we could have

8    been more careful in choosing words.  That's it.  We have not

9    had our client say, for example, I relied on my attorney in

10   choosing that word.  That's a waiver of the affirmative

11   defense.  We would agree to that.  That's not what happened

12   here.

13         All our declaration says as one of -- And I would

14   point out this is only one of several reasons why we pointed

15   out that the document -- that the allegation is taken out of

16   context.  But, in any event, we pointed out that we could have

17   been more careful in choosing the word.  We could have used the

18   word finished instead of formulated and that they wouldn't even

19   have an issue here.  There would not be any discussion here.

20   Because it's very clear, if you look at the document -- and

21   Mr. Clawson can testify to this -- that the document is not a

22   finished document.  It was never completed.  It was never

23   submitted to Mr. Zall.  And he's going to provide testimony

24   about that.  And he doesn't need any attorney to add any

25   additional information to that.

1    So there's no basis here where Mr. Clawson has waived

2    the privilege by putting the advice of counsel at issue.

3    That's not what's happened.  And in fact the standard here is

4    of course the Roehrs versus Minnesota Life Insurance case out

5    of this very district.  And it requires that you of course have

6    to look to Arizona law to decide what is the -- whether there's

7    been a waiver, and it requires that the assertion of the

8    privilege was the result of some affirmative act such as the

9    filing of suit or raising an affirmative defense by the

10   asserting party.

11    So the party asserting the defense has to assert

12   affirmatively that he has relied upon the advice of counsel in

13   making that defense.  That's what happens when a party, for

14   example, in a sexual harassment case says or a discrimination

15   case says I didn't discriminate because I ran this by my

16   counsel, and my counsel said it was fine.  We would admit

17   that's a waiver.  Nothing akin to that is at play here.

18   This is simply an acknowledgment by our firm that we could have

19   been more careful in choosing our words.  That's it.

20    THE COURT:  Well, what I will say here is that, in my

21   view, that given your reliance on the statements here, I would

22   say that there is sufficient waiver such that Mr. Uppal can

23   question Ms. Lac -- Lancero, excuse me, with respect to how her

24   terminology came to be in terms of that document.  And

25   certainly if -- And let me just say this.

1        My sense is that you both understood what was

2   potentially going to happen in this hearing.  And for you to

3   come forward this afternoon at the very time that you're to

4   present evidence and witnesses and to place this

5   attorney-client privilege argument before me without prior

6   meeting and conferring or at least briefing it further for the

7   Court, that is not how we operate.  And I will tell you that

8   this sort of back and forth of not meeting and conferring or

9   meeting and conferring and then deciding to go off on your own

10  really creates more hardship for you than it does for the

11  Court.  It delays the process greatly.

12        Rather than delay, however, with respect to this

13  issue, I'm going to tell you that I do find that it is relevant

14  here to the particular statements that were made in your

15  response at document 115.  I'm going to permit the limited

16  questioning with respect to what was referred to here in your

17  briefing.  And if you decide that you wish to waive

18  attorney-client privilege, then what we can do is seal the

19  proceeding and operate in camera.

20        MR. BARTON:  Well, Your Honor, one point before I

21  address that, because you raise a good point about the

22  meet-and-confer obligation.

23        Counsel did send us an e-mail two days ago and

24  requested that both of us be present.  At that point we told

25  him that we would be present.

1          THE COURT:  Well, let me just say this.  I'm not going

2     to get into an argument about what has been going on in this

3     case.  You obviously are operating on your own sort of schedule

4     here.  And that's sort of the posture that we find ourselves

5     in.

6          So I'm not today going to entertain any sort of

7     argument with respect to what is going on in terms of what

8     appears to me to be a breakdown in professionalism between

9     opposing counsel.  And so let's proceed.

10          In that fashion, Mr. Uppal, you may ask Ms. Lancero

11    limited questions.  You may object.  I will place your

12    objection in the record.

13          And then if you are moving further and if I determine

14    that there is attorney-client privileged area that is being

15    gone into, then we will seal the courtroom, and I will hear

16    from counsel and the witness.

17          MR. BARTON:  May I make a record?

18          THE COURT:  You may.

19          MR. BARTON:  Just very briefly, Your Honor, we in fact

20    made it very clear to Mr. Uppal in those prior communications

21    that we were not using the advice of counsel or advice to

22    Mr. -- as a defense in this case.  We simply were not using the

23    advice of counsel as a defense.  And that's why we explained we

24    would not be testifying in this case.  I would further urge the

25    Court to let us brief this issue because -- you're right -- it

1      is a surprise.  And instead we have --

2              THE COURT:  It's not -- It's not a surprise to you.

3      It's a surprise to me.

4              MR. BARTON:  Fair enough.  We have Mr. Clawson here,

5      who is prepared to testify and who has the real knowledge about

6      what happened and what he understood that term to mean, and

7      that's what matters since he's the one who's accused of

8      perjuring himself.  I would suggest it would make sense perhaps

9      to let Mr. Clawson testify and, if we have more time, then put

10     Ms. Lancero on.

11             THE COURT:  Let's proceed in that way.

12             MR. BARTON:  Thank you.

13             MR. UPPAL:  Your Honor --

14             THE COURT:  You're going to question him anyway.

15     That's my assumption, Mr. Uppal.  Is that correct?

16             MR. UPPAL:  Not necessarily, Your Honor.  I may have

17     what I need from Ms. Lancero.  And since Your Honor has ruled

18     about the waiver, I really would ask the Court to permit me to

19     start with Ms. Lancero.  I don't want the testimony to be

20     tailored.  And, Your Honor, there's no, as you've noted,

21     there's no surprise to Mr. Barton.  When this whole thing arose

22     long ago I filed a motion and a request to depose counsel.  And

23     I teed this issue up in the response -- in the reply to the

24     second motion for sanctions.  I really would like to start with

25     Ms. Lancero, and I will abide by your ruling as to the

LANCERO – DIRECT                                    14

1    questioning.

2            THE COURT:  All right.  Let's go with Ms. Lancero.

3    That's my final word on the matter.  Please come forward and be

4    sworn.

5              KATYA LANCERO, PLAINTIFFS' WITNESS, SWORN

6            THE CLERK:  If you would please state and spell your

7    full name for the record.

8            THE WITNESS:  Katya Lancero, K-a-t-y-a, Lancero,

9    L-a-n-c-e-r-o.

10           MR. UPPAL:  Your Honor, before we begin, this morning

11   opposing counsel and I traded exhibit binders, so both sides,

12   per the Court's rules and requirements, have pre-marked our

13   exhibits and submitted them to Your Honor's clerk, but we've

14   also traded binders to expedite matters.

15           May I approach the bench and hand Ms. Lancero the

16   exhibit binder which are the plaintiffs' exhibits for use in

17   this case?  It would just speed things up.

18           THE COURT:  You may.

19                         DIRECT EXAMINATION

20   BY MR. UPPAL:

21   Q.  Ms. Lancero, good afternoon.  Could you please state your

22   role in this case.

23   A.  I'm an associate attorney at BurnsBarton, and I represent,

24   along with lead counsel, David Barton, Mr. Troy Clawson and

25   Accurate Chemical & Services.

UNITED STATES DISTRICT COURT

1    Q.  And have you served as -- Has BurnsBarton served as counsel

2    for defendant Troy Clawson since the inception of this case

3    when the complaint was originally filed in state court on June

4    24, 2015?

5    A.  No.  Our representation began on July 6th, 2015.

6    Q.  Thank you.  Ms. Lancero, you have before you exhibit

7    binders and -- or I should say one exhibit binder.  And I'd

8    like you to turn to Tab 10 underneath which you will find what

9    has been pre-marked as Plaintiffs' Exhibit 10.  Are you there?

10   A.  Yes.

11   Q.  Okay.  So Exhibit 10 was plaintiffs' motion for sanctions

12   or, in the alternative, motion for order to show cause why

13   sanctions should not be imposed upon defendants.  It was filed

14   at docket 48 on June 2, 2016; is that correct?

15   A.  That is correct.

16   Q.  And you remember this motion; is that right?

17   A.  I do.

18   Q.  It was served upon defendants and upon you in your capacity

19   as defense counsel?

20   A.  Yes.

21   Q.  And you were required to file a response to this motion on

22   behalf of both defendants ACS as well as defendant Clawson; is

23   that right?

24   A.  Yes.

25        MR. UPPAL:  All right.  I move that Exhibit 10 be

1    admitted.

2              THE COURT:  It is already a matter of record, and it

3    will be admitted for this hearing.

4              MS. UPPAL:  All right.  Thank you, Your Honor.

5              Ms. Lancero, would you now turn to Exhibit 11 in your

6    binder.

7              Your Honor, this is defendants' verified response in

8    opposition to plaintiffs' motion for sanctions already filed at

9    docket 53 on June 13, 2016.  In light of what you just said,

10   Your Honor, I would move that this be admitted as well.

11             THE COURT:  And for purposes of the hearing, it is

12   admitted.  It is already a permanent record on the docket.

13             MR. UPPAL:  Your Honor, in that case, if I might ask,

14   to expedite matters, can we go ahead or, rather, may I go ahead

15   and assume that everything that has been filed before the Court

16   is deemed admitted for purposes of this hearing?

17             THE COURT:  Yes.

18             MR. UPPAL:  Thank you, Your Honor.

19   Q.  (BY MR. UPPAL)  Ms. Lancero, did you have a role in

20   drafting defendants' verified response in opposition to

21   plaintiffs' motion for sanctions?

22   A.  Yes.

23   Q.  Were you the primary attorney who drafted the response?

24   A.  I don't understand the word primary.  It was a joint

25   effort.

1    Q.  Well, what was your role in drafting this motion or,

2    rather, this response to the motion for sanctions?

3    A.  As I mentioned before, it was a joint effort.  And so I do

4    recall reading plaintiffs' motion and working together to

5    formulate a response.

6    Q.  Okay.  You said it was a joint effort.  Could you tell

7    me -- and I'm looking for the names here -- in terms of

8    drafting this response at Exhibit 11, which you've said was a

9    joint effort, please tell me the names of the other individuals

10   with whom you had this joint effort.

11   A.  Myself and David Barton.

12   Q.  All right.  And that's your co-counsel who's here today,

13   right?

14   A.  That is correct.

15   Q.  All right.  Ms. Lancero, turn to Page 3, and I want to

16   direct your attention to Lines 9 through 12.  Let me know when

17   you're there.

18   A.  I'm there.

19   Q.  All right.  Do you see where it says, "For almost four

20   hours on June 11, 2015, Clawson mulled over his binders of

21   business cards using them to draft a plan for developing

22   Accurate's business.  Clawson picked the businesses that he

23   felt that would bring Accurate the most success.  Importantly,

24   about 15 of the businesses he listed in his plan were not

25   Swisher customers."  Did I read that correctly?

1    A.   Yes.

2    Q.   So I want to see if I have this right.   Is it your client,

3    defendant Clawson's position, that he created the Accurate

4    Phoenix Arizona Plan and the Accurate Northern Arizona Plan on

5    June 11, 2015?

6           MR. BARTON:   Objection, Your Honor.   Goes well beyond

7    the issue at -- there's alleged to have been a waiver on.

8           THE COURT:   She may answer her understanding.

9           THE WITNESS:   Could you repeat the question please.

10   Thank you.

11   Q.   (BY MR. UPPAL)   According to your client, defendant

12   Clawson, based on the section that we just read, is it his

13   position that he created the Accurate Phoenix Arizona Plan and

14   the Accurate Northern Arizona Plan on June 11, 2015?

15          MR. BARTON:   Same objection, Your Honor, and invasion

16   of privilege.

17          THE COURT:   Overruled.

18          THE WITNESS:   Are you asking that in Lines 9 through

19   12 we are only referring to the Phoenix and Northern Arizona

20   Plans with respect to 9 through 12?

21   Q.   (BY MR. UPPAL)   Ms. Lancero, did you not understand my

22   question?

23   A.   No.   Thank you.

24   Q.   Okay.   Is your client, defendant Clawson, taking the

25   position that he created the Accurate Northern Arizona Plan and

1   the Accurate Phoenix Arizona Plan on June 11, 2015?

2   A.  Yes.

3   Q.  And based on the portion of Exhibit 11 we just read, it

4   took him four hours to create these two plans?

5   A.  That is correct.

6   Q.  And he had to look at a stack of binders that had business

7   cards in order to create those two plans?

8   A.  That is correct.

9   Q.  So it took Mr. Clawson quite a bit of effort then, wouldn't

10  you say, to create the two plans?

11          MR. BARTON:  Objection.  Ambiguous.

12          THE COURT:  Well, I think it calls for speculation.

13  Q.  (BY MR. UPPAL)  All right.  I'll withdraw the question,

14  Your Honor.

15          Ms. Lancero, what I want to ask you is that if

16  Mr. Clawson's memory was good enough to create the Accurate

17  Northern Arizona Plan and the Accurate Phoenix Plan on June 11,

18  2015, how did he forget about creating these plans when he

19  signed his affidavit dated July 31, 2015?

20          MR. BARTON:  Objection.  Speculation.  Foundation.

21          THE COURT:  Sustained.

22  Q.  (BY MR. UPPAL)  Ms. Lancero, turn to Exhibit 10 in the

23  binder please.

24  A.  Can you repeat that please.

25  Q.  Turn to Exhibit 10, which is Tab 10 of the binder.

1    A.   Got it.   Thank you.

2    Q.   You have before you plaintiffs' motion for sanctions or, in

3    the alternative, motion for order to show cause why sanctions

4    should not be imposed upon defendants, right?

5    A.   Correct.

6    Q.   Okay.   Did BurnsBarton send this motion to defendant

7    Clawson?

8    A.   I don't recall.   Like the physical -- You mean did I e-mail

9    him the document itself or mail it to him in the mail?   That I

10   don't recall.   We've certainly discussed the issues, but --

11   Q.   Well, that wasn't my question.   I didn't really ask

12   whether -- the specificity of whether you e-mailed it,

13   physically handed it to him.   My question was BurnsBarton --

14   And that includes not just you but includes Mr. Barton.   It

15   includes any other attorneys at your firm.   It includes your

16   secretaries, paralegals, your administrative staff.   My

17   question is did BurnsBarton send this motion at Exhibit 10 to

18   its client, defendant Clawson?   Certainly you must have done

19   that, didn't you?

20   A.   Personally, no.   I didn't send, and I'm not sure if anyone

21   else in my firm did.   We certainly discussed the issues most

22   likely, but I didn't e-mail the document to Mr. Clawson.

23   Q.   Again, not --

24   A.   Or I didn't send it personally.   I didn't send it in any

25   way to him.

1    Q.  To your knowledge, did anyone affiliated with the law firm

2    of BurnsBarton by any manner whatsoever send or forward the

3    motion at Exhibit 10 to its own client, defendant Clawson?

4              MR. BARTON:  Objection.  Asked and answered.  And,

5    again, we're getting far afield here from the issue that's

6    allegedly been -- this witness is supposed to testify about.

7              THE COURT:  Well, you made a foundational objection,

8    so I'm going to grant him a little bit of leeway there.  But

9    she has not necessarily answered the last question that was

10   asked.  Do you know if anyone did?  And I'll ask it that way.

11   Do you know if anyone from the firm sent him the plaintiffs'

12   motion, document 48?

13             THE WITNESS:  I don't know.

14   Q.  (BY MR. UPPAL)  Is it possible that BurnsBarton could have

15   filed a response to the plaintiffs' motion at Exhibit 10

16   without actually having asked Mr. Clawson to read it?

17             MR. BARTON:  Speculation.

18             THE COURT:  She can answer it if she can.

19             THE WITNESS:  I don't know.

20   Q.  (BY MR. UPPAL)  You said previously we discussed it.  What

21   did you mean by that?

22   A.  First of all, this was June of 2016.  So it was most likely

23   discussed between myself and David and Mr. Clawson.  However,

24   it's hard to remember.

25   Q.  So as you testify here today under oath, is it your

1    testimony that you're not sure whether you or Mr. Barton

2    discussed plaintiffs' motion for sanctions with defendant

3    Clawson?

4    A.  No.  We discussed it with him.

5    Q.  And did you inform Mr. -- Did you or anyone at BurnsBarton

6    inform Mr. Clawson that he was being accused of perpetrating a

7    fraud on the Court and submitting a false affidavit under oath?

8    A.  Yes.

9    Q.  And did BurnsBarton explain to defendant Clawson that this

10   motion for sanctions at Exhibit 10 was a very serious matter

11   and needed to be treated seriously?

12   A.  Absolutely.

13   Q.  And what was his response?

14   A.  He understood.

15        MR. BARTON:  Objection, Your Honor.  Again, it's a

16   different issue.  It's a different privilege.  It's a different

17   communication.  It's not certainly the one we asserted here.

18   This is invading the privilege in a significant way and an

19   irrelevant way to the question at hand.

20        THE COURT:  Well, she has answered already.  It will

21   be on the record.  And I'm going to again remind you we talked

22   about the narrow issue that you were to discuss with this

23   witness.

24   Q.  (BY MR. UPPAL)  Thank you, Your Honor.  I just wanted to

25   lay some context for this matter.

1              But, Ms. Lancero, thank you.  Will you now turn to

2    Exhibit 5, which you have before you in the binder behind Tab

3    5.  Do you recognize Exhibit 5 as Defendant Troy Clawson's

4    first supplemental disclosure statement?

5    A.  Yes.

6    Q.  All right.  And do you see that under -- on the first page

7    under Section I, documents that Clawson may use to support his

8    claim or defenses, do you see that this disclosure states

9    documents Bates numbered Accurate 000135-145?

10   A.  Yes.

11   Q.  And contemporaneous with this first supplemental

12   disclosure, is it correct that your firm BurnsBarton produced

13   those documents Bates labeled Accurate 000135 through 145?

14   A.  Yes.

15   Q.  And do you see that behind the first page, those Bates

16   numbered documents are attached?

17   A.  Yes.

18              MR. UPPAL:  All right.  Your Honor, this is one of the

19   few exhibits that has not been filed, but it is the defendants'

20   first supplemental disclosure, and I move that it be admitted.

21              MR. BARTON:  No objection.

22              THE COURT:  With -- Let me just see if I understand

23   this, because this does look familiar to me.  Hasn't this

24   document been filed as a sealed exhibit to one of the --

25              MR. UPPAL:  Yes, Your Honor, it has been.  Thank you

1    for that correction.

2              THE COURT:  All right.  So I will admit it then for

3    purposes of this hearing as Exhibit 5.

4    Q.  (BY MR. UPPAL)  Ms. Lancero, turn to the second page of

5    Exhibit 5, which is Bates labeled Accurate 000135.  You're

6    there?

7    A.  Yes.

8    Q.  Okay.  Is this page an e-mail from defendant Troy Clawson

9    to Brad Zall at Accurate?

10   A.  Yes.

11   Q.  And this e-mail shows that Mr. Clawson e-mailed Brad Zall

12   at -- on Thursday, June 11, 2015, right?

13   A.  Yes.

14   Q.  And Brad Zall is the president of defendant ACS, correct?

15   A.  Yes.

16   Q.  And ACS is also your client, right?

17   A.  Yes.

18   Q.  So since you produced these documents, since your firm

19   produced these documents, isn't it correct that the documents

20   which are Bates labeled Accurate 136 through 145 were attached

21   by Mr. Clawson to the e-mail that he sent to Mr. Zall on June

22   11, 2015?  Ms. Lancero --

23   A.  Yes.

24   Q.  Okay.  Thank you.  And you see on the page that says

25   Accurate 00135 at the very top, do you see where it says

1    attachments?

2    A.  Yes.

3    Q.  And what are the attachments?

4    A.  They are the AccurateNorthernArizonaPlan.docx,

5    AccuratePhoenixArizonaPlan.docx.

6    Q.  Okay.  Now, on that same page, the e-mail that's at the

7    bottom of the page from Mr. Clawson to Mr. Zall, please read

8    aloud the last sentence.

9    A.  Are you referring to the talk to you soon or the sentence

10   preceding that?

11   Q.  Ms. Lancero, I'll just read it, and you tell me if I've

12   read it correctly.

13   A.  Sure.

14   Q.  On the page that's Bates labeled Accurate 000135, do you

15   see where your client defendant Clawson wrote to Brad Zall

16   "I'll work on Southern Arizona tomorrow"?

17   A.  I do.

18   Q.  Now turn to Exhibit 11, which is defendants' verified

19   response to plaintiffs' motion for sanctions.  Are you there?

20   A.  I am.

21   Q.  Okay.  And this in fact, Exhibit 11, is defendants'

22   verified response in opposition to plaintiffs' motion for

23   sanctions or, in the alternative, motion for order to show

24   cause why sanctions should not be imposed, right?

25   A.  Yes.

1    Q.  And it's on the letterhead of your firm BurnsBarton, right?

2    A.  Our names are in the top left, but it's not our letterhead.

3    Q.  Pleading paper.  Thank you.

4    A.  Yeah.

5    Q.  Is that a yes?

6    A.  Yes.

7    Q.  Turn to Page 14 of this same exhibit and tell me if on Page

8    14 that's defendant Clawson's sworn verification in support of

9    this response.

10   A.  It is.

11   Q.  Do you see where the second paragraph states "I have read

12   defendants' verified response in opposition to plaintiffs'

13   motion for sanctions or, in the alternative, motion for order

14   to show cause why sanctions should not be imposed, and I state

15   under penalty of perjury that the factual statements in this

16   document that pertain to my actions are true and correct and to

17   the best of my knowledge and understanding"?

18   A.  Yes.

19   Q.  I read that correctly?

20   A.  You did.

21   Q.  So given that Mr. Clawson signed that sworn affirmation,

22   wouldn't he have read the entirety of Exhibit 11?

23          Ms. Lancero, come on.  How could he swear to it if he

24   didn't read it?

25   A.  He stated here -- I mean, the document speaks for itself --

1    that he read our response.

2    Q.  Is that --

3    A.  So if you could repeat your question in case I didn't

4    answer it.

5    Q.  That's a yes, Ms. Lancero?

6    A.  Could you repeat your question please.  Thank you.

7    Q.  Given that your client defendant Clawson gave this sworn

8    affirmation, isn't it correct that he would have had to have

9    read the entirety of Exhibit 11?

10   A.  Yes.

11   Q.  Go to Page 3 of Exhibit 11, and I want to direct your

12   attention to Lines 24-26.  Please let me know when you're

13   there.  Ms. Lancero, are you --

14   A.  Yes, I'm there.

15   Q.  Do you see where it says -- where the last sentence of Page

16   3 states:  "Although Clawson's e-mail to Zall stated that he

17   would work on Southern Arizona tomorrow, Clawson never actually

18   ended up formulating a plan for Southern Arizona."  Do you see

19   that?

20   A.  I do.

21   Q.  I read that correctly?

22   A.  You did.

23   Q.  And that statement Mr. Clawson swore was factually correct,

24   didn't he?

25   A.  Yes.

1   Q.  But that statement in actuality is false; isn't that right?

2   A.  That is not correct.

3   Q.  All right.  So, Ms. Lancero, isn't it true that your

4   client, defendant Clawson, did in fact create a Southern

5   Arizona Plan?

6   A.  He didn't actually finish creating it, but he had started

7   on one.

8           MR. UPPAL:  Objection, Your Honor.  Non-responsive.

9           THE WITNESS:  So the word create is a little

10  ambiguous, because if you're intending the word create to

11  mean --

12          MR. UPPAL:  Your Honor, objection.  Non-responsive.

13          THE COURT:  Ask the question again.  Let me hear the

14  answer.  Answer the question if you can.  I'm not going to hear

15  arguments about semantics.

16          Reask the question.

17  Q.  (BY MR. UPPAL)  Just one minute, Your Honor.

18          Ms. Lancero, please turn to Exhibit 12.

19          Exhibit 12 is selected portions of plaintiffs'

20  controverting statement of facts in opposition to defendants'

21  motion for partial summary judgment.  Do you remember

22  defendants filing a partial motion for summary judgment in this

23  case?

24  A.  I do.

25  Q.  And you recall -- Excuse me.  I misstated that.  Do you

1    remember defendants filing a partial motion for summary

2    judgment?

3    A.  I do.

4    Q.  Do you remember plaintiffs filing a response and a

5    controverting statement of facts?

6    A.  I do.

7    Q.  And did you carefully review the plaintiffs' controverting

8    statement of facts?

9          MR. BARTON:  I'm going to object, Your Honor, again.

10   Where is this going?

11         MR. UPPAL:  Your Honor, the Southern Arizona Plan is

12   attached, and this witness has seen it before.

13         THE COURT:  You may proceed.

14   Q.  (BY MR. UPPAL)  So, Ms. Lancero, did you carefully read the

15   plaintiffs' controverting statement of facts?

16   A.  I certainly read it.  It's hard to say whether the word

17   carefully, to what extent that means, but I certainly read it.

18   Q.  So you read -- you read the controverting statement of

19   facts, but it might not have been carefully?

20         MR. BARTON:  Objection.  Argumentative.

21         MR. UPPAL:  I'll withdraw the question.

22   Ms. Lancero --

23         THE COURT:  Well, let me just say here there's some

24   wordsmithing going on that I don't appreciate.  Either she

25   answers the question directly or we're going to have this back

1    and forth.  And time is ticking here, and I'm not going to hear

2    this all afternoon.

3         Please just answer the question.  If you can't answer

4    it, say you can't answer it, and then we can move on.

5         THE WITNESS:  Yes, Your Honor.

6         I don't remember going through every single line of

7    plaintiffs' controverting statement of facts including the

8    exhibits attached.  In fact, some were filed -- Yeah.  I don't

9    remember.  I was about to say that some might have been filed

10   under seal, and we had never gotten the exhibits, but it's hard

11   to remember.  This was a long time ago.

12   Q.  (BY MR. UPPAL)  Okay.  Ms. Lancero, as part of Exhibit 12,

13   would you please turn to the Accurate Southern Arizona Plan.

14   You'll first see that there is an affidavit of Mark Cardwell.

15   Then you will see an Exhibit A to the affidavit of Mark

16   Cardwell.  Then you will see the Accurate Phoenix Plan.  And if

17   you turn to the next plan, I believe you will see a document

18   that at the top is titled Accurate Southern Arizona Plan.  Let

19   me know when you're there.

20   A.  I'm there.

21   Q.  Now that you see it before you on paper, would you agree

22   with me that the Accurate Southern Arizona Plan was in fact

23   created?

24   A.  It's my understanding that it was never finished.  However,

25   yes, this exists.  It's words on a paper, but from my

LANCERO - DIRECT

1   understanding, it's partially executed.

2   Q.  I see.  What about this Accurate Southern Arizona Plan

3   remains unfinished?

4   A.  From my understanding, the number of customers perhaps.

5   Honestly, it's calling for speculation.

6               MR. UPPAL:  Your Honor, objection.  Non-responsive.

7               THE COURT:  Well, I think she answered the question,

8   so let's move on.

9   Q.  (BY MR. UPPAL)  Ms. Lancero, now that you have the Accurate

10  Southern Arizona Plan before you, are you contesting or arguing

11  that it wasn't formulated?  Doesn't it look formulated to you?

12  A.  All I can say is that there's a list of customers on this

13  one and two pages, and then the third page has some words as

14  well.

15  Q.  Is that a yes or no, Ms. Lancero?  Does the Accurate

16  Southern Arizona Plan that you have before you appear to be

17  formulated to you?

18  A.  It's hard to answer.  I don't know what standard to use to

19  say whether a specific plan created by someone is finished or

20  not.  It's my understanding that it wasn't finished, so you're

21  using the term formulate, and --

22              MR. UPPAL:  Your Honor, I don't want to argue with

23  this witness.

24              THE COURT:  Let me just remind the parties here who

25  the fact finder is and who the determiner of credibility of

UNITED STATES DISTRICT COURT

1    witnesses is.  And so with that in mind, you can move forward.

2    Q.  (BY MR. UPPAL)  Thank you, Your Honor.

3              Ms. Lancero, when did BurnsBarton first know or first

4    learn of the existence of the Accurate Southern Arizona Plan?

5    A.  I was told that there was some words put on the page.

6    However, I didn't know what it looked like until it was

7    disclosed to us by you.

8    Q.  I see.  So is that all you were told about the Accurate

9    Southern Arizona Plan, that there were some words put on a

10   page?

11   A.  Yes.  But it wasn't actually formulated and that it wasn't

12   sent to Mr. Zall.

13   Q.  Okay.  Were you told anything else about the Accurate

14   Southern Arizona Plan?

15   A.  No, no.

16   Q.  Are you sure there's nothing else?

17   A.  No.

18   Q.  Who told you this?  Please tell me the name.

19   A.  Mr. Clawson.

20   Q.  That's your client, defendant Clawson, right?

21   A.  Yes.

22   Q.  How did he come to tell you this?  How did he tell you that

23   the Accurate Southern Arizona Plan were just some words on a

24   page?

25   A.  I don't understand the question.

1   Q.  How did it happen?  Did you ask him a question such as,

2   "Hey, your e-mail states I'll work on the Southern Arizona

3   Plan.  Where is it?  Plaintiffs are asking for it."  What is

4   the context in which your client came to tell you that the

5   Accurate Southern Arizona Plan were just some words on a page?

6   A.  You are correct it was the e-mail that Mr. Clawson sent to

7   Mr. Zall saying I will work on Southern Arizona tomorrow that

8   prompted our discussion.

9   Q.  All right.  So let me see if I have this right.  You saw

10  Mr. Clawson, defendant Clawson's e-mail to Mr. Zall, and you

11  noted the section of that e-mail that said tomorrow I'll work

12  on Southern Arizona; is that right?

13  A.  Yes.

14  Q.  And that prompted you, Ms. Lancero, to ask Mr. Clawson

15  where is the Southern Arizona Plan?

16  A.  I asked him did you work on the Southern Arizona Plan the

17  next day as your e-mail stated.

18  Q.  And what was his reply?

19  A.  His reply was that he put some words on a page but was

20  heading to vacation and could not finish the Southern

21  Arizona -- the Southern Arizona document, list.

22  Q.  Is that all he said to you?

23  A.  Yes.

24  Q.  When did he tell you this?

25  A.  I honestly don't remember.

LANCERO - DIRECT

1    Q.  Give me an estimate, because it's very important for this

2    case and for this motion.

3    A.  It was prior to the Southern Arizona Plan being disclosed

4    to us from you and your expert.

5    Q.  Well, Ms. Lancero, let me see if this jogs your memory at

6    all, and you can tell me if it does or it doesn't.

7             On June 11, 2016, your firm filed a response to a

8    motion for sanctions, right?

9    A.  Are you referring to the first or the second, Mr. Uppal?

10   Q.  It's Exhibit 11.

11   A.  Yes.

12   Q.  And that response was sworn to by your client, Mr. --

13   defendant Zall, right?

14            MR. BARTON:  Objection.

15            MR. UPPAL:  We've already been over this.  The

16   verification was at the end of your response.

17            MR. BARTON:  It wasn't Mr. Zall.

18   Q.  (BY MR. UPPAL)  Excuse me.  I misspoke.  Your client,

19   defendant Clawson, signed a verification to this response,

20   right?

21   A.  Yes.

22   Q.  And in this response that your firm filed on June 11 of

23   2016, it states on Page 3 of Lines 24-26, quote, although

24   Clawson's e-mail to Zall stated that he would work on the

25   Southern Arizona Plan tomorrow, Clawson never actually ended up

1   formulating a plan for Southern Arizona, right?

2   A.  Yes.

3   Q.  So --

4          MR. BARTON:  Your Honor --

5   Q.  (BY MR. UPPAL)  -- wouldn't you have had to have had this

6   discussion with defendant Clawson about where's the Southern

7   Arizona Plan sometime prior to June 11 of 2016?

8   A.  Probably.

9   Q.  Is that a yes?

10  A.  Yes.  It -- I honestly don't remember when that

11  conversation took place with Mr. Clawson.

12         MR. BARTON:  Your Honor, just to correct the record,

13  we filed that on June 13th.

14         MR. UPPAL:  Thank you.  Mr. Barton is correct.  Doc 53

15  is filed on June 13, 2016, but the verification to that

16  response is signed by Mr. Clawson on June 11, 2016.

17  Q.  (BY MR. UPPAL)  All right.  So you're telling me you don't

18  remember when this conversation with your client occurred when

19  he told you that the Southern Arizona Plan were just some words

20  on a page.  But now that you have seen the Southern Arizona

21  Plan, would you characterize it under oath as just some words

22  on a page?

23         MR. BARTON:  Objection.  Relevance.

24         THE COURT:  Overruled.

25         THE WITNESS:  To be honest, yes.  It's words on a page

1    for sure.

2    Q.   (BY MR. UPPAL)   When Mr. Clawson told you that the Southern

3    Arizona Plan was just some words on a page, did you or anyone

4    else affiliated with BurnsBarton ask him to provide it to you?

5    A.   No.

6    Q.   Did you or anyone at BurnsBarton, including your colleague,

7    David Barton, make any kind of inquiry at all as to whether

8    your client, defendant Clawson, was accurately describing the

9    Southern Arizona Plan as just some words on a page?

10   A.   I don't know.

11   Q.   Did you, Ms. Lancero, make any kind of inquiry or effort to

12   actually look at the Southern Arizona Plan before your firm on

13   June 13, 2016, told the Court that it had never been

14   formulated?

15   A.   No.

16   Q.   But you knew it existed in some format, right?

17   A.   No.   It was extremely downplayed.

18   Q.   That's fine.   But even if it was downplayed, you knew it

19   existed in some format; isn't that right?

20   A.   To the extent that words on a page, sure.

21   Q.   So that's a yes?

22   A.   To the extent that words on a page can constitute existing,

23   then yes.

24   Q.   Who chose the word formulated?

25   A.   It was a joint decision.

LANCERO - DIRECT

1  Q.  By who?

2  A.  Both David Barton and myself.

3  Q.  So did you discuss with your colleague David Barton --

4  Well, actually I'll withdraw that question.  Let me back up.

5          When Mr. -- When defendant Clawson told you that the

6  Southern Arizona Plan did exist, albeit as words on a page, who

7  else other than you and defendant Clawson were present?

8  A.  No one else was present.

9  Q.  So Mr. Barton wasn't there?

10 A.  That's correct.

11 Q.  Okay.  When you learned this information from defendant

12 Clawson, did you inform anyone else at BurnsBarton that Mr. --

13 that defendant Clawson had confirmed that the Southern Arizona

14 Plan did exist or at least had been started?

15 A.  No.

16 Q.  You didn't -- never told David Barton about this?

17 A.  No.  As I mentioned, it was extremely downplayed, and I'll

18 leave it at that.

19 Q.  Well, Ms. Lancero, help me out here.  I'm not

20 understanding.  If you never discussed this issue with David

21 Barton, how could attorney David Barton have played any role in

22 choosing the word formulated?

23 A.  It was a joint decision to use the word formulate.

24 Q.  So are you saying you concealed from your co-defense

25 counsel the fact that defendant Clawson had told you that the

1    Southern Arizona Plan existed?

2    A.  I didn't find it worth stating.

3    Q.  At some point your colleague, Mr. Barton, must have learned

4    that the Southern Arizona Plan did exist, right?

5    A.  Yes.

6    Q.  What was his reaction when he learned that?

7              MR. BARTON:  Objection.  Relevance.

8              THE COURT:  Overruled.

9              THE WITNESS:  He was surprised.

10   Q.  (BY MR. UPPAL)  What did Mr. Barton say?

11   A.  I honestly don't remember.  And I don't remember him being

12   surprised, but I assume that's --

13   Q.  So, Ms. Lancero, he was surprised or he wasn't surprised?

14   A.  He was surprised, but honestly it's a very attenuated

15   memory, but, yeah, I'm sure he was surprised.

16   Q.  Okay.  Tell me or tell the Court what you remember about

17   how you informed your colleague, co-defense counsel David

18   Barton, that despite representing to the Court under oath that

19   the Southern Arizona Plan was never formulated, it did actually

20   exist?

21   A.  Can you repeat your question please.

22   Q.  Sure.  At some point -- We've already established that you

23   represented, you and -- Haven't we already established that you

24   and defendant Clawson represented to the Court under oath that

25   the Southern Arizona Plan had never been formulated?

1    A.  We represented that, and Mr. Clawson verified the

2    statement.

3    Q.  Right.  And after making that sworn representation, at some

4    point you informed David Barton that the Southern Arizona Plan

5    did in fact exist in some kind of format, right?

6    A.  I don't remember the exact -- how it happened, if I

7    informed Mr. Barton or if perhaps he found out by way of your

8    expert's disclosure.

9    Q.  So are you saying that the first time Mr. Barton may have

10   learned of the fact that the Southern Arizona Plan existed was

11   when the plaintiffs found it and disclosed it?

12   A.  That could be the case.  I honestly don't know.

13   Q.  You just don't remember?

14   A.  I don't remember.  I wouldn't know when David Barton found

15   out and how.

16   Q.  And you don't remember his reaction when he found out

17   either?

18   A.  No.

19   Q.  But you do remember him being surprised?

20   A.  Well, I remember -- I honestly don't remember.

21   Q.  Well, you keep going back and forth.  Was he surprised or

22   was he not surprised?

23   A.  I honestly don't know.  I'm going to state that I don't

24   know.  I don't remember.

25   Q.  Have you now told the Court the sum total of all inquiries

1   or efforts that you made of any kind in response to defendant

2   Clawson telling you that he did in fact start the Southern

3   Arizona Plan?

4   A.  Yes.

5   Q.  Yet even though you had this knowledge, you chose to tell

6   the Court, backed up by sworn verification, that the Southern

7   Arizona Plan had never been formulated?

8   A.  That is correct.  And that's why we stated in our reply

9   that we should have used the word finished.

10  Q.  And after making the representation backed up by a sworn

11  verification that the Southern Arizona Plan had never been

12  formulated, isn't it true, Ms. Lancero, that you undertook

13  efforts to keep plaintiffs' expert from finding that plan?

14  A.  No.

15  Q.  Ms. Lancero, after defendant Clawson confirmed for you the

16  existence of the Southern Arizona Plan, did you ask him how he

17  created it?

18  A.  No.

19  Q.  Did you ask him if he had taken any efforts to preserve it?

20  A.  No.

21  Q.  Did you tell him that he was under an obligation to

22  preserve it?

23  A.  If it was -- If there was anything there, honestly, words

24  on a page, I don't know to what extent he meant by that.

25  Q.  Ms. Lancero --

1    A.  And so --

2    Q.  -- that's not my question.

3    A.  But yes.

4    Q.  You did tell him that he was under a duty to preserve it

5    that you remember?

6    A.  We told him to preserve all documents in this case that are

7    relevant and potentially relevant --

8    Q.  Ms. Lance --

9    A.  -- under the rules of procedure.

10   Q.  I'm sorry, Ms. Lancero.  I didn't mean to interrupt you.

11   Have you finished?

12   A.  Yes.

13   Q.  Ms. Lancero, back to my question, which is when defendant

14   Clawson told you that the Southern Arizona Plan existed, at

15   that time, at that time did you remind him in any way that he

16   was under a duty to preserve that document?

17   A.  No.

18   Q.  Whether you asked him or not, did you learn that defendant

19   Clawson had created the Southern Arizona Plan on his laptop

20   computer?

21   A.  No.

22   Q.  Did you know that the Accurate Phoenix Arizona Plan and the

23   Accurate Northern Arizona Plan were created on defendant

24   Clawson's computer?

25   A.  He told me they were.

1   Q.  So then didn't it make sense to you that something called

2   the Southern Arizona Plan would likely have been created on his

3   computer as well?

4   A.  That would be a fair assumption.

5   Q.  Yet you made no efforts to image that computer?

6   A.  We actually asked Mr. Clawson to image his computer, but it

7   didn't happen.

8   Q.  Why not?

9   A.  I don't know.

10  Q.  When did you ask Mr. Clawson to image his computer?

11  A.  At the beginning of the lawsuit.

12  Q.  Did you make any inquiry as to why Mr. Clawson, despite

13  your having told him to image the computer, failed to do so?

14  A.  No.

15  Q.  Does that strike you as appropriate?

16          MR. BARTON:  Objection, Your Honor.

17          THE COURT:  Overruled.

18          THE WITNESS:  Can you repeat the question?

19  Q.  (BY MR. UPPAL)  Does that strike you as appropriate?

20  A.  What, Mr. Uppal?

21  Q.  That despite your having told defendant Clawson at the

22  beginning of the lawsuit, as you've just said, to image his

23  computer, he didn't do so?

24  A.  That would be a fair assumption.

25  Q.  What's a fair assumption, that Mr. Clawson's actions were

1    appropriate or inappropriate?

2    A.   That it would be inappropriate to not image his computer

3    when we asked him to do so.

4    Q.   And, Ms. Lancero, as an attorney, you're aware, aren't you,

5    that the duty to preserve evidence also extends to counsel such

6    as yourself?

7    A.   Yes.

8    Q.   So what steps did you take to preserve the Accurate

9    Southern Arizona Plan, which you've already told us you knew

10   existed?

11   A.   I knew that words had been put on a page, yet I wasn't sure

12   if it was in existence at the time we had that conversation.

13   But can you repeat your question?

14   Q.   Ms. Lancero, what efforts did you undertake as the defense

15   counsel who has entered an appearance in this case and made

16   representations to the Court to try and ensure that the

17   Southern Arizona Plan was preserved?  If it's nothing, you can

18   tell us nothing?

19   A.   I didn't.

20   Q.   Thank you.  Did you discuss with your co-defense counsel,

21   Mr. Barton, any efforts or lack thereof to preserve the

22   Southern Arizona Plan?

23   A.   No.

24   Q.   My last question, did you understand that my last question

25   pertained to all discussions with Mr. Barton irrespective of

1    whether you initiated them or he initiated them?

2    A.  Can you -- I am confused.

3    Q.  Were there any discussions between you and David Barton

4    about preserving the Southern Arizona Plan?

5    A.  No.  He didn't know it existed or to whatever extent it did

6    exist, so --

7    Q.  When did Mr. Barton learn that the Southern Arizona Plan

8    existed?

9    A.  I honestly don't know, and I believe you've asked that

10   question.  I don't know.

11   Q.  So I would have to ask Mr. Barton about that; is that

12   right?

13   A.  I believe it would be when you disclosed -- when plaintiffs

14   disclosed the Southern Arizona Plan, but --

15   Q.  But you're not sure about it?

16   A.  But I'm not sure.

17   Q.  So to get a definitive answer, I would have to ask

18   Mr. Barton; is that right?

19   A.  Yes.

20   Q.  Ms. Lancero, as you sit here today, would you agree with me

21   that you as a defense counsel have an ethical duty of candor to

22   the Court?

23   A.  Absolutely.

24   Q.  And that's no surprise to you, right?

25   A.  No surprise.

1    Q.  Ms. Lancero, do you believe that you complied with and

2    satisfied your duty of candor to the Court by filing a verified

3    brief which told the Court under oath that the Southern Arizona

4    Plan had never been formulated?

5    A.  My response would be what we put in our reply, which is we

6    should have used the word finished.

7    Q.  I understand that.  I understand that, Ms. Lancero, but my

8    question is slightly different.  And we all know what you put

9    in your brief, and I respect that.

10           But as you are here under oath on the stand, is it

11    your position that in making the representation to the Court

12    that the Southern Arizona Plan had never been formulated, even

13    though you knew it existed, you complied with your duty of

14    candor to the Court?

15    A.  Yes.

16    Q.  And, Ms. Lancero, forgive me if I've asked you this before,

17    but is it your position that you didn't undertake any efforts

18    to try and prevent plaintiffs' expert from finding the Southern

19    Arizona Plan on defendant Clawson's computer?

20    A.  Can you repeat that?

21    Q.  Did you or anyone at BurnsBarton undertake any efforts to

22    try and prevent or block the plaintiffs' expert from finding

23    the Southern Arizona Plan?

24    A.  Absolutely not.

25    Q.  Now, as you sit here today, you know that Southern Arizona

1    Plan was found on defendant Clawson's computer, right?

2    A.   Yes.   I believe it was a deleted carved file or something

3    along those lines.

4    Q.   And it was found in unallocated space, right?

5    A.   I honestly don't know.

6    Q.   Isn't it true that before you turned over the --

7    Mr. Clawson's computer and laptop to the plaintiffs' expert,

8    there was a discussion and back and forth between counsel for

9    the parties about a protocol for how electronic discovery

10   should be conducted?

11   A.   This is correct.

12   Q.   Isn't it also correct that during those discussions about

13   the electronic discovery protocol, the firm of BurnsBarton

14   tried to dissuade or prevent the plaintiffs from undertaking

15   discovery as to deleted files?

16   A.   No.

17   Q.   Turn to Tab 15 of your exhibit binder, which is Exhibit 15.

18           Do you recognize, Ms. Lancero, do you recognize

19   Exhibit 15 as an e-mail that you sent to my colleague, Alanna

20   Brook, on September 6, 2016?

21   A.   Can you repeat that question please.

22   Q.   Do you recognize Exhibit 15 as an e-mail that you sent to

23   my colleague, Alanna Brook, on September 6, 2016?

24   A.   Yes.

25   Q.   And that's your signature block at the bottom of the

1    e-mail, right?

2    A.  Yes.

3            MR. UPPAL:  Your Honor, I would move to admit Exhibit

4    15.

5            THE COURT:  The entirety of the exhibit or just --

6            MR. UPPAL:  Yes, Your Honor.  I can lay the foundation

7    for the back-and-forth e-mails.

8    Q.  (BY MR. UPPAL)  Ms. Lancero, Exhibit 15, I'm going to ask

9    you about the e-mail at the top, but Exhibit 15 consists of a

10   string of e-mails, and you are a party.  It appears that you're

11   a party to all those e-mails.  So do you recognize sending and

12   receiving the e-mails that are part of Exhibit 15?

13   A.  Yes.

14           MR. UPPAL:  Your Honor, I now move to admit Exhibit

15   15.

16           THE COURT:  Exhibit 15 is admitted.

17   Q.  (BY MR. UPPAL)  Ms. Lancero, I want to direct your

18   attention to the second paragraph of Exhibit 15, and please

19   read along with me.  That second paragraph states "In regards

20   to item number one of your proposal, we would like to limit the

21   search to user-accessible files and deleted files.  Troy cannot

22   reasonably access unallocated files, and data retrieved from

23   unallocated space often cannot be associated with a specific

24   date or time; i.e., the search would only reveal data that

25   existed at any time in the past, according to Peak Forensics."

1    Did I read that correctly?

2    A.  Yes.

3    Q.  And that's what you wrote; isn't that right?

4    A.  It is.

5    Q.  Okay.  And isn't it correct that in sending this e-mail,

6    you did not want the plaintiffs or their expert to search

7    unallocated space on your client/defendant Clawson's computer?

8    A.  Yes.  However, I was just going by the advice of Peak

9    Forensics.  So to be honest, I didn't quite know what it meant.

10   So I didn't technically personally want it but going by the

11   seat of what Peak Forensics provided as far as advice.

12   Q.  Prior to defendants' disclosure of the Southern Arizona

13   Plan, didn't you already know that defendant Clawson had

14   deleted it from his computer?

15   A.  No.  And your question was confusing.  Can you please

16   repeat it.  You had mentioned defendants' disclosure.

17   Q.  Thank you.  I have a bad habit of doing that.  I apologize.

18   I appreciate you correcting me.

19          We previously were talking about the fact that the

20   plaintiffs' expert found the Southern Arizona Plan, right?

21   A.  Yes.

22   Q.  And then the plaintiffs' disclosed the Southern Arizona

23   Plan to the defendants and to you as defense counsel, right?

24   A.  Yes.

25   Q.  Prior to that disclosure, isn't it true that you already

1    knew that defendant Clawson had deleted the Southern Arizona

2    Plan from his computer?

3    A.   No.

4    Q.   So is it your position that the first time you learned of

5    the deletion of the Southern Arizona Plan was when plaintiffs

6    found and disclosed that plan to you?

7    A.   I can't really say.   I don't know.

8    Q.   So you might have known about it before, but you don't

9    remember?

10   A.   Yeah.

11   Q.   How would you have known about it before, before the

12   disclosure by the plaintiffs?   Wouldn't Mr. Clawson have had to

13   have told you?

14   A.   Well, he mentioned that there were words on a page, but

15   nothing -- he didn't provide us with that, and the

16   conversations didn't go any further than that.

17   Q.   Again, not my question.   If you knew prior to the

18   plaintiffs' disclosure of the Southern Arizona Plan that it was

19   deleted, wouldn't that knowledge have had to have been conveyed

20   to you by your client, defendant Clawson?

21   A.   Yes.

22   Q.   So now do you remember defendant Clawson telling you that

23   he had deleted the Southern Arizona Plan?

24   A.   No.

25   Q.   Would you please turn to Exhibit 16.   Ms. Lancero, Exhibit

1   16 is also a series of e-mails to which you were either the

2   sender or the recipient.  Could you please look through those

3   and let me know if you recognize them.

4   A.  Yes, I recognize these.

5   Q.  All right.  In Exhibit 16 are e-mails that you either sent

6   to plaintiffs' counsel or received from plaintiffs' counsel

7   concerning ESI discovery and the discovery protocol, right?

8   A.  Yes.

9         MR. UPPAL:  Your Honor, I move that Exhibit 16 be

10  admitted.

11        THE COURT:  Exhibit 16 may be admitted.

12  Q.  (BY MR. UPPAL)  Ms. Lancero, turn to the first page of

13  Exhibit 16.  Do you see that you have items that are numbered

14  one, two, three, four?

15  A.  Yes.

16  Q.  All right.  And this was an e-mail that you sent to my

17  colleague, Alanna Brook, on September 15, 2016?

18  A.  Yes.

19  Q.  I want to focus your attention on the second item that you

20  wrote.  Please read along with me.  I see you're getting water,

21  so I'll pause.

22  A.  Okay.  Thank you.  Okay.

23  Q.  All right.  Ms. Lancero, read along with me on the item

24  number two that you wrote.  "Mr. Cardwell will only search the

25  forensic images for the electronically stored information that

1   was previously produced by defendants on June 17, 2016, by way

2   of a shared folder on Box.com."  Did I read that correctly?

3   A.  Yes.

4   Q.  That was your proposal, wasn't it?

5   A.  No.  I don't know what you mean by proposal and --

6   Q.  So, Ms. Lancero, you don't understand the word proposal?

7   A.  I understand the word proposal.  That didn't represent the

8   entire protocol that we were going back and forth and coming to

9   an agreement about.  But, yes, I wrote that line, and I

10  proposed what it says there.

11  Q.  Okay.  So if the plaintiffs had agreed to what you wrote,

12  which was that Mr. Cardwell would only search the forensic

13  images for electronically stored information that your side

14  previously produced, isn't it true the Southern Arizona Plan

15  would never have been uncovered?

16  A.  That is true.

17  Q.  And that in fact is what you wanted, isn't it, Ms. Lancero?

18  A.  No.  And may I add that I don't remember number two ever

19  being the protocol that we agreed upon or that we -- or that we

20  proposed.  I don't remember.

21  Q.  Thank you, Ms. Lancero.  I would like for you -- I'd like

22  for you to turn to Exhibit 20.

23          Your Honor, on Exhibit 20, on the Re line there is a

24  marking about Rule 408 settlement communications.  But I want

25  to preface my questioning by stating that I'm going to limit it

1    to the first sentence of the third paragraph, first page, that

2    starts with "We have confirmed."  That's all I want to talk

3    about.

4             THE COURT:  So -- I'm sorry -- are you proposing to

5    revise this exhibit for the purposes of the record?

6             MR. UPPAL:  No, Your Honor.  I just anticipate an

7    objection based on Rule 408, and I just want to make it clear

8    to Your Honor as well as to Mr. Barton that I'm not going to be

9    asking about any Rule 408 communications.  I'm only going to be

10   asking about the first sentence of the third paragraph.

11            So with that, Ms. Lancero --

12            THE COURT:  Well, let me just say this for purposes of

13   the record then:  If you are not going to engage in the

14   remainder of what is written in the letter, then you probably

15   should file a revised exhibit, redacted.

16            MR. UPPAL:  We will immediately do so, Your Honor.

17            THE COURT:  All right.  Thank you.

18   Q.  (BY MR. UPPAL)  Ms. Lancero, do you recognize Exhibit 20 as

19   a letter that your firm sent to plaintiffs' counsel on January

20   20, 2017?

21   A.  So, to be honest, I don't remember the letter, although I

22   understand that based -- the sentence in the second paragraph,

23   "Based on the current state of your expert report, we do not

24   feel it necessary to disclose an expert witness at this time,"

25   I recognize that statement because we've used it as an exhibit

1   in these briefings.  But I don't remember the remainder of the

2   letter.

3   Q.  Ms. Lancero, look at the end of the letter.  Do you see

4   that this letter is signed by David Barton and copied to you,

5   Katya M. Lancero?

6   A.  I do.

7   Q.  Do you have any reason to believe that your firm did not

8   send this letter to plaintiffs' counsel?

9   A.  No.

10         MR. UPPAL:  Your Honor, I move to -- Well, actually

11  I'll move at the end.

12  Q.  (BY MR. UPPAL)  Ms. Lancero, I want to direct your

13  attention to the first sentence of the third paragraph.  Please

14  read along with me.  It states "We have confirmed with Troy

15  Clawson that although he deleted the Accurate Phoenix Arizona

16  Plan and the Accurate Northern Arizona Plan from his thumb, he

17  did so in the usual course and according to his custom on

18  January 11, 2015, well before Swisher filed the complaint on

19  June 24, 2015."  Did I read that correctly?

20  A.  You had just stated January instead of June, but otherwise,

21  yes.

22  Q.  I'm sorry.  I must be getting tongue-tied.  Thank you for

23  correcting me on that.

24  A.  No worries.

25  Q.  So other than transposing January for June, I read it

1    correctly?

2    A.  Yes.

3    Q.  So, Ms. Lancero, is it correct then that your firm

4    confirmed with Troy Clawson that he deleted the Accurate

5    Phoenix Arizona Plan and the Accurate Northern Arizona Plan?

6    A.  That's correct.

7    Q.  Did your firm also confirm with Mr. Clawson that he deleted

8    the Southern Arizona Plan?

9    A.  No.

10   Q.  Why would your confirmation of deletion of plans be limited

11   to the Arizona Plan and the Phoenix Plan?

12   A.  It's -- I honestly wouldn't -- I don't know.  But you had

13   asked us with respect to those plans, and perhaps that's why,

14   but honestly I don't know.

15   Q.  So is it your sworn testimony here today that you confirmed

16   with defendant Clawson that the Phoenix Plan was deleted and

17   the Northern Arizona Plan was deleted, but you never asked him

18   whether he had deleted the Southern Arizona Plan?

19   A.  Yes.

20   Q.  And I asked you -- I phrased it as you, so let me now

21   expand it to your firm BurnsBarton.  Did anyone affiliated with

22   the firm of BurnsBarton inquire in any way of Mr. Clawson

23   whether he had deleted the Southern Arizona Plan?

24   A.  I don't know.

25   Q.  So in order to get an answer to that, in order for me to

1    know if Mr. Barton had a discussion like that, I would have to

2    ask him?

3    A.  Yes, I suppose so.

4          MR. UPPAL:  Your Honor, ask for a one-minute colloquy

5    with my colleague.

6          Ms. Lancero, thank you.  Your Honor, pass the witness.

7          THE COURT:  Thank you.  Before I pass the witness, let

8    me just ask -- And in fact we are at 4:30, and, again, we will

9    continue this matter so that both sides can have an opportunity

10   to make a full record here.

11                           EXAMINATION

12   BY THE COURT:

13   Q.  But before you step down, let me ask you:  You mentioned in

14   your testimony that you told your client to preserve all

15   documents as he is required to do anytime there's litigation in

16   federal court.

17         Do you recall when you gave him that instruction?

18   A.  It was at the beginning of the lawsuit.

19   Q.  And when you say the beginning of the lawsuit, was it at

20   your first meeting, and roughly do you recall when that was, if

21   you remember?

22   A.  I don't remember.  It's a faint memory.  We became counsel

23   on July 6th, 2015.

24   Q.  And so do you have any memory as a matter of policy or

25   protocol in your firm how that conversation would or when it

1    would generally occur?

2    A.  Yes.  It would be upon beginning representation, telling

3    our clients that they have a duty to preserve all documents.

4    Q.  And you testified that you asked Mr. Clawson to image his

5    computer at the start of the lawsuit.  And I don't recall

6    whether you stated to your knowledge whether or not he did or

7    you were aware whether he did.

8    A.  I'm pretty sure he did not image his computer.

9    Q.  And did you ever inquire as to whether or not he imaged his

10   computer?  Otherwise, I'm kind of puzzled as to why you would

11   ask him and not follow up.

12   A.  Right.  So we did ask, and honestly I think we thought he

13   did, and we eventually found out that he had not.

14   Q.  And then just so I'm clear, you have testified that the

15   description that you were given about what is now referred to

16   as the Southern Arizona Plan was described as words on a page.

17   Let me see if I understand the testimony here.

18           How did that -- How did he describe that?  Was there a

19   question of was there a Southern Arizona Plan formulated, and

20   was the response no, there's just some words on a page, or how

21   did that conversation come up?

22   A.  Absolutely, Your Honor.  Mr. Clawson has three binders, one

23   for Northern Arizona, one for Phoenix, and one for Southern

24   Arizona.  So, first of all, in response to his e-mail to

25   Mr. Zall on June 11th, 2015, that he would work on Southern

1    Arizona tomorrow, that instigated this conversation, along with

2    the fact that he has a third binder for Southern Arizona,

3    asking did you create the Southern Arizona Plan.

4           And he said that he had begun to create one and had

5    put some words on a page but didn't finish it, had gotten

6    stopped because of his vacation beginning the next day, and

7    that he never sent it to his boss, and that they in fact

8    weren't planning on going down to southern Arizona to convert

9    customers.

10   Q.  Did you ask him to produce those words on a page at any

11   time?

12   A.  No.

13   Q.  And why not?

14   A.  I thought that they were -- that it was practically

15   nothing.  Honestly, it was downplayed.  I should have.

16           THE COURT:  All right.  I have nothing further.

17           Now, I'm assuming, Mr. Barton, that you wish to do

18   some follow-up with your co-counsel here, and we are at 4:30.

19   And I think this is a good time to break.

20           As I mentioned, I do have to get on the road and fight

21   some northern bound traffic.

22           And so let me -- And you may step down.

23           THE WITNESS:  Thank you.

24           THE COURT:  Let me propose a couple of dates and times

25   and see if we can determine -- I guess let me just inquire of

1    counsel.  Mr. Uppal, how much longer do you anticipate that you

2    have with any witness with regard to your motion?

3            MR. UPPAL:  Your Honor, of course I don't know what

4    questions Mr. Barton is going to ask, so putting that aside and

5    reserving maybe just a little bit of time to re-question

6    Ms. Lancero should it be necessary, the other witness I intend

7    to present is directed at spoliation, which is our expert

8    witness, Mr. Cardwell.  I would say that Mr. Cardwell should

9    take no more than 30 minutes to an hour.

10            THE COURT:  Okay.  And then I assume there would be

11    some cross-examination by Mr. Barton.

12            MR. BARTON:  For sure.

13            THE COURT:  And that would -- We'll give you roughly

14    45 minutes to an hour for cross.

15            MR. BARTON:  Thank you, Your Honor.

16            THE COURT:  And then some redirect if necessary.

17            I may limit you, however, in the time, but I want to

18    give both opportunity to develop a full record.

19            And then beyond that, did you have any other

20    witnesses, or it was just the other -- the other, I guess,

21    expert computer witness?

22            MR. UPPAL:  Your Honor, in addition to the expert

23    computer witness, I believe I may have a few questions of

24    Mr. Bartons based on today's testimony.  That shouldn't take

25    more than 15 to 20 minutes.

1    THE COURT:  And then, Mr. Barton, who do you have in
2    terms of your witnesses?
3    MR. BARTON:  Mr. Clawson.
4    THE COURT:  Okay.  Well, it sounds to me like, at
5    least in terms of the motions hearing, we should set aside
6    perhaps half a day.  I like to give my staff a break, and I
7    often need one as well.
8    So the first opportunity we have is the morning of
9    March the 6th, and we can begin as early as 9:15 and go through
10   up to noon.
11   Wednesday -- And in fact if we need to take a little
12   bit of time afternoon, I have 1:15 to about 2:00 available.
13   And if that is not -- if that is not something that
14   you can make, then we have Wednesday, March 7th, at 1:30 and
15   the remainder of the day.
16   MR. FROMAN:  Your Honor, excuse me.  May I ask a
17   question?
18   THE COURT:  You may.
19   MR. FROMAN:  Were you going to include in this next
20   session also the pretrial, final pretrial conference, or are we
21   just talking about the motion that Mr. Uppal started with
22   today?
23   THE COURT:  Well, at this juncture, I think the time
24   that I have on my calendar and what you are asking for will
25   only permit the scheduling of the continuation of this hearing.

1    And then once that is done, once we schedule that, then I was

2    going to follow up with the second final pretrial conference

3    schedule.

4            MR. FROMAN:  Thank you.

5            THE COURT:  So do either of those days work, March 6th

6    in the morning?  And in fact we can start, if necessary, as

7    early as 9:00 or even 8:45 and go through to noon, or, again,

8    Wednesday March 7th beginning at -- and I would say that we can

9    start at 1:15 and use the rest of the day.

10           Mr. Uppal, March 6th available at all?

11           MR. UPPAL:  Your Honor, both dates are available.  I

12   would prefer March 7th because it will allow me not to have to

13   move too many things on my calendar, but I can do both dates

14   should Mr. Barton have a preference.

15           THE COURT:  Mr. Barton.

16           MR. BARTON:  March 7th is best for us as well, Your

17   Honor.

18           THE COURT:  All right.  So we will continue this

19   hearing on Wednesday, March 7th.  We will begin -- Let's begin

20   at 1:15 just to give you some room.

21           Then let us set your final pretrial conference at --

22   Let's shoot for Wednesday, March 14th, at 1:30.  Is that

23   available, Mr. Uppal?  And I would suggest an hour for that

24   hearing.

25           MR. UPPAL:  Your Honor, my colleague, Mr. Froman, will

```
 1    need to be available for that, so if you could give me one

 2    minute.

 3              THE COURT:  Yes.

 4              MR. FROMAN:  That's fine.  That's good for me.

 5              MR. UPPAL:  So, yes, fine for plaintiffs, Your Honor.

 6              THE COURT:  Wednesday, March 14th, at 1:30.  And

 7    Mr. Barton?

 8              MR. BARTON:  That works for us, Your Honor.

 9              THE COURT:  All right.  And we will set roughly one

10    hour, give or take a few minutes on either end, for the final

11    pretrial conference then.

12              All right.  Then we will continue.

13              And I'm assuming, Ms. Lancero, that we don't

14    necessarily have to have you administered the oath again.  When

15    you take the stand, you are under oath.  All right.  Is there

16    anything further?

17              MR. FROMAN:  Yes, Your Honor.  I had one further

18    question.  In regards to the final pretrial, would it benefit

19    the Court if the parties filed brief written responses to the

20    motions in limine ahead of the pretrial argument?

21              THE COURT:  Yes.  And I will limit you in page length

22    to three pages in terms of your response.

23              MR. FROMAN:  Okay.  I think that would be plenty, but

24    just from reviewing getting ready today, I noticed that none of

25    us filed any responses, and I thought it might be helpful to
```

1          the Court if we did.

2                    THE COURT:  I thought there were responses filed.

3                    MR. FROMAN:  Oh, I'm sorry.  I'm being corrected.

4                    THE COURT:  If there were no responses filed to any of

5          the motions in limine, then, yes, we do want those.

6                    MR. FROMAN:  Okay.  Then if I'm incorrect, I

7          apologize, Your Honor.

8                    MR. BARTON:  Yeah, there are responses.

9                    THE COURT:  Okay.  All right.  And then if there is

10         nothing else, then we are adjourned.

11             (Proceedings recessed at 4:38 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## C E R T I F I C A T E

2

3        I, LINDA SCHROEDER, do hereby certify that I am duly

4  appointed and qualified to act as Official Court Reporter for

5  the United States District Court for the District of Arizona.

6        I FURTHER CERTIFY that the foregoing pages constitute

7  a full, true, and accurate transcript of all of that portion of

8  the proceedings contained herein, had in the above-entitled

9  cause on the date specified therein, and that said transcript

10  was prepared under my direction and control.

11        DATED at Phoenix, Arizona, this 5th day of March,

12  2018.

13

14

15                                   s/Linda Schroeder
                                Linda Schroeder, RDR, CRR
16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**