UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Swisher Hygiene Franchise      )
Corp., et al.,                 )
                               )
            Plaintiffs,        )      CV-15-1331-PHX-DJH
                               )
        vs.                    )      Phoenix, Arizona
                               )      March 15, 2018
Troy Clawson and Teri          )          9:33 a.m.
Clawson, husband and wife,     )
et al.,                        )
                               )
            Defendants.        )
                               )
_____)

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS

MOTION HEARING - DAY 2

(Pages 64 through 175 and 216 through 220.)

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2     For the Plaintiffs:

3             Fisher & Phillips
              By: PAVNEET SINGH UPPAL, ESQ.
4                  SHAYNA HELENE BALCH, ESQ.
              3200 North Central Avenue, Suite 805
5             Phoenix, AZ  85012

6     For the Defendants:

7             BurnsBarton
              By: DAVID T. BARTON, ESQ.
8             45 West Jefferson Street, 11th Floor
              Phoenix, AZ  85003

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED  STATES  DISTRICT  COURT**

1

<u>INDEX OF WITNESSES</u>

2    <u>WITNESSES FOR THE</u>    <u>Direct</u>   <u>Cross</u>   <u>Redirect</u>   <u>The Court</u>
   <u>PLAINTIFFS</u>:

3

   BARTON, David       76
4    CARDWELL, Mark     110    139    168

5

6

<u>INDEX OF EXHIBITS</u>

7    <u>EXHIBIT NO.</u>:     <u>DESCRIPTION</u>:        <u>RECEIVED</u>:

8      5    Defendant Troy Clawson's First Supplemental
          Disclosure Statement dated 4/26/16     148
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1        THE CLERK:  Civil case 15-1331, Swisher Hygiene

2   Franchise Corporation versus Troy Clawson and others.  This is

3   the time set for day two of oral argument.  Please announce

4   your presence for the record.

5        MR. UPPAL:  Your Honor, good morning.  On behalf of

6   Swisher, Pavneet Singh Uppal of the law firm of Fisher &

7   Phillips.  With me is my colleague, Ms. Balch, also from Fisher

8   & Phillips.  Ms. Balch is not really staffed on this case, but

9   my associate, Alanna Brook, has a deposition in another matter,

10  so Ms. Balch is assisting me for this hearing.

11        THE COURT:  Good morning.

12        MR. BARTON:  Good morning, Your Honor.  David Barton

13  with the law firm of BurnsBarton here on behalf of the

14  defendants.  With me is Mr. Troy Clawson, who is one of the

15  defendants.

16        THE COURT:  Good morning.  Now, pending before the

17  Court is a motion to continue this proceeding owing to

18  Ms. Lancero's illness.  And we wish her a speedy recovery.  I

19  have considered the motion, and I've considered Mr. Uppal's

20  response.  And I find that at this juncture it is not necessary

21  to take a continuance.  I think we have a number of witnesses

22  that Mr. Uppal, at least two more from what I understand, he

23  intends to call.  Well, actually three more.  And I would

24  suggest that we proceed in the following way:  That, Mr. Uppal,

25  do you have Mr. Mark Cardwell here present?

1    MR. UPPAL:  Yes, Your Honor.

2    THE COURT:  And I would suggest that we proceed with

3 Mr. Cardwell.  And I don't think we should proceed with

4 Mr. Barton unless his co-counsel is available, and then we can

5 take up with Mr. Clawson next, and then we'll just see how far

6 we get this morning with those two witnesses.  And then we can

7 certainly reserve some time.  I understand that we are

8 rescheduled or have a schedule of next Thursday for this matter

9 as well, and we can continue in that regard, and hopefully she

10 will be fully recovered by then.  And you will have an

11 opportunity to examine her, Mr. Barton.

12    MR. BARTON:  Thank you, Your Honor.

13    THE COURT:  And also pending before the Court is the

14 defendants' motion for reconsideration regarding the testimony

15 and the Court's prior ruling with respect to the

16 attorney-client privilege.

17    I've reviewed the motion, and I will deny the motion.

18 I reread the testimony that was given.  And in my view, at

19 least by my reading of it -- and I carefully read it -- it does

20 not involve any sort of privileged communication.

21    The testimony was focused on what is in the public

22 record and publicly filed affidavits included.  And to the

23 extent that there were communications relating to Mr. Clawson,

24 the only communications that I see that were divulged were the

25 terms "words on a page".  And that information is relevant to

1 the proceeding.  It does not arise to the level of a privileged

2 communication.  In fact, much of what Ms. Lancero testified to

3 was included in the publicly filed response to the motions for

4 sanction.  And so given that, I'm going to deny the motion for

5 reconsideration.

6    But I will say, Mr. Uppal and Mr. Barton, given that

7 ruling, I'm going to remind you that there may come a time

8 where attorney-client privileged information may be

9 inadvertently disclosed.  And so I urge you both to do your

10 best to ensure that that does not occur, because should that

11 occur, then I will have to reconsider what I have previously

12 ruled twice now.

13    And so with that, let's proceed ahead.  Please call

14 your next witness.

15    MR. UPPAL:  Your Honor, I totally understand or I

16 believe I understand what you have stated with respect to the

17 witnesses that I may call today.  But I was planning on calling

18 Mr. Barton, and that's still how I would like to proceed.

19    THE COURT:  Well, I don't think at this juncture that

20 would be appropriate because Mr. Barton should have the

21 opportunity to have his co-counsel present, because of course

22 someone is going to possibly examine him, at least from the

23 perspective if there are issues that need to be clarified.

24    Now, Mr. Barton, I would suggest, however, that one

25 way to proceed, unless you vehemently disagree, is that if

1   Mr. Uppal does examine you, that there will be a transcript

2   available of your examination.  And we could proceed in that

3   fashion.  But -- And let me just leave it up to Mr. Barton.

4        MR. BARTON:  I'm not worried about testifying except

5   that, Your Honor, the Rules of Ethics, both the Rules of

6   Privilege and Rule 3.7, put us in a really difficult spot if

7   I'm going to be a witness in this case.  I cannot continue to

8   represent my client if I'm a witness in the case.  And so

9   that's what my concern is.  And provided that, if I understand

10  your prior order previously, which is that I do not have to

11  reveal attorney-client privileged information, I don't have a

12  problem testifying about my firm's conduct in this case.  I am

13  concerned, however, that in that case, I'm worried that Rule

14  3.7 would require us to withdraw as counsel.

15       THE COURT:  Well, Mr. Uppal, why don't you give me a

16  proffer as to what you intend to examine Mr. Barton about.

17       MR. UPPAL:  Your Honor, you'll recall that when we

18  were last here, Ms. Lancero claimed to have a fuzzy memory on a

19  variety of issues.  We are here representing to the Court,

20  arguing to the Court that defendants and their counsel have

21  engaged in a fraud on the Court.  You will recall that

22  Ms. Lancero conceded to Your Honor that even though she knew

23  the existence of the Southern Arizona Plan, despite her

24  knowledge of that fact, she represented to Your Honor, backed

25  up by a verification from defendant Troy Clawson, that the

1   Southern Arizona Plan was never formulated.

2          I then asked Ms. Lancero, well, when did David Barton

3   become aware of the existence of the plan, and she said I don't

4   know.  And I asked her, well, then, to get a definitive answer

5   on that, wouldn't I have to ask Mr. Barton.  And she

6   acknowledged, yes, that was the case.

7          I also asked her, I said, Ms. Lancero, you apparently

8   can't remember when Mr. Barton became aware of the existence of

9   the Southern Arizona Plan, but when he did become aware of it,

10  what was his reaction.  And you might recall that she waffled

11  back about four times between stating that he was surprised

12  or -- and wasn't surprised.

13         So the thrust of my examination of Mr. Barton would be

14  specifically, you know, when did he become aware of the

15  Southern Arizona Plan, what was his reaction, what remedial

16  measures or disciplinary measures, if any, did he institute

17  when he became aware of this fact, did he participate in the

18  fraud upon the Court.  And also Ms. Lancero was engaging -- I

19  believe Your Honor might have used the phrase wordsmithing on

20  certain issues.  And I intend to present those issues to

21  Mr. Barton.

22         So, for example, Ms. Lancero stated that even now when

23  she looks at the Southern Arizona Plan, it's just words on a

24  page.  I would like to put that to the partner who is in charge

25  of supervising Ms. Lancero, which is David Barton.  Does he

1    still, as he views this document, as to which lies have been

2    presented to the Court, does he still view this document as

3    just words on a page.

4         So those would be the topics on, in outline form, I

5    would like to depose Mr. Barton.  And he should be prepared to

6    testify as to this because on February 22nd I told Mr. Barton

7    in writing that I was going to call both him and Ms. Lancero to

8    the stand.  There's no surprise at all.  In fact, I have that

9    e-mail if the Court would like to see it.

10        THE COURT:  Well, I think, Mr. Uppal, you can ask

11   those first three questions.  I don't necessarily know that I

12   need to hear from Mr. Barton about what his view is with

13   respect to Ms. Lancero's characterization of the Southern

14   Arizona Plan.  But as -- it is relevant, Mr. Barton, in terms

15   of when you became aware and what you did and how you proceeded

16   with respect to the discovery of the Southern Arizona Plan.

17   It's relevant to these proceedings here.

18        I don't think that answering that question, unless

19   there's some unusual circumstance, will divulge any

20   attorney-client privilege.  And so I think with those three

21   areas of inquiry, very briefly, Mr. Uppal, then, Mr. Barton,

22   you can proceed.

23        MR. BARTON:  Your Honor, I'm more than happy to set

24   the record straight.  I'm more than happy to provide accurate

25   testimony about what happened.  I would ask the Court to

1    consider whether this side show has, quite frankly, become an

2    attack upon my firm.  And if so, if the question is whether my

3    firm acted appropriately, then I believe it's more appropriate

4    to conduct that hearing in a separate hearing in chambers.  It

5    has no relevance, what my firm's conduct, whether my firm

6    behaved appropriately, has no relevance to the issue here

7    before the Court, which is whether Mr. Clawson engaged in

8    perjury.

9            And so, quite frankly, if Mr. -- I welcome the

10   opportunity to set the record straight.  I can affirm to the

11   Court that we have done nothing wrong.  We have not engaged in

12   any fraud on the Court.  And I would very much look forward to

13   the opportunity, but I believe it's something that ought to be

14   handled separately as to my firm's conduct.  We're not on trial

15   here.  Our conduct is not a point in this motion.

16           The motion is addressed to whether Mr. Clawson

17   perjured himself.  If Mr. Uppal would like to suggest that

18   somehow my firm has engaged in a fraud upon the Court, then

19   that ought to be handled in a separate proceeding.

20           THE COURT:  Mr. Uppal.

21           MR. UPPAL:  Your Honor, it's all part and parcel of

22   the same thing.  We filed a motion for sanctions and for entry

23   of default.  And at that time we didn't believe or didn't know

24   that the BurnsBarton law firm had engaged in this fraud on the

25   Court, which fraud on the Court is clearly an exception to the

1    attorney-client privilege.

2              In response, Your Honor will recall, in response to

3    our motion for default and sanctions, defense counsel then

4    first stated that they had purportedly made a, quote-unquote,

5    mistake in representing in writing to Your Honor and to us as

6    the plaintiff that the Southern Arizona Plan was never

7    formulated.

8              That then put the misconduct of defense counsel at

9    issue.  In the reply brief, which Your Honor has read, we

10   stated very clearly they have waived the privilege.  They've

11   engaged in gross misconduct.  We asked for permission to depose

12   defense counsel.  We even listed the topics on which we would

13   propose to depose defense counsel.  And you have before you

14   just a couple of weeks ago a defense counsel, Ms. Lancero,

15   admitting on the stand under oath that even though she knew of

16   the existence of the Southern Arizona Plan, she still told you,

17   Your Honor, and us that that plan was never formulated.  It's

18   not any stretch to now have Mr. Barton answer about his firm's

19   role in what is clearly misconduct and part and parcel of fraud

20   upon the Court.

21             THE COURT:  Well, I think, as I mentioned, we can

22   either proceed in one of two ways.  Mr. Barton can take the

23   stand.  You can ask the three questions, the three initial

24   questions, and that's it.  And I don't necessarily want you to

25   get into an area of asking Mr. Barton about his opinions as to

1    what Ms. Lancero testified to.  There are three questions that

2    you initially stated you wished to ask:  When did he find out

3    about the plan?  What did he do?

4           And I can't recall what the third question was.

5           But beyond, that I'm going to limit you.  And if

6    you're not inclined to do that, then I ask you to call your

7    next witness, Mr. Uppal.

8           MR. UPPAL:  Your Honor, thank you.  I appreciate that.

9    So I would like to proceed with those three lines of inquiry,

10   putting Mr. Barton under oath right now.  But I'd ask a

11   clarification.  Is Your Honor limiting me to those three areas

12   of inquiry with Mr. Barton as of right now or forever?

13          THE COURT:  Well, as of right now, unless I hear more.

14   And remember, counsel, that this matter has been fully briefed

15   as well.  I have a full record on it already.  I've got

16   testimony.  And so this is supplemental, in my view, but it's

17   necessary in order to complete the record.

18          MR. UPPAL:  If I might just say one thing, Your Honor,

19   it has been fully briefed, but if I had not been allowed to

20   call Ms. Lancero as to which Mr. Barton vehemently objected and

21   raised arguments that were rejected by the Court and if the

22   Court had not found a waiver of the privilege, this Court would

23   never know that Ms. Lancero knew of the existence of a Southern

24   Arizona Plan when she told you, backed up by a verification,

25   that it didn't exist.  And I'm concerned that there might be

1    similar landmines with Mr. Barton.

2              MR. BARTON:  That is a gross misstatement of

3    Ms. Lancero's testimony.

4              THE COURT:  Well, you let me be the judge of that, and

5    so let's proceed.

6              Please come forward and be sworn, Mr. Barton.

7              THE CLERK:  Please state your name and spell your last

8    name for the record.

9              THE WITNESS:  David Barton, B-a-r-t-o-n.

10             DAVID BARTON, PLAINTIFFS' WITNESS, SWORN

11                        DIRECT EXAMINATION

12   BY MR. UPPAL:

13   Q.  Mr. Barton, good morning.

14   A.  Good morning.

15   Q.  Sir, you are counsel for defendants ACS and Troy Clawson,

16   correct?

17   A.  That is correct.

18   Q.  And you are a senior partner at the law firm of

19   BurnsBarton?

20   A.  I am.

21   Q.  In fact, you're the named partner?

22   A.  I am one of the named partners.

23   Q.  And who is the other named partner?

24   A.  Christine Burns.  I don't -- I'm not sure this is one of

25   the questions you're supposed to ask me, but that's fine.

1   Christine Burns.

2   Q.  All right, sir.  And just to lay some context here, the

3   other attorney working as defense counsel on this case

4   representing the defendants is your colleague and co-counsel,

5   Katya Lancero?

6   A.  That is correct.  She's a third-year associate and a

7   graduate of the University of Arizona and did not anticipate

8   testifying last time.

9   Q.  Right.  Well, that's interesting, since you're saying she

10  didn't anticipate testifying.  Didn't I tell you in writing and

11  didn't I tell both you and Ms. Lancero in writing on February

12  22, point blank, that I would be calling you and her as

13  witnesses at the last evidentiary hearing?

14  A.  You did.  And I told you we would not be testifying.

15          THE COURT:  All right.  Let's proceed.

16  Q.  (BY MR. UPPAL)  Mr. Barton, before I get into the three

17  areas of inquiry, just want to make sure that we're in

18  agreement about something.  In your role as a partner on this

19  case for defense counsel, is it correct that you were

20  responsible for managing and supervising Ms. Lancero?

21  A.  Yes, I am.

22  Q.  In fact, you have an ethical duty to manage the associate

23  on the case, right?

24  A.  I do.

25  Q.  Sir, would you please turn to exhibit -- You have an

78

1    exhibit binder before you, correct?

2    A.  I do.

3    Q.  Turn to Exhibit 11, which has already been admitted.  It's

4    defendants' verified response in opposition to plaintiffs'

5    motion for sanctions.  Do you have that before you?

6    A.  Yes, I do.

7    Q.  Okay.  Sir, under whose signature was this verified motion

8    filed with the Court?

9    A.  My signature.

10   Q.  And that makes you responsible for it, right?

11   A.  Yes, it does.

12   Q.  On Page 3, please read along with me.  On Page 3, turn your

13   attention to Lines 24-26.  Do you see where it says, "Although

14   Clawson's e-mail to Zall stated that he would work on Southern

15   Arizona tomorrow, Clawson never actually ended up formulating a

16   plan for Southern Arizona"?

17   A.  I see that.

18   Q.  I read that correctly?

19   A.  You did.

20   Q.  That's a false statement, isn't it?

21   A.  It is not.

22   Q.  As you sit here today, you're still claiming that

23   statement's not false?

24   A.  It was true when made.

25   Q.  Is it true today?

1   A.   One might argue about the linguistics, but, yes, it could

2   be true today.   Mr. Clawson still believes it's true today.

3   Q.   How about you?

4   A.   I do believe that there's a way it could be read as true.

5   Q.   Great.   So in that case, let's turn to the Southern Arizona

6   Plan itself.   In your exhibit binder, turn to Exhibit 5.   And

7   then Exhibit 5 is Defendant Troy Clawson's first supplemental

8   disclosure statement.   Attached to that -- Excuse me.   I

9   referred you to the wrong document, sir.

10          Turn to Exhibit 12, which is plaintiffs' controverting

11   statement of facts in opposition to defendants' motion for

12   partial summary judgment, which was filed on February 9, 2017,

13   at docket 89.

14          At Exhibit A you will find Accurate Southern Arizona

15   Plan.   Let me know when you've found it, sir.

16   A.   I see a document entitled Accurate Southern Arizona Plan.

17   Q.   Turning to the next page, do you see the Accurate Northern

18   Arizona Plan?

19   A.   I do.

20   Q.   Mr. Barton, are you and your clients claiming that the

21   Accurate Northern Arizona Plan was never formulated?

22   A.   We are not.

23   Q.   Because the Accurate Northern Arizona Plan looks formulated

24   to you, doesn't it?

25   A.   The Accurate Northern Arizona Plan?

1   Q.  Yes.

2   A.  The Accurate Northern Arizona Plan was formulated, yes.

3   Q.  I see.  And now that you have the Accurate Southern Arizona

4   Plan before you, Mr. Barton, under oath you're still claiming

5   that that doesn't look like a formulated document?

6   A.  Without reviewing what my client has told me about the

7   Southern Arizona Plan -- and he will testify about it

8   himself -- I can say, yes, it was never formulated.

9   Q.  Well, help me out here.  The Accurate Southern Arizona Plan

10  is in writing, right?

11  A.  Yes, it is.

12  Q.  It consists of three pages, right?

13  A.  That's correct.

14  Q.  And defendant Clawson created this plan, right?

15  A.  I believe he did.

16  Q.  Wait a minute.  You believe?  You don't know?

17  A.  Well, I wasn't there when he created it, but I believe he

18  did.

19  Q.  Are you really arguing the point of whether you're --

20          THE COURT:  Mr. Uppal, let's move forward, please.

21  Q.  (BY MR. UPPAL)  What's the title that your client defendant

22  Clawson gave to this document?  He called it a plan, didn't he?

23  A.  Accurate Southern Arizona Plan.

24          And I would direct your attention to Exhibit 41.

25  Q.  That's okay, Mr. Barton.

1    A.  You asked a question.

2    Q.  You answer my questions please.

3    A.  Exhibit --

4            THE COURT:  All right.  Mr. Barton, we know how this

5    proceeds.

6    Q.  (BY MR. UPPAL)  Mr. Barton, go to Exhibit 11 that I

7    referred to you previously, Page 3.  I want you to have it

8    before you.  Again, on Page 3 at the bottom of the page it says

9    that -- I'm paraphrasing here -- Mr. Zall never formulated the

10   Southern Arizona Plan, right?

11   A.  No.  It says, "Clawson's e-mail to Zall stated that he

12   would work on Southern Arizona tomorrow.  Clawson never

13   actually ended up formulating a plan for Southern Arizona."

14   Q.  All right.  When did you first acquire any knowledge of

15   whether or not Mr. Clawson ended up formulating a plan for

16   Southern Arizona?

17   A.  We had spoken with him about it when the Northern and

18   Phoenix plan were revealed in April, 2016.

19   Q.  All right.  So let's back up for a minute.  In this case

20   your clients first filed a sworn affidavit stating that

21   Mr. Clawson had never discussed any clients of Swisher with

22   ACS, right?

23   A.  Your Honor, I don't believe that's one of the questions I'm

24   here to testify about.

25           THE COURT:  Well, you can answer the question.

1      THE WITNESS:  Oh.  Repeat the question.

2  Q.  (BY MR. UPPAL)  Did you not understand the question?

3  A.  I objected, so I don't remember the question precisely.

4  Q.  Isn't it correct -- and I can put it before you, but I'm

5  trying to speed up your testimony -- isn't it correct that

6  initially your clients filed an affidavit under oath under

7  penalty of perjury with the Court representing to the Court

8  that Mr. Clawson had never discussed any Swisher customers with

9  ACS?

10  A.  In Exhibit 1, which is the declaration of Mr. Clawson that

11  was filed in response to the application for preliminary

12  injunction in August of 2015, my understanding is that the

13  attorneys Quarles & Brady, who represented ACS, asked

14  Mr. Clawson to sign a declaration in response to the

15  application for preliminary injunction.

16      In one of those paragraphs Mr. Clawson was asked to

17  talk about whether he had taken any what are called the CWCs,

18  working capital calculators.  He said he had not.

19  Q.  Mr. Barton, did you not understand my question?

20  A.  I did.  I'm answering your question.

21  Q.  I'll withdraw the question since you're going on to other

22  topics.

23      On Exhibit 1 turn to Paragraph 17.

24  A.  Okay.

25  Q.  This is in fact Exhibit 1 is a sworn affidavit signed by

1    Troy Clawson, right?

2    A.  That is correct.

3    Q.  At the end of Paragraph 17 do you see where it says, "As

4    noted above, I have not solicited Swisher customers either

5    before or after I left Swisher, nor have I identified any

6    Swisher customers that ACS should go after"?  It says that,

7    right?

8    A.  I see that in a paragraph dealing with the working capital

9    calculators.

10   Q.  So is that a yes?

11   A.  Yes.  It says that.

12   Q.  I want to focus your attention on the phrase "nor have I

13   identified any Swisher customers that ACS should go after."

14   A.  I see that.

15   Q.  That's a false statement, right?

16   A.  It is a statement that was incorrect.

17   Q.  Okay.  When did you and your firm first learn that

18   Mr. Clawson's sworn statement that he had not identified

19   Swisher customers that ACS should go after was, as you put it,

20   incorrect?

21   A.  April, 2016.

22   Q.  Do you have a more specific date or just the month?

23   A.  Give me just a second.

24          If you look at Exhibit 4, this is an e-mail that Katya

25   Lancero sent to you.  It's actually from me.  It explains that

BARTON - DIRECT

1   that statement is inaccurate, and it explains that we're going

2   to correct it.  And that was the e-mail dated April 26.  So my

3   best recollection is that it would have happened just prior to

4   that.

5   Q.  You said it's -- I think you said it's really from me or

6   it's from me.  What did you mean by that?

7   A.  Well, if you look at it, it's "Dear Pavneet," and it's

8   signed by me.

9   Q.  I see.  So Ms. Lancero forwarded the e-mail, but you

10  drafted it?

11  A.  I believe I did.

12  Q.  Okay.  So in this e-mail that you're referring to of April

13  26, 2016, you reference that an amended affidavit would be

14  filed, right?

15  A.  That is correct.

16  Q.  Okay.  How many days before this April 26, 2016, e-mail did

17  you learn that the statement by Mr. Clawson under oath "nor

18  have I identified any Swisher customers that ACS should go

19  after" was incorrect?

20  A.  I don't know.  It would have been soon before this.

21  Q.  Well, but, sir, that's subjective.  I don't know what you

22  mean by soon.  You might mean three months.  You might mean six

23  months.  Give me your best estimate.

24  A.  My obligation under the rules of conduct is to disclose any

25  new information within 30 days.  I know it was definitely less

1    than 30 days before this.  I believe it was within the week,

2    but I'm not 100 percent certain.

3    Q.  But you might have sat on this information for 30 days?

4    A.  Absolutely not.  When we learned about it, we wanted to

5    correct it.

6    Q.  All right.  So is it a -- is it your testimony that, to the

7    best of your knowledge, within the week prior to April 26,

8    2016, you learned of the incorrect nature of Mr. Clawson's

9    sworn affidavit that he filed with the Court?

10   A.  That's my best recollection.

11   Q.  How?  How did you learn?  Who told you?

12   A.  I believe it was the attorneys from Quarles & Brady.

13   Q.  Name them.

14   A.  Craig O'Loughlin.

15   Q.  Now, you've identified a name.

16          THE COURT:  Who is that?  I'm sorry.

17          THE WITNESS:  Craig O'Loughlin.

18   Q.  (BY MR. UPPAL)  Now you've identified a name, but you still

19   haven't told me how did you learn?  What was said to you?

20   Repeat the words that were said to you by Mr. O'Loughlin or, I

21   should say, attorney O'Loughlin that conveyed the knowledge to

22   you for the first time that Mr. -- that defendant Clawson's

23   sworn affidavit was incorrect.

24   A.  I can't repeat the words.  I don't remember them precisely.

25   Q.  That's fine.  You're here under oath, so do the best that

1    you can in terms of telling me and telling the Judge what

2    Mr. O'Loughlin told you.

3    A.   I cannot put words in Mr. O'Loughlin's mouth.   What I can

4    tell you is that I learned that in the process of discovery,

5    Mr. Zall, who is the president of Accurate, had turned over

6    some documents to Mr. O'Loughlin that are attached to my

7    e-mail, I believe.   No, they're not.   They are attached to the

8    disclosure statement.   I apologize.   Let me make sure that's

9    offered.

10           They're attached to the disclosure statement, which is

11   Exhibit 5.   Mr. O'Loughlin had learned that Mr. Zall had turned

12   over to him this e-mail dated June 11.   And in looking at that

13   document, Mr. O'Loughlin realized that that might contradict

14   the declaration they had prepared for Mr. Clawson to sign

15   earlier.

16   Q.   All right.   So in April of 2016, did you also learn that

17   Mr. Clawson had started some kind of plan for Southern Arizona?

18   A.   We knew what the e-mail said, which is "I'll work on

19   Southern Arizona tomorrow."   That's Exhibit 5, Page 2.

20   Q.   Right.   But my question to you is in April of 2016, did you

21   also learn that Mr. Clawson had at least started on the

22   Southern Arizona Plan?

23   A.   No.

24   Q.   When?   I'm looking for a date.   When did you learn for the

25   first time, when did you first acquire knowledge of the

1    existence of a Southern Arizona Plan?

2    A.  If you'll turn back to Exhibit 40 -- 39.

3    Q.  I'm sorry.  Say that again.

4    A.  Exhibit 39.

5             THE COURT:  I have no Exhibit 39.

6             THE CLERK:  I think that's a defendants' exhibit,

7    correct?

8             THE WITNESS:  Yes.

9             THE CLERK:  It's in the blue notebook behind you.

10            THE WITNESS:  Sorry, Your Honor.

11   Q.  (BY MR. UPPAL)  Mr. Barton, I too do not have an Exhibit

12   39.

13   A.  It's the new exhibits that I handed you this morning.

14   Q.  Okay.  So it's in a batch of exhibits that you've just

15   marked today?

16   A.  Yes.  My associate Katya Lancero did not have the benefit

17   of these exhibits when she was here testifying.

18            THE COURT:  All right.  I think the question is when

19   did you first learn of the existence of the plan.  Can you

20   answer that question?

21            THE WITNESS:  I can.  January 13th, 2017.  Actually

22   whenever I received the letter dated January 13th, 2017.

23   Q.  (BY MR. UPPAL)  All right.  So your testimony is that you

24   first learned of the existence of the Southern Arizona Plan

25   when I wrote you the letter on January 13, 2017, the same

UNITED STATES DISTRICT COURT

1    letter that you've marked as your Exhibit 39?

2    A.    That is correct.  If you look at the second page, the

3    penultimate paragraph, you disclosed to us for the first time

4    that your ESI expert had turned up a document entitled the

5    Southern Arizona Plan.  And if you look at my correspondence

6    back to you, which is Exhibit 20, your Exhibit 20 -- Did I lose

7    my mike?

8              I'm sorry.  Can you hear me?

9              THE CLERK:  You might have --

10             THE WITNESS:  Sorry.  I'm pushing the pause.

11             If you look at my exhibit in response back to you,

12   which is Exhibit 20, on Page 2 of my letter back to you dated

13   January 20th of 2017, I will read that paragraph.  "Swisher

14   further alleges that it located a file titled Accurate Southern

15   Arizona Plan in the data produced by Mark Cardwell.  While the

16   document may be entitled Accurate Southern Arizona Plan, you

17   have stated nothing about its content.  Moreover, we have been

18   unable to locate this title in the data produced by Mark

19   Cardwell.  Please indicate whether you found this title --

20   where you found this title and if it is anything more than a

21   title."

22   Q.    (BY MR. UPPAL)  Great.  Thank you, Mr. Barton.  So I just

23   want to make sure that, you know, there's no issue with respect

24   to semantics or word choice or a mistake.  I'm not only asking

25   you when you first acquired knowledge of the Southern Arizona

1   Plan that has been filed with the Court.  My question's broader

2   than that.  I'm asking you when did you first acquire any

3   information or knowledge or inkling of the fact that

4   Mr. Clawson may have started on some kind of plan for Southern

5   Arizona?

6   A.  About this time, January 13th to 20th of 2017.

7   Q.  What do you mean about this time?

8   A.  Ms. Lancero had a conversation.  I'm not going to reveal

9   the details of that conversation.  Mr. Clawson can testify

10  about that, about what there was with regard to a Southern

11  Arizona Plan.

12  Q.  Your Honor, this is what you've already ruled on that's

13  been waived.

14          So are you saying, sir, that Ms. Lancero at some point

15  told you that there was some kind of plan for Southern Arizona?

16  A.  Do I need to reveal that conversation, a conversation

17  between counsel?

18          THE COURT:  Well, I think you can answer the question

19  as to what she told you about the existence of a plan, what she

20  discovered.

21          THE WITNESS:  What I can tell you is that she had

22  discovered that there was a plan -- there may have been a plan

23  but that she did not believe it, in her understanding, it had

24  not been finished or completed.  It may have been started but

25  that there was no specific recollection of it, and it had been

90

1    forgotten.

2    Q.  (BY MR. UPPAL)  That's what Ms. Lancero told you, right?

3    A.  That is correct.

4    Q.  Where did she tell you this?  At your office at

5    BurnsBarton?

6    A.  That is correct.

7    Q.  Did she tell you in an e-mail or face to face?

8    A.  Face to face.

9    Q.  And have you now told the Court everything that Ms. Lancero

10   told you on this topic?

11   A.  I don't believe so, because I don't remember the entire

12   conversation.

13   Q.  Did you make notes of it?

14   A.  I did not.

15   Q.  Would you have a billing entry on it?

16   A.  I might.

17   Q.  And that billing entry then would tell you the date on

18   which you had this conversation with Ms. Lancero, right?

19   A.  Possibly.

20   Q.  Why haven't you looked at that billing entry?

21   A.  I see no need to look at that billing entry.  I have

22   correspondence.

23   Q.  Even though you knew that you were going to be here

24   under oath?

25   A.  That's correct.

BARTON - DIRECT

1  Q.  Okay.  So when?  What is the date on which Ms. Lancero

2  conveyed this information to you?

3  A.  I don't know exactly.  Sometime either after or around

4  January 20th, 2017.

5  Q.  January 20th?

6  A.  2017.  That's correct.

7  Q.  So let me get this straight.  On January 13, 2017, I wrote

8  you a letter informing you of the fact that our ESI expert had

9  found something that looked like an Accurate Southern Arizona

10 Plan, right?

11 A.  Something titled Accurate Southern Arizona Plan.

12 Q.  Okay.  Did that -- Did that spark any action on your part?

13 A.  Yes.

14 Q.  Okay.  What did you do?

15 A.  We called Troy Clawson.

16 Q.  About what?

17 A.  To find out what this was.

18 Q.  So did you ask Mr. Clawson anything like, hey, Troy, did

19 you create or draft or start or make or do anything in

20 connection with a Southern Arizona Plan?

21 A.  I did not call Mr. Clawson.  Ms. Lancero did.

22 Q.  Yet she forgot about that when she was testifying on the

23 stand, didn't she?

24 A.  That's not what I heard her say.

25 Q.  How do you know Ms. Lancero made this call to Troy Clawson?

1    A.   Because she reported on it to me.

2    Q.   When?

3    A.   As I said, sometime around January 20th.

4    Q.   So is it your testimony that my letter to you of January

5    13, 2017, triggered your co-counsel, Ms. Lancero, to call Troy

6    and ask him about the Southern Arizona Plan?

7    A.   Yes.

8    Q.   Did you direct her to do so?

9    A.   I don't recall if I did or if she did it on her own.

10   Q.   Did she tell you that Troy Clawson, well before my letter

11   of January 13, 2017, had already told her that he had started a

12   Southern Arizona Plan?

13   A.   She did not.

14   Q.   But you now know that, right?

15   A.   Pardon me?

16   Q.   You now know that, don't you?

17   A.   Know that what?

18   Q.   Were you here during Ms. Lancero's testimony?

19   A.   I was.

20   Q.   Do you recall Ms. Lancero's testimony on the subject of

21   whether she had any knowledge of the Southern Arizona Plan?

22   A.   I do.

23   Q.   And do you recall Ms. Lancero testifying that she had in

24   fact discussed the existence of the Southern Arizona Plan with

25   defendant Troy Clawson?

BARTON - DIRECT

1    A.   I do recall her saying that.

2    Q.   And that Mr. -- Do you also recall her testifying that

3    Mr. Clawson told her that it was words on a page?

4    A.   I remember her saying that it had not been -- in a

5    conversation, which she didn't remember when it happened, that

6    Mr. Clawson had told her that it had not been finished or

7    completed, that he had forgotten about it, and it was just

8    words on a page or something to that effect.

9    Q.   Right.  But that conversation occurred -- That conversation

10   between Ms. Lancero and defendant Clawson occurred before my

11   letter --

12   A.   That's not true.

13   Q.   -- of January 13, 2017, didn't it?

14   A.   That is not true.

15   Q.   How do you know that's not true?

16   A.   As I've just described for you, we didn't know about the

17   Southern Arizona Plan until your letter of January 13, 2017.

18   Q.   We.  So now you're including both yourself and Ms. Lancero?

19   A.   That is correct.  To our understanding, before this date,

20   we didn't think there ever was a Southern Arizona Plan.

21        MR. UPPAL:  Your Honor, that's contrary to what

22   Ms. Lancero testified, so I'd like a chance to call her again.

23        THE WITNESS:  I'm more than happy to put her on the

24   stand.

25        THE COURT:  You're going to have an opportunity to

1   redirect.

2   Q.   (BY MR. UPPAL)   All right.   So, in any event, putting aside

3   when Ms. Lancero first acquired knowledge --

4          THE COURT:   And, Mr. Uppal, you've gone down this path

5   already, exhaustively, I might add, so let's move on.

6          MR. UPPAL:   All right, Your Honor.

7   Q.   (BY MR. UPPAL)   After Ms. Lancero, in response to my letter

8   of January 13, 2017, had a conversation with Mr. Clawson about

9   his making or creating a starting -- or starting a plan for

10  Southern Arizona, what did Mr. Clawson say?

11  A.   I'm not going to reveal my client's testimony.

12         MR. UPPAL:   Your Honor, this has been waived.

13         THE COURT:   You'll have an opportunity to examine

14  Mr. Clawson.

15         MR. UPPAL:   Your Honor, I totally understand that, but

16  I think one of the points here is not just Mr. Clawson's fraud

17  but, rather, counsel's participation in the fraud.   And that is

18  an exception to the privilege, and Mr. Barton should not on one

19  hand be able to claim that it was a mistake of counsel yet not

20  answer these questions.

21         THE WITNESS:   We didn't say it was a mistake of

22  counsel.   You're misconstruing our response to your second

23  motion for sanctions.

24         MR. UPPAL:   Mr. Barton, there's no question to you.

25         THE COURT:   Let's move on.   You can ask Mr. Clawson.

95

1              MR. UPPAL:  Your Honor, on this issue, I will

2     certainly abide by your ruling, but are you ruling that what

3     Mr. Clawson said in response to Ms. Lancero's inquiry about the

4     existence of the Southern Arizona Plan is -- cannot be

5     answered?

6              THE COURT:  Well, I think it's -- I don't think it's a

7     question that Mr. Barton can answer.  You can reask

8     Ms. Lancero.

9              MR. UPPAL:  Well, Your Honor, I don't want to try your

10    patience, but let me try rephrasing the question.

11    Q.   (BY MR. UPPAL)  What did Ms. Lancero tell you that

12    Mr. Clawson had informed her after she asked him about the

13    existence of the Southern Arizona Plan?

14    A.   I believe you've already asked me that question, and I

15    believe I've already described that conversation.  She told me

16    it had not been finished; that if it did exist, it was just

17    some words on a page or something to that effect; that it had

18    been started but that Mr. Clawson had forgotten about it; and

19    that it hadn't, in her mind or his mind, been formulated or

20    finished.

21    Q.   And what you just testified about, Ms. Lancero conveyed

22    this information to you after January 13 of 2017?

23    A.   That is correct.

24    Q.   So did this cause you to search for the Southern Arizona

25    Plan?

1   A.  At this point in the proceeding the -- Mr. Clawson's

2   computer on which this plan had been created was already in

3   your expert's possession.  We didn't -- So we did not because

4   you had indicated that you had found it, and so my response was

5   to ask you what did you find.

6   Q.  Did your firm -- So that's a no, right?  You didn't do

7   anything to look for it on your own?

8   A.  I could not because you had the computer.  Your expert had

9   the data.

10  Q.  We had an image of the computer.

11  A.  That's true.  I guess we could have.  You're right.

12  Q.  So just so we have a clear record, you could have searched

13  for the Southern Arizona Plan, but you chose not to?

14  A.  We asked you what you'd found, yes.  The way the

15  discovery -- If you look back at --

16  Q.  Mr. Barton, all I'm asking you is whether you searched for

17  the Southern Arizona Plan, given that you had Mr. Clawson's

18  computer.

19  A.  No, because given the posture --

20  Q.  That's all I need.

21  A.  -- of the litigation at that time, it didn't make sense to

22  do so.

23  Q.  Did you ask Mr. Clawson if he had deleted the Southern

24  Arizona Plan?

25  A.  I did not.  I don't know if Ms. Lancero did or not.

1    Q.   That didn't seem important to you, to ask or to have

2    Ms. Lancero ask or to have any number of attorneys in your firm

3    ask your own client, the defendant, whether he had deleted the

4    Southern Arizona Plan?

5    A.   I didn't say it wasn't important, and I didn't say we

6    didn't ask.

7    Q.   So it wasn't --

8    A.   I don't know if it was asked.

9    Q.   So whether or not Mr. Clawson had deleted the Southern

10   Arizona Plan was important?

11   A.   Pardon?

12   Q.   So is it correct that whether or not Mr. Clawson had

13   deleted the Southern Arizona Plan was important?

14   A.   Was it important?

15   Q.   Yes.

16   A.   I guess I don't understand the question.   Important to

17   what?

18   Q.   Since you don't understand my question, let me rephrase it.

19   Is it significant, would it be of interest to the Court, would

20   it be of interest to the jury, would it be of interest to

21   Swisher whether or not your client, defendant Clawson, had

22   deleted the Southern Arizona Plan?

23   A.   I have no idea what would be of interest to Swisher.   I can

24   tell you that certainly I wanted to understand what the plan

25   was, where it existed, when it had been created.   I wanted to

1   understand what happened.

2   Q.  Well, since you wanted to understand all this, certainly

3   you must have undertaken some efforts directly or indirectly to

4   find out whether the Southern Arizona Plan was deleted, didn't

5   you?

6   A.  I think you'd already told us, didn't you, it had been

7   deleted?  Doesn't your letter to me tell you that you found

8   deleted data on the Southern Arizona Plan?

9   Q.  Mr. Barton, are you not understanding my question?

10  A.  I didn't need to ask.  It was already confirmed it had been

11  deleted.

12  Q.  Did you --

13  A.  And Mr. Clawson will testify about that.

14          THE COURT:  All right.  Let's stop please.  Let's let

15  one person speak at a time.

16      (Cell phone messaging sound.)

17          MR. UPPAL:  Your Honor, I apologize for that.

18  Q.  (BY MR. UPPAL)  The question for you, Mr. Barton, is did

19  you confirm with your own client, defendant Clawson, whether he

20  had deleted the Southern Arizona Plan?

21  A.  I did not, and I don't know if Ms. Lancero did.

22  Q.  So as far as you know, no one at your firm ever checked

23  with defendant Clawson regarding whether he deleted the

24  Southern Arizona Plan?

25  A.  I don't know.

1    Q.  And yet as of this time, you knew that Mr. Clawson had not

2    followed your instruction to image his computer; isn't that

3    right?

4    A.  That's not true.

5    Q.  Do you remember Ms. Lancero testifying under oath that at

6    the inception of the case or near the inception of the case,

7    your firm instructed defendant Clawson to image his computer?

8    A.  That is correct.

9    Q.  And you folks knew that he had not imaged his computer?

10   A.  I don't know that that's true.

11   Q.  What did you do, Mr. Barton, to follow up on your

12   instruction to defendant Clawson to image his computer?

13   A.  We told Mr. Clawson not to delete anything.  We told him to

14   save everything on his computer.  We told him that his computer

15   would probably be turned over as part of the production in this

16   lawsuit.  And we turned that computer over to your expert to be

17   imaged and searched.  We also asked Mr. Clawson to make his own

18   best effort to create an image of his computer.

19       (Cell phone ringing.)

20   Q.  Were you finished with your answer, Mr. Barton?

21   A.  I am.

22   Q.  My question to you once again --

23            THE COURT:  He answered the question, Mr. Uppal.

24   Let's move on.

25   Q.  (BY MR. UPPAL)  When did you find out that Mr. Barton had

1   violated your instruction to image his computer?

2   A.  Mr. Barton didn't violate my instructions.  I didn't know

3   that Mr. Clawson had ever violated my instructions.

4   Q.  When did you find out?  When did you first acquire

5   knowledge of the fact that Mr. Clawson had not followed,

6   complied with, adhered to your instruction to have his computer

7   imaged?

8   A.  I'm not going to reveal conversations with my client on

9   that issue.

10  Q.  Your Honor, once again this is -- goes right to spoliation

11  and fraud on the Court, and I believe -- I don't want to speak

12  for the Court.  My understanding of the Court's ruling was

13  privilege has been waived to these issues.

14  A.  Mr. Clawson can testify about that.

15  Q.  I want to ask you because I'm interested in your

16  participation.

17  A.  I don't want to reveal my client's conversations.

18          THE COURT:  Mr. Clawson can answer.

19  Q.  (BY MR. UPPAL)  Your Honor, are you ruling that I cannot

20  get this information from -- because I -- Mr. Clawson actually

21  cannot answer when Mr. Barton first became aware of the fact

22  that the computer had not been imaged.  Only Mr. Barton can

23  testify as to that.

24          THE COURT:  Can you answer the question?

25          THE WITNESS:  I can.

1          THE COURT:  When did you learn?

2          THE WITNESS:  Last week.

3    Q.  (BY MR. UPPAL)  Okay.  So last week you learned for the

4    first time that Mr. Clawson had not followed your instruction

5    to image his computer?

6    A.  No, that's not true.

7    Q.  I must not be understanding.

8    A.  You're not.

9    Q.  When?  I'm looking for a date.  I'm looking for a time.

10   A.  Last week is the first time I understood that Mr. Clawson

11   was unable to image his computer as we had requested.

12   Q.  From the inception of the case when you first told

13   Mr. Clawson to image his computer to last week, did you take

14   any steps to follow up and check whether the computer had been

15   imaged?

16   A.  I personally did not.

17   Q.  Did anyone at your firm do that?

18   A.  Yes.

19   Q.  Who?

20   A.  Katya Lancero.

21   Q.  What steps did she take to follow up on whether or not

22   Mr. Clawson's computer had been imaged?

23   A.  We retrieved the computer, and we made it available to your

24   expert in September of 2016.

25   Q.  How does that constitute Mr. Clawson imaging the computer?

BARTON - DIRECT

1    A.  You have to understand this is Mr. Clawson's personal

2    laptop.  It's not the Swisher computer that he used and turned

3    over back to the company at the time he left.  We didn't --

4    Q.  Mr. Barton, that seems like an argument.  I'm asking you a

5    fact.

6    A.  I'm explaining, answering your question.  Mr. Clawson's

7    personal laptop did not become even relevant to this case until

8    you asked for it, and we agreed to produce it at that time.

9    Q.  So discovery was never served on you for electronically

10   stored information?

11   A.  My understanding that the request for the electronically

12   stored information began in earnest in about August of 2016.

13   And we produced Mr. Clawson's laptop to you once we agreed upon

14   a protocol September -- Let me grab the exhibit so I don't get

15   it wrong.

16   Q.  That's okay, Mr. Barton.  I want to go to a different

17   question.

18   A.  It's Exhibit 17.

19   Q.  Mr. Barton --

20           THE COURT:  All right.  There's no question before

21   you, Mr. Barton.

22   Q.  (BY MR. UPPAL)  Mr. Barton, turn to Exhibit 2.

23   A.  Okay.

24   Q.  Do you see that Exhibit 2 is plaintiff Swisher

25   International, Inc.'s first set of requests for production upon

1    defendant Troy Clawson?

2    A.  I see that.

3    Q.  And do you see that this set of production requests was

4    served on February 22nd, 2016, by hand delivery upon your firm?

5    A.  I see that.

6    Q.  Do you see the certificate of service lists service by hand

7    delivery upon yourself, David Barton, and Katya Lancero, right?

8    A.  I see that.

9    Q.  Turn to your request for production number seven.  And

10   without any commentary, just read it.  That's all I want you to

11   do.  Read production request number seven.

12   A.  "All documents including electronic documents or tangible

13   things in your possession, custody, or control bearing the name

14   Swisher and/or Pro-Clean."

15   Q.  Thank you.  Now, Mr. Barton --

16   A.  I don't remember a motion to compel on that issue.

17   Q.  Thanks for the commentary.

18            THE COURT:  All right.  There's no question before

19   you, Mr. Barton.

20   Q.  (BY MR. UPPAL)  Mr. Barton, we'll get through this quicker

21   if you just answer my question, sir.

22            THE COURT:  All right.  You let me control.

23            MR. UPPAL:  Absolutely, Your Honor.

24            THE COURT:  Please.

25   Q.  (BY MR. UPPAL)  I apologize.  Mr. Barton, how many years

1   have you been practicing law?

2   A.  25 or so.

3   Q.  And how many years have you been a partner?

4   A.  I'd have to look.

5   Q.  Well, you're a named partner at BurnsBarton, right?

6   A.  That is correct.

7   Q.  And previously you were a partner at Quarles & Brady,

8   right?

9   A.  That is correct.

10  Q.  And, Mr. Barton, on your Web site for BurnsBarton, you hold

11  yourselves out -- hold yourself out as a competent, experienced

12  lawyer, right?

13  A.  Your Honor, may I object to this line of questions?

14          THE COURT:  I'm going to find it irrelevant.  Let's

15  move on, Mr. Uppal.

16          MR. UPPAL:  Your Honor, if you would bear with me for

17  one minute, because --

18          THE COURT:  I'm not going to, Mr. Uppal.  Let's move

19  on.

20  Q.  (BY MR. UPPAL)  Mr. Barton, as an experienced lawyer, isn't

21  it correct that you know that when a document is deleted, the

22  more time that goes by, the higher the likelihood that that

23  document will be modified or become unavailable?

24  A.  I know that we have the documents at issue in this case.

25  They were not overwritten as you're suggesting.

1    Q.  That's not my question to you, Mr. Barton.  Isn't it true

2    that you know, based on your experience as an attorney, that

3    when a document is deleted, the more time that goes by, the

4    more difficult and unlikely it will be that that document will

5    be able to be retrieved?

6    A.  What I know, based upon what I've heard experts say, is

7    that once a document is deleted, it goes to someplace on the

8    computer that is not actually deleted, that it's still there.

9    And that as additional documents are stored, there is a

10   possibility that those additional documents could overwrite the

11   data at issue.  That didn't happen in this case.

12   Q.  And the longer the amount of time that a document has been

13   deleted, the higher the probability that the document will be

14   overwritten, right?

15   A.  I don't know that.

16   Q.  When you learned of the existence of the Southern Arizona

17   Plan, what did you do?

18   A.  I wrote you and asked for clarification.

19   Q.  What else did you do, if anything?

20   A.  I had a conversation with Katya Lancero in which she

21   reported to me about her conversation with Mr. Clawson.

22   Q.  Did you do anything else?

23   A.  I'm sure we did a lot of things.  I don't know what else

24   you're talking about.

25   Q.  I'm just asking you a question.  I'm trying to give you a

1    chance to tell the Court everything that you did after learning

2    of the existence of the Southern Arizona Plan.

3    A.  If you're suggesting that we didn't do enough, I would

4    remind you that at that time --

5              THE COURT:  All right.  Mr. Barton, I'm going to cut

6    this off.  You're being non-responsive.

7              THE WITNESS:  Okay.

8              THE COURT:  If you recall what you did and you can

9    relay that to the Court, please do so.

10             THE WITNESS:  I did not need to do anything else,

11   because at that time your expert was in possession of a

12   complete image of the computer at issue.

13             THE COURT:  I'm going to give you two more questions,

14   Mr. Uppal.

15   Q.  (BY MR. UPPAL)  Did you, yourself, have a communication or

16   conversation or discussion of any kind with your client,

17   defendant Troy Clawson, about the Southern Arizona Plan when

18   you learned of its existence?

19   A.  I did not.  I assigned that task to Ms. Lancero.

20   Q.  When you learned of the existence of the

21   Southern Arizona Plan in January of 2017, did you take any

22   steps to inform the Court that your firm's sworn -- that your

23   firm's representation backed up by sworn verification that the

24   Southern Arizona Plan had never been formulated was incorrect?

25   A.  Several points.  Point number one, we did not make any kind

 1    of false representation to the Court.   Number two is

 2    Mr. Clawson will explain to you he did not believe that his

 3    representation to the Court was inaccurate either.   And, number

 4    three, we didn't do anything -- we didn't need to do anything

 5    else with the Court because, as we believed and still believe,

 6    that representation was not inaccurate.   We corrected the one

 7    in the statement we believed was inaccurate.   And, number four,

 8    we didn't need to do anything else because your client was

 9    already in possession of the data.   We anticipated that the

10    full story would come out and that there could be simply a

11    document titled Southern Arizona Plan or there could be a

12    complete plan.   We didn't know.   But we knew you had the data,

13    so we asked you to tell us what you found.

14            THE COURT:   Let me follow up here, Mr. Barton and

15    Mr. Uppal.   I do this because you have exhausted your

16    questions.

17            When you state we corrected the one in the statement

18    we believed to be inaccurate, what do you mean?

19            THE WITNESS:   That's a declaration of Mr. Clawson that

20    was filed in response to the original application for

21    preliminary injunction.

22            THE COURT:   All right.

23            You may step down.

24            MR. UPPAL:   Your Honor, before he steps down, just so

25    we have a clear record, may I ask one very brief question about

1    what Mr. Barton just said?

2              THE COURT:  What is it related to, Mr. Uppal?

3              MR. UPPAL:  I just want to make sure I understood him

4    that he -- whether or not he's still claiming that his firm's

5    representation to the Court that the Southern Arizona Plan was

6    never formulated is somehow not inaccurate.  He testified about

7    that, but it wasn't clear about what document he was referring

8    to.  That's all I want to know, if he is still taking the

9    position that BurnsBarton's representation to Your Honor backed

10   up by a verification that the Southern Arizona Plan was never

11   formulated is accurate or inaccurate.

12             THE COURT:  You may answer.

13             THE WITNESS:  Thank you, Your Honor.  I believe it's

14   accurate.

15             MR. UPPAL:  Thank you, Mr. Barton.

16             THE WITNESS:  And I'll explain why.  Okay?  That

17   representation --

18             MR. UPPAL:  Mr. Barton --

19             THE COURT:  He can explain.

20             THE WITNESS:  That representation was made to the

21   Court in our response to the motion for sanctions in June,

22   2016.  At the time my firm had absolutely no knowledge that

23   there was anything other in the form -- in terms of a

24   Southern Arizona Plan other than something that might have been

25   started or wasn't ever completed or didn't exist.  We didn't

1   think there was a plan at all.  Okay?

2          So when that statement was made in June, 2016, it was

3   absolutely correct.

4          Now, we later learned that there was something titled

5   a Southern Arizona Plan, and subsequently your expert actually

6   produced the entire thing in February of 2016.

7          When we learned that, we had a conversation with

8   Mr. Clawson, and we asked him:  What the heck?  You told us

9   there wasn't a plan.  Now we've got some document.  What's

10  going on?

11         And he said:  I never really finished it.  I never

12  formulated it.  I never thought it was done.  So I didn't ever

13  send it to Brad.  It wasn't complete, so, i.e., it wasn't

14  formulated.

15         And I don't believe that that was an inaccurate

16  statement.  It was never completed.  It was never sent to Brad.

17  So that's the position I'm taking.

18         THE COURT:  All right.  We are finished with this

19  witness.  You may step down, Mr. Barton.

20         Mr. Uppal, let me suggest that we take about a

21  10-minute break, 10-, 15-minute break, and then we can proceed

22  with your next witness.

23         MR. UPPAL:  Thank you, Your Honor.

24     (Proceedings recessed from 10:36 a.m. until 10:50 a.m.)

25         THE COURT:  Mr. Uppal, please call your next witness.

1          MR. UPPAL:  Thank you, Your Honor.  We'd call Mark

2   Cardwell.

3          THE COURT:  Mr. Cardwell, please come forward and be

4   sworn.

5          THE CLERK:  Please state your name and spell your last

6   name for the record.

7          THE WITNESS:  Mark Cardwell, C-a-r-d-w-e-l-l.

8              MARK CARDWELL, PLAINTIFFS' WITNESS, SWORN

9                      DIRECT EXAMINATION

10  BY MR. UPPAL:

11  Q.  Good morning, Mr. Cardwell.

12  A.  Good morning.

13  Q.  Mr. Cardwell, would you please briefly explain your role in

14  this current lawsuit and litigation.

15  A.  I was called in to analyze two pieces of media, a laptop

16  computer and a USB flash drive.

17  Q.  And you were called in by Swisher, correct?

18  A.  That's correct.

19  Q.  As its computer forensics expert?

20  A.  Yes.

21  Q.  So then essentially you were serving in the role of a

22  testifying computer forensics expert on behalf of plaintiff

23  Swisher; is that right?

24  A.  Yes.

25  Q.  And would you please briefly summarize your qualifications

1    and expertise as a computer forensics expert.

2              MR. BARTON:  Your Honor, we'll stipulate that he's

3    an expert.

4              THE COURT:  All right.

5    Q.  (BY MR. UPPAL)  How many times have you testified in court

6    as a computer forensics expert?

7    A.  About 19, 20 times.

8    Q.  Okay.  I believe that you previously stated that you were

9    called in by Swisher to examine two pieces of media.  I'm not

10   sure if that's the word that you used, but I just want to make

11   clear were the two things that you were called in to examine,

12   were those Troy Clawson's laptop and flash drive?

13   A.  That's correct.

14   Q.  And a flash drive is sometimes called a thumb drive, right?

15   A.  Yes.

16   Q.  I think the be -- I believe that the defendants are

17   referring to it as a thumb drive, so is it all right with you

18   if we use that terminology?

19   A.  Yes.  That will work for me.

20   Q.  How did you obtain defendant Clawson's computer laptop and

21   thumb drive?

22   A.  I retrieved them from the law firm BurnsBarton.

23   Q.  So you physically went to defense counsel's office?

24   A.  Yes.

25   Q.  Who did you meet with?

1    A.  And they were delivered to me by Katya.

2    Q.  So you met with defense counsel Katya Lancero?

3    A.  Yes.

4    Q.  And did Ms. Lancero give you defendant Clawson's laptop and

5    thumb drive?

6    A.  Yes, she did.

7    Q.  Do you recall preparing and signing an affidavit in this

8    case regarding your findings and conclusions after you searched

9    defendant Clawson's laptop and flash drive?

10   A.  Yes, I do.

11   Q.  You have an exhibit binder before you.  Would you please

12   turn to Exhibit 12.

13   A.  I'm there.

14   Q.  Do you see that your declaration is attached as part of

15   Exhibit 12?

16   A.  Yes.

17   Q.  And you see it's titled declaration of Mark S. Cardwell?

18   A.  Yes.

19   Q.  And that's your signature on the last page of the

20   declaration, right?

21   A.  It is.

22   Q.  And you dated it February 8, 2017?

23   A.  Yes.

24   Q.  All right.  Your Honor, I believe the Court has already

25   ruled that everything filed for purposes of this ruling is

1   admitted, and we have filed this declaration with the Court.

2            MR. BARTON:  Your Honor, if I may?

3            THE COURT:  You can be heard.

4            MR. BARTON:  I just want to be sure this is for this

5   hearing only.

6            THE COURT:  Well, I think this is also part of the

7   public record.  It's at document -- I'm sorry -- 89-1.  And so

8   it will be separately marked as an exhibit for this proceeding.

9            MR. BARTON:  Certainly.  I just want to make it clear

10  that if I'm not objecting it, I'm reserving any objections I

11  might have to this at trial.

12           THE COURT:  Yes.

13           MR. BARTON:  Thank you.

14  Q.  (BY MR. UPPAL)  Mr. Cardwell, turn to Paragraph 30 of your

15  declaration, and I'm not going to have you go over your entire

16  declaration, but I am going to focus on Paragraph 30.  So read

17  it aloud please.

18  A.  "Attached at Exhibit A to my declaration are hard copies of

19  the carved files which I found on the storage media which are

20  titled:  (1) Accurate Phoenix Arizona Plan; (2) Accurate

21  Southern Arizona Plan; (3) Accurate Northern Arizona Plan.  As

22  explained above, because the electronic documents corresponding

23  to the above-referenced hard copies were retrieved from

24  unallocated space on the storage media, those files were

25  deleted at some point.  It is important to note that the

1    Windows event logs show Windows last asked:  (1) whether the

2    Accurate Phoenix Arizona Plan should be saved on October 20,

3    2015; (2) whether the Accurate Southern Arizona Plan should be

4    saved on August 13, 2015; and (3) whether the Accurate Northern

5    Arizona Plan should be saved on December 16, 2015.

6            "Thus, the event -- the Windows event logs clearly

7    show that:  (1) the Accurate Phoenix Arizona Plan existed as an

8    active file in allocated space as of October 20, 2015; (2) the

9    Accurate Southern Arizona Plan existed as an active file in

10   allocated space as of August 13, 2015; and (3) the Accurate

11   Northern Arizona Plan existed as an active file in allocated

12   space as of December 16, 2015.

13           "Furthermore, I was unable to locate active files

14   titled Arizona -- sorry -- Accurate Phoenix Arizona Plan,

15   Accurate Southern Arizona Plan, and Accurate Northern Arizona

16   Plan in allocated space.  We -- pardon me -- we know based on

17   the Windows event logs that those documents bearing the

18   foregoing file names existed on the storage media, and the fact

19   that they are no longer in allocated space on the storage media

20   means that they were deleted.

21           "Finally, based on the Windows event logs:  (1) the

22   Accurate Phoenix Arizona Plan must have been deleted on or

23   after October 20, 2015; (2) the Accurate Southern Arizona Plan

24   must have been deleted on or after August 13, 2015; and (3) the

25   Accurate Northern Arizona Plan must have been deleted on or

1    after December 16, 2015."

2    Q.  Thank you, Mr. Cardwell.  Can you please explain to the

3    Court how you know that the three plans that you just

4    referenced, including the Southern Arizona Plan, were deleted.

5    A.  Because I found them in unallocated space which is

6    populated by data that have been deleted at some time in the

7    past.

8    Q.  All right.  So is it then correct that if a document is

9    found in unallocated space, that ipso facto means that it was

10   deleted?

11   A.  Yes.  There's no other explanation for it.

12   Q.  All right.  And could you explain metadata and its

13   significance.

14   A.  Metadata, there are various types.  I assume you're talking

15   about file metadata here because we're talking about these plan

16   files.  File metadata is data about data that's maintained by

17   the Windows operating system.  So for every file that is

18   created and saved on a hard drive or any other storage media,

19   Windows, when it saves it, attaches to it metadata including

20   create date and time, modify date and time, and last accessed

21   date and time.  That data remains with the document for its

22   entire life.

23   Q.  So then is it correct that if the Phoenix Arizona Plan, the

24   Southern Arizona Plan, and Northern Arizona Plan had not been

25   deleted, Swisher would be able to look at the metadata for

1    those plans?

2    A.   That's right.  I sort of stopped short on my previous

3    answer.  When I say for its entire life, that means up until

4    the time it's deleted, because at that point it's no longer a

5    live document as far as Windows is concerned.  The metadata is

6    removed from the document.  It's not associated with any kind

7    of metadata anymore.  And it is simply random data in

8    unallocated space on the hard drive.

9    Q.   So is it also correct then that -- I know you've laid out

10   the metadata's not available, but you're an expert, so if the

11   metadata were available for these three plans, is it correct

12   that we'd be able to look at that metadata and determine when

13   Mr. Clawson created those plans?

14   A.   Yes, we would know when it was created.

15   Q.   And we would also know when, for example, he printed or

16   accessed those plans based on the metadata.

17   A.   The last modified or last accessed, yes.

18   Q.   How significant is metadata in your field as a computer

19   forensics expert?

20   A.   It's right at the heart of it.  Virtually anytime we're

21   talking about data that lives on a computer or thumb drive, the

22   dates are extremely important to questions at hand:  When did

23   that document come into being?  When was it last modified?

24   Et cetera.

25   Q.   And as a computer forensics expert, you're routinely -- is

1    it correctly you're routinely asked by litigants to find and

2    analyze the metadata for particular documents that are of

3    significance?

4    A.  Yes, yes.  It's almost always important to establish

5    timelines for the life of a document.

6    Q.  Right.  And there's no way in this case -- do I have this

7    correct? -- there's no way in this case for you or any computer

8    forensics expert to look at the metadata for the three plans?

9    A.  Right.  We can't -- We can't recreate that metadata.

10   Q.  And that's because those three plans were deleted?

11   A.  Correct.

12   Q.  All right.  Now, your affidavit in Paragraph 30, which you

13   read aloud to the Court, states that the Accurate Phoenix

14   Arizona Plan must have been deleted on or after October 20,

15   2015.  The Accurate Southern Arizona Plan must have been

16   deleted on or after August 13, 2015.  And the Accurate Northern

17   Arizona Plan must have been deleted on or after December 16,

18   2015.  How are you sure that those three plans must have been

19   deleted after those three dates?

20   A.  That is based on the information contained in the Windows

21   event logs.

22        Windows keeps a variety, a large variety of different

23   types of activity logs for the computer that tell you such

24   things as what happened to the system, you know.  When did the

25   system last shut down?  One of the other things it tracks is in

1   an application log where it concerns itself with what software

2   applications are doing on the computer.  And in this situation,

3   I found log entries where Windows was prompting the user

4   whether the user wanted a file saved or not.  Presumably the

5   user was reviewing it or editing it and went to close it, so

6   Windows said do you want to save it?

7           That would only happen if the doc was live at the

8   time.  It was in allocated space.  It was an active file.  So

9   the event log makes that clear.

10  Q.  So Mr. Cardwell, let me see if we understand this

11  correctly.  Windows is a common operating system, right?

12  A.  Yes.

13  Q.  In fact, it's the operating system published by Microsoft?

14  A.  Yes.

15  Q.  It's the most prevalent operating system?

16  A.  Yes.

17  Q.  And it in fact is the operating system that was being used

18  on Mr. Clawson's computer?

19  A.  That's right.

20  Q.  Okay.  And so when you create a document such as the three

21  plans that are attached to your affidavit, the Phoenix Plan,

22  the Southern Arizona Plan, the Northern Arizona Plan, when

23  you're creating that type of document, Windows automatically

24  periodically will ask you do you want to save that document?

25  A.  Only when you're working on it, yes.  When you're working

1   on it and attempt to close it, Windows will confirm whether you

2   want to save it.

3   Q.  Is that some kind of failsafe system built into Windows to

4   make sure that the document is not accidentally lost?

5   A.  Presumably, yeah.  Windows always maintains temporary copy

6   in case it fails because it is known to, and it just prompts on

7   your way out of a document whether or not you intend to save it

8   to make sure you don't lose any changes that you made to it.

9   Q.  Okay.  So is it your testimony and it's laid out in your

10  affidavit that Windows asked Mr. Clawson whether or not he

11  wanted to save the Accurate Phoenix Arizona Plan on October 20,

12  2015?

13  A.  Yes.

14  Q.  And then it asked the same question whether or not

15  Mr. Clawson wanted to save the Accurate Southern Arizona Plan

16  on August 13, 2015?

17  A.  Yes.

18  Q.  And Windows also asked Mr. Clawson whether he wanted to

19  save the Accurate Northern Arizona Plan on December 16, 2015?

20  A.  Yes.

21  Q.  So then he must have been working on those plans on those

22  dates?  Is that what you're saying?

23  A.  Yes.  They had to have been open and closed on that date.

24  Q.  I see.  So you know that those three plans must have

25  existed on those dates because Windows -- the Windows event log

1   files show that Windows asked Mr. Clawson whether or not he

2   wanted to save them?

3   A.  Yes.

4   Q.  But when you looked at Mr. Clawson's computer and thumb

5   drive, those three plans are not active files?

6   A.  That's correct.

7   Q.  They're in unallocated space?

8   A.  Yes.

9   Q.  So are you essentially telling the Court that you know that

10  those plans must have been deleted after the three dates we

11  just went over?

12  A.  Yes.  They have to have been.

13  Q.  Okay.  But there's a difference, right, between pinpointing

14  a date when something is deleted versus saying it must have

15  been deleted sometime after a particular date?

16  A.  That's right.

17  Q.  Can you pinpoint the date on which Mr. Clawson would have

18  deleted those three plans?

19  A.  No, I can't.  The best I could do is get a before or after

20  or some range of dates if I had other information that

21  indicated it was there at some other time as well.

22  Q.  Do you know when the original complaint was filed in this

23  lawsuit?

24  A.  I do not recall that offhand, no.

25  Q.  Well, I'll tell you that the original complaint was filed

CARDWELL - DIRECT

1    on June 24, 2015.  So these three dates that you've given on

2    which you've concluded that the plans must have been deleted

3    after those dates, those three dates all postdate June 24,

4    2015, don't they?

5    A.  They do.

6    Q.  So in your expert -- In your expert opinion, what's the

7    significance, if any, of the fact that these three plans that

8    we're talking about were deleted from Mr. Clawson's computer

9    months after the complaint was filed?

10            MR. BARTON:  Objection.

11            THE COURT:  Overruled.

12            THE WITNESS:  In my experience, it means that someone

13   was either unaware of the duty to preserve or they didn't want

14   somebody to see something.

15   Q.  (BY MR. UPPAL)  Is one -- In your field and expertise as a

16   computer forensics expert, do you encounter people who

17   deliberately delete evidence to make it unavailable to the

18   other side?

19            MR. BARTON:  Objection.  Relevance.

20            THE COURT:  Overruled.

21            THE WITNESS:  That is absolutely my experience and the

22   primary reason I'm called in to these kind of engagements.

23   Q.  (BY MR. UPPAL)  Okay.  And that purpose and goal of making

24   evidence disappear, is that also a reason why someone might not

25   image their computer?

1    A.   Presumably, because if it's imaged, it's captured, as long

2    as that image survives, all the data that was on that hard

3    drive survives.

4    Q.   So, for example, if Mr. Clawson had imaged his computer

5    prior to August 13, 2015, would we still have the metadata for

6    the Accurate Southern Arizona Plan?

7    A.   Yes, we would.   If it were saved on the computer, we would.

8    Q.   And that would allow us to see when Mr. Clawson created

9    that plan; is that right?

10   A.   Yes.

11   Q.   Mr. Cardwell, have you been here for the entirety of this

12   hearing that started at 9:30 a.m. today?

13   A.   I'm sorry?   Here for the --

14   Q.   Have you been here in court for the entirety of this

15   hearing that started at 9:30 a.m. today?

16   A.   Yes, I have.

17   Q.   Were you here when I asked Mr. Barton, defense counsel

18   Barton, about whether it's true that as time goes by, a deleted

19   document becomes -- it becomes less likely that that document,

20   you know, can be retrieved or found?   Do you remember that line

21   of questioning?

22   A.   Yes, I do.

23   Q.   Would you please explain to the Court how and why the

24   passage of time affects your ability as a computer forensics

25   expert to find and retrieve a deleted document.

CARDWELL - DIRECT

1    A.   Yes.   When a file is deleted in Windows, it actually

2    doesn't go anywhere.   It's not moved on the hard drive.   It

3    remains where it has always been.   But Windows now marks that

4    space as unallocated, meaning that it might as well be empty,

5    and it's available for storage of new information.

6          When another file is created on that computer and is

7    saved by the user, it may be saved right on top of that portion

8    of the drive that file now lives in, or it may not touch it, or

9    it may overwrite it in part.   It may last for a very long time,

10   or it may last for an hour.   There's no way to predict that.

11   There's no algorithm published by Microsoft that tells us how

12   long it might live.   And there are so many factors that bear on

13   that that there is no way to know.

14         For example, if one runs an anti-virus check every

15   night, that may change data.   If one runs the Windows

16   defragmenter to optimize the use of drive space, that's hugely

17   destructive of unallocated data, because Windows picks up files

18   that are out in the middle of the drive by themselves, and it

19   moves them to another part of the drive so that all data is

20   contiguous.   In the process it overwrites what used to be

21   there.   So that's a very, very destructive process.

22         And just over time the storage of information, if the

23   drive has a lot of information on it and very little empty

24   space, whatever is in that empty space is much more likely to

25   get overwritten more quickly.

UNITED STATES DISTRICT COURT

1   Q.   Thank you, Mr. Cardwell.

2         And assume that someone doesn't -- Well, first of all,

3   the process of defragmenting, is that automated?

4   A.   It can be, yes.  Typically it used to be.  I'm not sure the

5   most current versions of the OS have it set as a default, but

6   it used to run weekly by default.

7   Q.   But put aside for a minute your example of defragging a

8   computer hard drive.  Even if that is not done, if there's no

9   defragging -- just assume that -- isn't it true that the more

10  time goes by, the more likely it is that the Windows operating

11  system will overwrite all or a portion of a deleted document?

12  A.   That is true, unless that computer is not turned on again

13  or it's on a shelf somewhere.  If it's being used, that data

14  likely will be overwritten at some time.

15  Q.   And isn't this the whole reason why ESI -- Actually let me

16  withdraw that question.  What is ESI, sir?

17  A.   What did I --

18  Q.   What is ESI?  Does ESI stand for electronically stored

19  information?

20  A.   Yes.

21  Q.   And these three plans that we're taking about, these are

22  ESI, right?

23  A.   Yes.

24  Q.   And isn't one of the primary reasons why a computer is

25  imaged and why lawyers tell their clients to image a computer

1    because, as time goes by, ESI is -- will become unavailable,

2    and it's less likely to be retrieved?

3    A.  Yes, that is true.  And there are many ways that a computer

4    can be damaged as well, you know.  You could have a hard drive

5    crash and lose everything, or you can have someone make a

6    decision that some of that data is damaging to them, and they

7    don't want it to be around.  So there are a lot of reasons data

8    can disappear.

9    Q.  Now, are you regularly retained by lawyers such as myself

10   or Mr. Barton to function in the capacity as a computer

11   forensics expert?

12   A.  Yes.  That's virtually all the time as opposed to being

13   directly engaged by clients.

14   Q.  So then you deal with a lot of lawyers; is that right?

15   A.  Yes.

16   Q.  Okay.  In your experience, did the lawyers that engage

17   computer experts such as yourself and deal with these issues of

18   imaging and preserving computers, do they generally know, do

19   you expect them to know that the more time that goes by, the

20   less likely it is that a deleted document can be recovered?

21            MR. BARTON:  Objection, relevance, Your Honor.

22            THE COURT:  Overruled.

23            THE WITNESS:  Yes.  I find that most lawyers are very

24   familiar with that.  In fact, one of the questions that I'm

25   asked very frequently by lawyers who haven't been through this

1    before is whether or not I have some template language that

2    they can use in a spoliation warning or duty to preserve

3    warning.

4    Q.   (BY MR. UPPAL)  Were you here when Ms. Lancero testified

5    that at or near the beginning of this case, the BurnsBarton law

6    firm had instructed Mr. Clawson to image his computer?

7    A.   Yes, I was.

8    Q.   What if anything do you conclude from the fact that

9    Mr. Clawson didn't follow that instruction?

10   A.   I think that's a very risky behavior.

11   Q.   In what sense?  How is it risky?

12   A.   In a sense he might get caught.  It's just not -- It's not

13   wise, nor smart, nor a safe thing to do.

14   Q.   By the way, was there -- was there an expert on the other

15   side, a computer forensics expert on the other side, that had

16   been retained by BurnsBarton?

17            MR. BARTON:  Objection.  Foundation.

18            THE WITNESS:  I -- Yes.

19            THE COURT:  I guess in terms of if you know, you can

20   answer.

21            THE WITNESS:  Yes, I know that there was one, but I

22   don't recall who it was.  I didn't have any interaction with

23   him.

24   Q.   (BY MR. UPPAL)  Do you recall if it was Peak Forensics?

25            MR. BARTON:  Objection.  Leading.

1        THE WITNESS:  I know that.  Yes, I know that company.

2        THE COURT:  I'm going to overrule, but I think the

3   answer is he knows the company.  I don't know -- Did you say

4   that, yes, that was the expert that was retained?

5        THE WITNESS:  I do recall -- I don't recall the name

6   of the company -- or the name of the expert, but I know the

7   company Peak, and I think that's what I was told was who was on

8   the other side.

9   Q.  (BY MR. UPPAL)  Mr. Cardwell, can you also explain -- Well,

10  let me rephrase it.  There's a program called Microsoft Word,

11  right?

12  A.  Yes.

13  Q.  Was that the program that was being used on Mr. Clawson's

14  computer?

15  A.  Yes.

16  Q.  Okay.  And can you explain to the Court the difference

17  between the file metadata that you've testified is gone as a

18  result of Mr. Clawson's deletion of the three plans and

19  Microsoft metadata -- I'm sorry -- Microsoft Word metadata?

20  A.  Yes.

21  Q.  And actually let me say one other thing too.  I apologize.

22  Am I even using -- I think I'm using the right term file

23  metadata, right?

24  A.  Yes.

25  Q.  In your field, that other kind of metadata that I'm asking

1    you about, Microsoft -- what I'm calling Microsoft Word

2    metadata, what would you call that?

3    A.   I would call that internal Word metadata.

4    Q.   When you say Word metadata, you're talking about Microsoft

5    Word, right?

6    A.   Correct.

7    Q.   Okay.  So just to make it sort of understandable and simple

8    here, is it okay with you, is it acceptable that I essentially

9    want you to compare and contrast the differences between file

10   metadata and Microsoft Word metadata.  Can you do that?

11   A.   Sure.

12   Q.   Okay.

13   A.   They are at one level very similar.  Most application

14   software, including Word, has internal metadata that it

15   concerns itself with.  It knows when it first created the

16   document.  Sometimes it knows who the last editor was.  It

17   knows when it was last printed.  But not all those metadata

18   items are turned on in the software.  Word leaves it to the

19   user to configure what information he or she wants to track.

20          So, for example, if you had a document that's going to

21   circulate among a lot of editors, you may want to turn on the

22   last editor and the date time last edited so that everybody

23   involved can know who last saw this and who to respond to.

24          So that data in an application program tends to be

25   less reliable and less predictable because it may or may not be

1   turned on, whereas operating system file metadata that Windows

2   puts in a file is very predictable, very enforced, because the

3   operating system ensures that it happens.

4   Q.  So are you essentially saying that a user can much more

5   easily tamper with Microsoft Word metadata?

6   A.  Yes, or simply turn it off.

7   Q.  Okay.  So in your opinion as a computer forensics expert,

8   if you want to know when a particular document such as the

9   three plans we're talking about were created, which do you

10  prefer or which do you like?  The file metadata or the

11  Microsoft Word metadata?

12  A.  I will always go with the file metadata.  And it's often

13  useful or sometimes useful to go to the application metadata

14  such as Word or Excel if you're looking for corroboration or

15  looking for something that might explain some scenario that the

16  operating system metadata doesn't explain.

17  Q.  If I'm creating -- Let's imagine that I'm on a computer and

18  I'm creating the Accurate Southern Arizona Plan.  Is it correct

19  that every time I save that document, the Word -- Microsoft

20  Word metadata will show the creation date as the date that I

21  save it?

22          MR. BARTON:  Objection, Your Honor.

23          THE WITNESS:  No.  Just --

24          THE COURT:  Wait.  Let me hear the objection.

25          MR. BARTON:  Non-disclosed opinions.  I don't even

CARDWELL - DIRECT

1    know where this is coming from.  I've never heard about it

2    before, even this topic.

3               THE COURT:  I'm going to overrule for purposes of the

4    hearing.  You may answer.

5               THE WITNESS:  No.  It will update last saved date if

6    it's turned on.

7               Create date should not change.  But if, for example,

8    you open a Word document and you want to save it to a different

9    folder on the hard drive or you want to save it to a thumb

10   drive, you do a file save as, and that creates a fresh copy of

11   the document in whatever location you've specified.  And that

12   does in fact have a new create date.

13   Q.  Okay.  And where in fact -- was it the thumb drive or was

14   it the unallocated space in the hard drive -- which of those

15   two locations did you find the Accurate Southern Arizona Plan?

16   A.  In the unallocated space on the flash drive, the thumb

17   drive.

18   Q.  So do I have it right that the -- if Mr. Clawson created --

19   First of all, you know, do you not, that -- That's a bad

20   question.

21              Given the Windows event log files, is it your opinion

22   that Mr. Clawson created the Southern Arizona Plan on his

23   computer laptop?

24   A.  Yes.

25   Q.  And then you found the deleted Southern Arizona Plan on

UNITED STATES DISTRICT COURT

1    Mr. Clawson's thumb drive?

2    A.  That's correct.

3    Q.  In unallocated space?

4    A.  Yes.

5    Q.  Meaning that it had also been deleted from the thumb drive?

6    A.  Yes.

7    Q.  So when Mr. Clawson created the Southern Arizona Plan on

8    his computer and then saved it to his thumb drive, the

9    Microsoft Word metadata would show the creation date being the

10   date that it was saved to the thumb drive; is that right?

11   A.  That's right.

12   Q.  But that's not necessarily the original date that the plan

13   was created?

14   A.  Not necessarily, because, likewise, when, in Windows, if

15   you copy a file without opening it, if you copy a file from a

16   hard drive to a thumb drive, the new copy will have a create

17   date of that date and time.  So now you have two copies of the

18   file with two different create dates.

19   Q.  Okay.  Now, you used the term carved files in your

20   affidavit.  What's a carved file?

21   A.  A carved file is, going back to my statement that when you

22   delete a file, it remains exactly where it was on the hard

23   drive or storage device, carving software is software that goes

24   through all that unallocated space, and it identifies former

25   files by looking for file headers and end-of-file markers that

1    exist for almost all files.

2            So right at the very beginning, the first few bytes of

3    a file include some kind of identifier that says I'm a Word

4    file or I'm an Adobe PDF file.  The carving software finds

5    those headers, and then it reads all the data that follows

6    until it finds an end-of-file marker or until it sees a header

7    of another file.  And it then collects that information and

8    saves it as a new file on the hard drive.

9            The file still will not have the metadata that was

10   with the original, but it will have whatever data from the

11   original file that the carving software is able to gather, and

12   it may be the first paragraph or it may be the entire document.

13   Q.  And did you find the three plans that are the subject of

14   Paragraph 30 of your declaration, did you first find them as

15   carved files?

16   A.  Yes.

17   Q.  And was there some indication that they were something

18   other than Word documents, that they were zip files or

19   something else?

20   A.  Yes.  It was sort of a strange situation.  There are files

21   that are referred to as container files because they contain a

22   variety of data.  All Microsoft files are considered container

23   files because they have -- you may have heard the term OLE for

24   object linking and embedding.  There are OLE objects stored

25   within a Word file or an Excel spreadsheet file that do

1    discrete functions for the application when it's building and

2    saving files.

3              The zip program that archives lots of files into one

4    container is a container file.  So the carving software

5    sometimes makes a mistake and guesses that since this looks

6    like a container, it must be a zip file.  But when I tried to

7    open the zip file, the zip archive program said it's not --

8    it's corrupt.

9              So I changed the extension.  I looked at the file

10   directly with a file editor, and it looked like it had the

11   structure of a Word file.  So I simply changed the zip

12   extension that the carving software put on it to doc, d-o-c,

13   for a Word file, and then Word opened it right up without

14   complaining.

15   Q.  What significance if any -- What significance if any is

16   there to the fact that the three plans, the Phoenix Arizona

17   Plan, the Northern Arizona Plan, and the Southern Arizona Plan

18   showed zip extensions when you first tried to find them or look

19   for them?

20   A.  I'm sorry.  Could you repeat that please.

21   Q.  Is there any significance to the fact that these three

22   plans showed zip extensions when you were using your software

23   to try and uncover relevant evidence?

24   A.  No.  The -- Well, I shouldn't say that.  I mean, it's not

25   uncommon for the carving programs to do this, but there are

1    lots of times when I find a file that has the wrong extension,

2    but there's no logical reason for it.

3              And in forensics we often call that file hiding.

4    People will, for example, if they don't -- Most people are

5    loath to get rid of data that they think might be important to

6    them in the future, so they want to keep it around, but they

7    don't want it to be found easily.

8              So one way to do that is by changing the extension and

9    fooling anybody who's doing a casual review about what kind of

10   file it is.

11             So I may take a Word document and change the extension

12   to EXE so I think it's a system file or DLL.  Nobody pays

13   attention to those things.  They're not of any value to a

14   forensic process.  But that doesn't often get people very far

15   anymore because our forensic software identifies improper file

16   types.  But it's still done.

17   Q.  Can you explain how labor intensive and/or difficult, if it

18   was difficult, it was for you to find these three deleted

19   plans.

20   A.  It's actually hard to describe how difficult it is.  It's a

21   very tedious and iterative process.

22             When I look for files that I know something about,

23   it's almost always by way of a keyword search.  So we come up

24   with a comprehensive list of terms that we think will

25   illuminate documents that contain the data we're looking for.

1          The problem is even if all we're talking about is

2    allocated files, active files on the hard drive, you can expect

3    that 90, 95 percent of all the responsive files are going to be

4    junk.  They're going to be meaningless to the examination.

5          As an example, if I may, in a product liability

6    matter, the word die was important because of some marketing

7    literature.  Well, I did a search including the word die, and

8    it came back with 4.1 million hits on the hard drive.

9          And then I found out that the user was a native German

10   speaker.  D-i-e is the word "the".  But that's a good example

11   of how you can think the best words are in your list, but

12   they're still going to return 95 percent unusable information.

13         So that all has to be culled.  And now if you take it

14   to another level and talk about unallocated space, not only do

15   you have all this 95 percent junk, but even the good stuff

16   looks like junk because when you have a Word doc that you're

17   looking at through the forensic software, it won't even look

18   like a Word document.  It will just -- It will contain all of

19   the coding that Windows embeds in a document that says this is

20   an end of paragraph; this is an indented paragraph; this is a

21   hanging indent; this is a page number.  So all that stuff makes

22   the data very, very messy and very time intensive to review.

23         And it's a very iterative process.  So you rerun it,

24   rerun it, rerun it to carve down the universe of data you have

25   to review to get to the best kernel of data you can.  And then

1    you spend a lot of time reviewing it to try to make sense of

2    what is a document, what's useful, what's not.

3    Q.  Those difficulties that you just described, were they also

4    present in your role as a computer expert in this case?

5    A.  Absolutely.

6    Q.  With respect to the Southern Arizona Plan, you've already

7    said that you found it in unallocated space.  I'm not asking

8    you to go over that.  But could you explain to the Court what

9    you had to do to find that deleted document.

10   A.  Well, first of all, all of the potential client names that

11   might be on such a list went on our keyword list.  The title

12   Southern Arizona Plan was part of the keyword search, which in

13   itself is complicated when you have multiple words.  If I have

14   three or five keywords in a phrase, each time that phrase is

15   hit, it comes back as five separate hits, so increasing the

16   size of the data universe.

17        But initially I was searching for the title that I

18   expected it to be.  After some time I found that in fact there

19   were a number of terms applied to the list.  Some were called

20   proposal for Northern Arizona or Southern Arizona.  Some were

21   plans for Southern Arizona.  Some were Southern Arizona Plan.

22        So each one of those searches took some time to find

23   maybe this version of it.  If we didn't, then we'll try another

24   version of it.

25        So, again, very, very iterative.

1    Q.  All right.  So is it your testimony that you first found

2    multiple documents that had the title or close to the title of

3    Accurate Southern Arizona Plan?

4    A.  I don't think that was the first thing I found.  I think

5    the first thing I found was something like proposal for

6    Southern Arizona.  But then as I continued the search, I

7    eventually came across the phrase Accurate

8    Southern Arizona Plan.

9    Q.  Right.  And you came across that phrase in unallocated

10   space, right?

11   A.  Yes.

12   Q.  So that would then tell you that if you come across the

13   phrase Accurate Southern Arizona Plan in unallocated space,

14   there was some document given that name that's been deleted?

15   A.  Yes.

16   Q.  But that's not the same thing as finding the actual

17   Southern Arizona Plan that's attached as Exhibit A to your

18   affidavit, is it?

19   A.  Right.

20   Q.  There's a difference between finding something in

21   unallocated space with a title versus the underlying document?

22   A.  Yes.

23   Q.  Would it have been easier for you to have found the

24   Accurate Southern Arizona Plan if defendants had disclosed that

25   they had created it on Clawson's computer but deleted it?

1    A.  If I had been given that exact title internal to the

2    document, yes, I probably would have got right at it.

3                MR. UPPAL:  Thank you, Your Honor.  Pass the witness.

4                THE COURT:  Yes.  Let me just ask a point of

5    clarification, because at the outset of your testimony, you

6    mentioned that you examined two pieces of information, that is,

7    the USB flash drive and the laptop.  And then I think Mr. Uppal

8    clarified where you found the Southern Arizona Plan, and you

9    stated on the thumb drive.

10                And so was there any discovery of either of the three

11   plans on the laptop?

12                THE WITNESS:  I don't remember whether I found any

13   part of a plan on the laptop.  I don't believe so.  I mentioned

14   the laptop primarily because there's the evidence of the

15   Windows event log that is on the laptop.  That's stored on the

16   laptop, and that's where I found that.

17                THE COURT:  Okay.  So on the laptop in the Windows

18   event log, you did find traces of these three documents?

19   A.  No.  I found in the event log the Windows prompt that says

20   do you want to save this document name?  Yes, that was in the

21   Windows event log on the laptop.  But the document itself was

22   not there.

23   Q.  And so is it a fair inference that the -- at least at some

24   point those documents were being worked on on the laptop?

25   A.  Yes, yes.

1          THE COURT:  All right.  Okay.  And Mr. Barton.

2          MR. BARTON:  Thank you, Your Honor.

3          THE COURT:  And let me just say, counsel, we're about

4   quarter till the lunch hour.  And I had not anticipated that we

5   would go this long.  How long do you think you'll be

6   Mr. Barton?

7          MR. BARTON:  I'll be pretty quick.

8                          CROSS-EXAMINATION

9   BY MR. BARTON:

10  Q.  Mr. Cardwell, good afternoon.

11  A.  Good afternoon.

12  Q.  First, when were you first retained by the plaintiffs?

13  A.  Spell my name?

14  Q.  When were you first retained by the plaintiffs?

15  A.  I'm sorry.  I don't recall offhand.

16  Q.  It was before September, 2016, correct?

17  A.  Yes.

18  Q.  Take a look at Exhibit 17 in the binder, if you would.

19  A.  Okay.  I'm at 17.

20  Q.  You got access to the media that you used to form your

21  opinions on or about September 20th, 2016, correct?

22  A.  Yes.

23  Q.  Okay.  And as you testified, they were made available at my

24  firm.  You came and picked them up.  Correct?

25  A.  That's right.

1    Q.  And there were two media you described; the laptop hard

2    drive and thumb drive, correct?

3    A.  Yes.

4    Q.  And it's very possible, isn't it, people sometimes will

5    create a document and save it to a thumb drive, correct?

6    A.  Yes.

7    Q.  Okay.  And we turned over both of those documents to you,

8    right?

9    A.  Yes.

10   Q.  Now, three months later you produced your report in this

11   lawsuit; is that correct?

12   A.  Yes.

13   Q.  Take a look at Exhibit 38, if you would.

14   A.  Mine goes up to 21.

15   Q.  I think that's here.  It's a new one.

16          THE COURT:  Defense Exhibit 38?

17          MR. BARTON:  Defense Exhibit 38.  That's correct.  I'm

18   sorry.  Not a new one.  It's in our first set of exhibits.  It

19   might be there under the binders.

20          THE CLERK:  Can you come up?

21          MR. BARTON:  May I?  Sure.

22   Q.  (BY MR. BARTON)  Do you see that document?

23   A.  Yes.

24   Q.  Is this the report you initially prepared in this case?

25   A.  Yes.  It appears to be.

1    Q.   And what's it dated?

2    A.   Date is December 27th.

3    Q.   December --

4    A.   27, 2016.

5    Q.   How about 21st?  Would that be the 21st?

6    A.   Are you talking about the stamp at the top?

7    Q.   If you look at the disclosure statement -- I'm sorry.  The

8    stamp on the top is when we received it.  But if you look at

9    the signature line --

10   A.   Oh, yes, signature is 21st.

11   Q.   The 21st of December, right?

12   A.   Yes.

13   Q.   And this was the report you prepared in your responsibility

14   as the expert in this case on behalf of Swisher, correct?

15   A.   That's right.

16   Q.   Take a look at Exhibit 40, if you would.  This is a new

17   exhibit we'll have to show him.  Keep your finger on Exhibit

18   38.  Could you read Paragraph 2 for the Court, 2A.

19   A.   "Deadlines for disclosure of experts and completion of

20   expert discovery."

21   Q.   And Paragraph A?

22   A.   "Plaintiffs shall provide full and complete expert

23   disclosures as required by Rule 26(a)(2) of the Federal Rules

24   of Civil Procedure no later than December 21, 2016."

25   Q.   Exhibit 38 that you prepared, was it a full and complete

1    expert disclosure as required by the Federal Rules of Evidence

2    in your opinion?

3               MR. UPPAL:  Objection.

4               THE WITNESS:  Yes.

5               MR. BARTON:  Okay.

6               THE COURT:  Well, let me just say limitedly that this

7    witness is not a lawyer, so he does not have to opine about his

8    opinion with respect to the rules of law.  But he is an expert.

9    And so he's answered the question.

10   Q.  (BY MR. BARTON)  Thank you.  So after having Mr. Clawson's

11   computer for three months, you produced a report, which is

12   Exhibit 38, correct?

13   A.  Yes.

14   Q.  And Exhibit 38, could you point to me anywhere in Exhibit

15   38 where any of the opinions you have expressed today are

16   included.

17   A.  Where any of the opinions I expressed today --

18   Q.  Are in 38.

19   A.  Bear with me while I go through it.

20               It looks to me like this covers what I was talking

21   about, and a lot of what I was talking about goes to stuff

22   that's in here.

23   Q.  Show me where it says, for example, that you uncovered

24   files in the carved media that you looked at or tell me where

25   you found -- tell me where it says you found the

1   Southern Arizona Plan.

2   A.   I can look for one thing at a time if you want to bear with

3   me.

4          MR. UPPAL:   Your Honor, we'll stipulate that the

5   expert did not find defendants' deletion of the

6   Southern Arizona Plan on or prior to December 21, 2016.

7   It certainly wasn't revealed to us, and he didn't find it, so

8   we'll stipulate that he couldn't have opined on the deletion of

9   the Southern Arizona Plan that he didn't find prior to December

10  21, 2016.   So it's not in that report.

11         MR. BARTON:   I'll take that stipulation.

12         THE COURT:   All right.

13  Q.   (BY MR. BARTON)   It's not in this report, is it?

14  A.   That specific file, no.

15  Q.   Even though you had the media at that time for at least

16  three months from September 20th until December 21st, you had

17  had the media in your possession, but when you made your

18  initial expert report, you didn't include anything about a

19  Southern Arizona Plan or deleted data, correct?

20  A.   That's what it looks like, yes.

21  Q.   Now, take a look at Exhibit 12.   What's the date at the

22  very top of that document?

23  A.   2-9-17.

24  Q.   2-9-17.   And this is your expert report that you prepared

25  in response to our motion for summary judgment, correct?

1    A.   Yes.

2    Q.   And this is one that includes your declaration; is that

3    correct?

4    A.   Yes.

5    Q.   And if I look back to Page 9 of your declaration, your

6    declaration is dated 8 February, 2017, is that correct?

7    A.   Yes, that's right.

8    Q.   And this is the first time you had ever disclosed your

9    findings or your opinions about what's been deleted or not from

10   these files, correct?

11   A.   It's the -- looks like the first time I talked about these

12   three plans, yes.

13   Q.   Yes.  And that was February 8th of 2017, correct?

14   A.   Yes.

15   Q.   Now take a look back at Exhibit 40, which is the Court's

16   scheduling order in this case, and read subparagraph 2B.

17   A.   "Defendants shall provide full and complete expert

18   disclosures as required by 26(a)(2) of the Federal Rules of

19   Civil Procedure no later than January 20."

20   Q.   So the first time you actually opined that there had been

21   deleted files from Mr. Clawson's computer was after the

22   deadline for the defendants to provide their own expert report,

23   correct?

24   A.   Yes, and at the time I had the information available to me.

25   Q.   Now, you found four documents on Mr. Clawson's computer

1    that may be relevant to this -- or Mr. Clawson's media that may

2    be relevant to this case, correct?

3    A.  Phoenix, Southern, and Northern.  What's the fourth?

4    Q.  Yeah.  So if I go back to Exhibit 12 on Page 6, this is

5    your February report.

6    A.  Yes.  The carving themselves.

7    Q.  You found four carved files that you -- that matched, had

8    the language in them, the keywords that we were searching for,

9    correct?

10   A.  Yes.

11   Q.  Okay.  And those four files you say were in unallocated

12   space, meaning that they had no metadata attached to them,

13   correct?

14   A.  Correct.

15   Q.  Meaning they had been deleted, correct?

16   A.  Yes.

17   Q.  Now, it's very possible they had been deleted in the usual

18   course of business, right?

19   A.  Yes.

20   Q.  It's very possible that after they'd been created,

21   Mr. Clawson decided he had no need for them and just deleted

22   them, correct?

23   A.  Yes.

24   Q.  And it's also true that what you found were the complete

25   documents, right?  They looked complete because you attached

1    them to your report, correct?

2    A.  Yes.

3    Q.  So as of February of 2017 or maybe before that, Swisher at

4    least had complete doc -- versions of the documents that are at

5    issue here, correct?

6    A.  Please repeat that.

7    Q.  As of February -- At least as of February, 2017, Swisher

8    had the documents that Mr. Clawson is accused of deleting,

9    correct?

10   A.  I don't know at what point they had them.

11   Q.  Well, you produced them to them, correct?

12   A.  I produced them, yes.

13   Q.  Yes.  And you gave them to Swisher, correct?

14   A.  Yes.

15   Q.  And they disclosed them here, correct?

16   A.  Yes.

17          THE COURT:  Let me back up, Mr. Barton.  My

18   understanding is that some of these documents were disclosed in

19   discovery prior to February 2017.

20          MR. BARTON:  That is correct.  Let me correct that

21   point very quickly as well.  Okay.

22   Q.  (BY MR. BARTON)  Would you take a look at Exhibit 6.  Do

23   you see this document?

24   A.  Yes.

25   Q.  Did plaintiffs' counsel ever ask you to look at the

1    metadata in the electronic files that were disclosed pursuant

2    to Exhibit 6 on June 17, 2016?

3    A.  Did they ask me to look at the documents on June --

4    Q.  Yeah, sure.  In formulating your opinions, did plaintiffs'

5    counsel ask you to look at these -- this ESI that had been

6    produced back in June of 2016?

7                THE COURT:  Well --

8                MR. UPPAL:  Your Honor --

9                THE COURT:  -- I'm having a difficult time following

10   that as well because I don't know how this witness can answer

11   because we don't know what the Bates numbers are that are

12   referred to, what those documents contain, so I think let's

13   move on, Mr. Barton.

14   Q.  (BY MR. BARTON) Let me lay that foundation, if I may, Your

15   Honor.  Take a look at Exhibit 5.

16           This is Troy Clawson's first supplemental disclosure

17   statement.  You're identifying documents Bates labeled 135 to

18   145.  Do you see that?

19   A.  Page 135?

20   Q.  No.  At the bottom of the first page on defendant Troy

21   Clawson's first disclosure statement, we are disclosing

22   documents Bates numbered Accurate 135 to 145.  Do you see that?

23   A.  I do.

24   Q.  And if you flip back, you'll see that those documents are

25   attached, correct, and 135 is the e-mail from Troy to Brad.  Do

1    you see that?

2    A.  Yes.

3    Q.  136 is the Phoenix Arizona Plan, correct?

4    A.  Yes.

5    Q.  And looking back to 143 is the Northern Arizona Plan,

6    correct?

7    A.  Yes.

8    Q.  So we disclosed hard copies of those documents on June --

9    sorry -- on April 26th, 2016.  Do you see that?

10   A.  No.  Where will I see that?

11   Q.  Sorry.  It's the very first -- back of -- Page 2 on Exhibit

12   5.

13   A.  You're going to have to guide me through this because I

14   have no connection to these documents at all.

15   Q.  Understand.  I'll make a record of it.

16            Move Exhibit 5 into evidence, Your Honor.

17            THE COURT:  Well, yes, for purposes of the hearing it

18   has already -- Well, it hasn't been a part of the record, so

19   it will be admitted.

20   Q.  (BY MR. BARTON)  All right.  So Exhibit 6 then is a second

21   supplemental disclosure.  If you look on that document, we are

22   disclosing the electronically stored information regarding

23   documents already produced.  Do you see that?

24   A.  Exhibit 6, I see the disclosure statement.

25   Q.  And it says that we're turning over electronically stored

1    information of already produced documents, correct?

2    A.  You're going to have to give me time to read this, because,

3    again, I've never seen this before that I can recall.

4    Q.  Well, for the record, Your Honor, let's just look at it.

5    This witness may not be the right person, but for the record if

6    you look at Exhibit 6 --

7         THE COURT:  Well I would think that the parties could

8    stipulate that this has already been produced.  So I'm not sure

9    why we're taking the time with this witness to go through this

10   Mr. Barton.

11        MR. BARTON:  My point is simply this:  The defendants

12   had already produced electronically stored versions of the

13   Phoenix Plan and the Northern Arizona Plan, and they did so

14   on -- with their second supplemental disclosure statement on

15   17th June of 2016.

16        My question to you is --

17        MR. UPPAL:  Objection, Your Honor.

18        THE COURT:  Well, he hasn't asked the question.

19        MR. UPPAL:  Well, but he's --

20        THE COURT:  He's permitted to ask the question so that

21   I can rule on your objection.

22   Q.  (BY MR. BARTON)  My question to you, Mr. Cardwell, is did

23   plaintiffs' counsel ask you to look at this ESI that was

24   produced in June of 2017 -- 2016?

25        MR. UPPAL:  Your Honor, now I want to object, because

1    this line of questioning is misleading.  I mean, they --

2               THE COURT:  Well, you know, I will say this; that the

3    topic of this testimony is related to the Southern Arizona Plan

4    and how it was discovered.  So I'm not sure, Mr. Barton, again,

5    how this is relevant for this witness to testify to.  That

6    information we will agree, all of us will agree the record is

7    clear that you produced those other plans.

8               The subject of his testimony is with regard to the

9    Southern Arizona Plan and how it was discovered, so please

10   tailor your questioning to that.

11              MR. BARTON:  I just want the record to be very clear

12   that we did not hide any --

13              THE COURT:  Very, very clear.

14              MR. BARTON:  -- any metadata.

15   Q.   (BY MR. BARTON)  Okay.  Let's talk about the Southern

16   Arizona Plan.  One of the plans you found that you identified

17   as a deleted document could have been deleted in the normal

18   course, correct?

19   A.   I don't know if it was deleted in the normal course or not.

20   Q.   But it could have been?

21   A.   It could have been.  It's possible.

22   Q.   And you found it in the carved files.  And that

23   Southern Arizona Plan you attached to your February report,

24   correct?

25   A.   Taking me back to my February report, and let me verify

1    that.  You're running a lot of documents by me here that I'm

2    not familiar with, so you're going to have to take it step by

3    step.

4    Q.  It's, if you flip back from your report to Exhibit A, it's

5    on Page 1, 2, 3, 4, 5.  Do you see that?

6          THE COURT:  What exhibit number is his report?

7    Q.  (BY MR. BARTON)  His report is Exhibit 12.  This is your

8    February report.  Do you see that?

9    A.  What page?

10   Q.  Page 12 is the Southern Arizona Plan.  I'm sorry.

11   A.  Exhibit 12 you mean?

12   Q.  I'm sorry.  There is one exhibit, Exhibit A to your

13   February -- Stay on Exhibit 12.  Within Exhibit 12 is an

14   Exhibit A.  All right?  And that Exhibit A includes the

15   Southern Arizona Plan you found, correct?

16   A.  Yes.

17   Q.  So as of February of 2017, you and the defendants had the

18   Southern Arizona Plan, correct?

19   A.  Apparently we did, yes.

20   Q.  And you found it on the media that Troy Clawson turned

21   over, correct?

22   A.  Yes.

23   Q.  Okay.  Now, you make some conclusions about when these

24   files were last opened or last deleted or last existing on the

25   computer.  I want to talk to you a little bit about that.

1   First of all, is it very possible that two files have the same

2   name?

3   A.  Yes.  You can have multiple documents of the same name.

4   Q.  You can save them in different locations with the same

5   name.  It will just create a copy of that file.  Correct?

6   A.  Correct.

7   Q.  And when MS Word saves a document, it simply pulls the

8   first line and saves it generally, correct?

9   A.  Say that again.

10  Q.  If I just -- If I'm in an MS Word document and I hit save,

11  it's going to save it as the first line, correct?  The title of

12  the document is going to be generally the first line of the

13  document, correct?

14  A.  No.  I mean, in my experience there's no connection at all

15  between the title of a document and whatever you name it on

16  disk.

17  Q.  Okay.  But let's put it this way then.  You can save the

18  document with the same title, correct?

19  A.  Yes.

20  Q.  So, for example, if I look back at the exhibits here

21  to your February opinion and I see the Southern Arizona Plan,

22  its title is Accurate Southern Arizona Plan, correct?

23  A.  Yes.

24  Q.  Now, it's possible that there could be two documents titled

25  Accurate Southern Arizona Plan that have very different

1    content, correct?

2    A.   It's possible, but I'm not sure that your question is

3    making sense to me, because we don't even know the title to

4    this doc -- We don't know that the name of this document was

5    Accurate Southern Arizona Plan.  All we know is that that's

6    what they called it internally.

7    Q.   So scooch over to Paragraph 29 in your opinion.  Okay.

8    That's where I'm getting to.  In Paragraph 29 of your opinion,

9    you identify the titles of documents that were asked to be

10   saved on certain dates, correct?

11   A.   Show me where I'm seeing that in my --

12   Q.   Paragraph 29 of your opinion.

13   A.   Well, title, I'm clearly talking about the title in the

14   document.

15   Q.   Correct.  But you got that information not from the

16   document itself but from the Windows event log, correct?

17   A.   I don't remember right offhand exactly what the Windows

18   doc -- event log said.

19   Q.   Read Paragraph 29 of your opinion please.  So have you had

20   a chance to read that, 29?

21   A.   I'm trying to find someplace where I reconcile that to the

22   Windows event log.  Where are you saying that the Windows event

23   log refers to the file names?

24   Q.   In Paragraph 29 you point out that in the Windows event

25   log, you had certain hits with documents that were entitled

1    Accurate Phoenix Arizona Plan, Accurate Southern Arizona Plan,

2    Accurate Northern Arizona Plan, correct?

3    A.  Right.

4    Q.  And that Windows event log is different than the carved

5    files, the actual files themselves, that you talk about in

6    Paragraph 23, correct.

7    A.  Let me rephrase that and see if I heard you right.  The

8    event log is different from the files?

9    Q.  Correct.

10   A.  I don't know what that means.  I mean the event, sure, the

11   event log and the files are two different subjects.

12   Q.  The file is one thing.  It's the document that you attached

13   as an exhibit, the actual Southern Arizona Plan.  Right?

14   A.  Okay.

15   Q.  But the -- That's correct?

16   A.  I -- Are we talking about title or file name?  What are you

17   talking about?

18   Q.  We're talking about two different things.  That's my point.

19   A.  Okay.

20   Q.  The data file you found, the Southern Arizona Plan that you

21   found in the unallocated space and that you produced with your

22   report, that is one thing, correct?  That is a document that we

23   can all look at because it's Exhibit A to your report, correct?

24   A.  Correct.

25   Q.  Now, the Windows event file, though, is different

1    information.  It's different metadata.  Correct?

2    A.  Yes.

3    Q.  It's operating system metadata that tells me when the user

4    was prompted with the question do you want to delete this file,

5    correct?

6    A.  Correct.

7    Q.  But you don't necessarily know that just because a document

8    has a specific title, that it is the document that you found in

9    the unallocated space, correct?

10   A.  Yeah.  Yes.  I think there's no way to say exactly what

11   file we're talking about, whether that's the name --

12            MR. UPPAL:  Your Honor, I apologize.  I have no

13   objection, but -- I'm not asking for the witness to be taken

14   off the stand -- I just need to step out for one minute for

15   personal comfort.

16            THE COURT:  Yes.  And we are at the lunch hour, and my

17   courtroom staff have been at it since -- as long as we have.

18   How much longer do you anticipate?

19            MR. BARTON:  Two questions, two questions.

20            THE COURT:  And can you hold for two questions?

21            MR. UPPAL:  Yes, Your Honor, and thank you, and I

22   apologize for even asking.

23            THE COURT:  No.  That's quite all right.  We're all

24   human here.  Mr. Barton, quickly.

25   Q.  (BY MR. BARTON)  So if you look at Exhibit 41 now, I've got

CARDWELL – CROSS                                                156

```
 1    to show you one more exhibit.  I'm sorry.
 2            THE COURT:  All right.  Now, I'm going to take a break
 3    because this is much longer than a question.
 4            MR. BARTON:  That's fine.
 5            THE COURT:  All right.  So --
 6            MR. BARTON:  Thank you, Your Honor.
 7            THE COURT:  -- are we coming back after lunch,
 8    gentlemen?
 9            MR. BARTON:  Fine with me.
10            MR. UPPAL:  Yes, Your Honor.
11            THE COURT:  Mr. Barton?
12            MR. BARTON:  That's fine with me.
13            THE COURT:  All right.  We will resume at 1:00 --
14    1:10.  And just remember that you are under oath, and you can
15    just resume the witness stand once we come back in.  All right.
16    We'll be in recess.
17        (Proceedings recessed from 12:03 p.m. to 1:18 p.m.)
18            MR. BARTON:  May I continue, Your Honor?
19            THE COURT:  Yes.
20    Q.  (BY MR. BARTON)  Mr. Cardwell, welcome back.  I want to
21    clarify one thing before I get back to where we were.  You
22    don't have any personal knowledge of who deleted the files that
23    you found in the deleted unallocated space on Mr. Clawson's
24    media, correct?
25    A.  Correct.
```

1    Q.  So it could have been, for example, his wife or his kids,

2    correct?

3    A.  I can't put anybody at the keyboard.

4    Q.  Could have even been a virus?

5    A.  Could have been a what?

6    Q.  A virus.

7    A.  I don't -- I don't see that in particular, no.

8    Q.  Could it have been though?  Is it a possibility that a

9    virus, a malicious virus, could have deleted those files?

10   A.  You know, that's so far out in my mind that I can't say

11   yes, no.  No, I don't think so.

12   Q.  But his kids and wife is definitely a possibility, correct?

13   A.  I don't know.  I don't know his kids and wife.  I'm saying

14   I can't put anybody at the keyboard.

15   Q.  Okay.  Exactly.  You can't say that Mr. Clawson deleted

16   those files, correct?

17   A.  That's what I said, yes.

18   Q.  Okay.  Now, we were talking about your report, so I'd like

19   you to open that up.  We're going to look at two paragraphs in

20   your report that I want the Judge to be clear about, because

21   you've got Paragraph 23 and Paragraph 29, and they refer to

22   different types of metadata, and I want to make that clear.

23   Okay?

24             THE COURT:  So let's be clear.  When you say report,

25   you're taking about his affidavit?

1    Q.   (BY MR. BARTON)   Exhibit 12, his affidavit, that's correct.

2    So are you there, Mr. Clawson?

3    A.   I'm there.

4    Q.   Okay.   Exhibit -- Paragraph 23 talks about the carved files

5    you found, correct?

6    A.   Yes.

7    Q.   These are the actual documents themselves, the

8    Southern Arizona Plan, the Northern Arizona Plan, that you

9    attached as an exhibit to your declaration, correct?

10   A.   Yes.

11   Q.   Okay.   Now, if I look at Paragraph 29, that talks about a

12   different set of metadata, correct?

13   A.   I'm sorry.   Say that again.

14   Q.   Paragraph 29 of your declaration.

15   A.   Yes.

16   Q.   That's a different set of metadata, correct?

17   A.   Where am I seeing metadata here?

18   Q.   The Windows event log files.

19   A.   Okay.   Sorry.   I was on --

20   Q.   Paragraph 29, correct?

21   A.   Yeah.

22   Q.   And the Windows event log files are not connected to the

23   carved files that you found in Exhibit -- that you described in

24   Paragraph 23, correct?

25   A.   I don't know if they are or not.   The carved files

1    themselves as opposed to the active files that they evolved

2    into?

3    Q.  That's exactly my point.  You cannot say with any degree of

4    certainty that the Accurate Southern Arizona Plan, for example,

5    that was the title of a document that you reference in

6    Paragraph 29 is the same document that you found in the

7    metadata or in the unallocated space in Exhibit 23, correct?

8    A.  I'm thinking about that.  The question doesn't really make

9    a lot of sense to me.  I see no other conclusion to draw.  I

10   see nothing else on the computer that would lead me to a

11   different conclusion.

12   Q.  Okay.  Well, let me ask you this.  Take a look at Exhibit

13   41, which is in front of you.  Have you got that?

14   A.  I've got it.

15   Q.  Let's let the Court get to it.  And I will represent to you

16   that this is a hypothetical document.  I created it last night.

17   Okay?

18          MR. UPPAL:  Objection, Your Honor.  Your Honor, this

19   Exhibit 41 was not submitted by the deadline that Your Honor

20   laid down for this hearing.  Mr. Barton handed it to me today

21   right before this hearing, not at the prior hearing.  It's

22   never been disclosed during discovery.  There's -- This

23   document just isn't in this case, nor was it submitted to the

24   Court by the deadline the Court set for the evidentiary

25   hearing.

1          MR. BARTON:  If I may, Your Honor?

2          THE COURT:  You may.

3          MR. BARTON:  First of all, it's a demonstrative.

4   Secondly, I'm using it because I didn't know until the last

5   hearing that Mr. Cardwell was going to be providing testimony

6   in this case.  You may have noticed in my exchange of e-mail

7   with Mr. Pavneet two days -- or last night, I asked him where

8   his witness list was, because I had never seen his list of

9   witnesses until we showed up in this courtroom on the 2nd of

10  March.

11         THE COURT:  Well, in any event, you, before the break,

12  said you had two questions.  You've exceeded your two

13  questions.  And so let's move on.  Either this is your last

14  question or something else is your last question.

15         MR. BARTON:  I do have a few more questions.  I'm

16  sorry.

17         THE COURT:  Well, I'm going to limit you.  You have 15

18  minutes.

19  Q.  (BY MR. BARTON)  Fine.  I can get it done in that time.

20  Looking at Exhibit 41, let's assume that I created that

21  document on my computer just like it is.  Accurate

22  Southern Arizona Plan are the only words on it.  How would

23  Windows Microsoft -- Microsoft Word save that document on my

24  computer?  What would it title it?

25  A.  Whatever you want it to.

1    Q.  And if I didn't give it a title, what would it title it?

2    A.  It would probably offer you that as a title.

3    Q.  Accurate Southern Arizona Plan, correct?

4    A.  Perhaps.

5    Q.  Okay.  And so when I look at Paragraph 29 of your report,

6    when you say that there were Accurate Southern Arizona Plans

7    that were deleted on these dates -- Do you see that?

8    A.  Yes.

9    Q.  It could be the Accurate Southern Arizona Plan that you

10   provided as part of your exhibit, or it could be a document

11   that looks exactly like Exhibit 41, correct?

12   A.  You know, this is not making a lot of sense to me, this

13   train of thought.  It doesn't strike me as logical within the

14   forensic context.  I mean, if -- First of all, it seems like an

15   easy question, and if the documents had not been deleted, it

16   would be easily answered.  But it's not easily answered, given

17   that we're working with destroyed data.

18   Q.  I'm just asking for a possibility.  It's possible, isn't

19   it?

20        THE COURT:  He answered.  Let's move on.

21   Q.  (BY MR. BARTON)  So the bottom line is you can't actually

22   connect the documents you found to the Windows event log file,

23   correct?

24   A.  I think I can based on what I've seen in my forensic

25   examination.

CARDWELL - CROSS

1    Q.   Interesting, because look at -- And how would you do that?

2    A.   Just in total context of the examination, I would expect to

3    see other evidence come forth, given the depth of the search I

4    did.  I would expect to see something that points in another

5    direction.  This is the only thing that makes sense to me

6    forensically in my opinion.

7    Q.   But as you point out, the only thing that you had when you

8    had the Windows event log file is the title, correct?  It

9    doesn't -- The Windows event log file does not point to any

10   specific document, correct?

11   A.   Yes, it points to a specific document.  It gives us the

12   name of that document.

13   Q.   Your testimony today is -- Okay.  It gives us only the

14   name, correct?

15   A.   Yes.

16   Q.   Doesn't tell you where it's stored, correct?

17   A.   Yes.

18   Q.   Am I correct it does not tell you where it's stored,

19   correct?

20   A.   That's right.

21   Q.   So you don't know that it would be the document that's on

22   the flash drive, for example, or on some other place on Troy's

23   computer, correct?

24   A.   Well, again, it doesn't make sense to me where you're

25   going, because if we have two documents, this one with nothing

1    but the title in it and another full document, and they were

2    both deleted, I would have found both of them.

3    Q.  Possibly.  Have you disclosed every document you found?

4    A.  That makes a lot more sense than what you're asking me to

5    answer yes to.  They would both be there in unallocated space,

6    because when you save two live documents with the same name,

7    the name is meaningless moving forward.  And they don't save

8    one over the top of the other like live documents would.

9    Q.  Did you not say that you found several different versions

10   of this Accurate plan?  I thought you testified to that.

11   A.  I'm sorry.  Did I say what?

12   Q.  I thought you testified earlier under questioning from

13   Mr. Uppal that there were several different versions of this

14   Southern Arizona Plan that you found?

15   A.  No, I don't think I said that.  What I said was I found

16   references to many variations on its name.  I didn't say I

17   found the files.

18   Q.  Were there not -- Well, you would have only found those if

19   they had been saved files, correct?

20   A.  Okay.  No.  I think you misunderstood me, or maybe I didn't

21   make myself clear.  When I said I found many variations on the

22   name, that doesn't mean in files with variable names.  It means

23   that I saw references to the name in different orders like

24   that, whether it was in an e-mail header, whether it was in a

25   snatch of unallocated space.  It was just different ways of

1    stating the name.  I didn't not intend to say I found multiple

2    documents with those different names.

3    Q.  And you haven't produced all those other documents that had

4    the different versions of the name, correct?

5    A.  I just told you there are not multiple documents with

6    multiple names.

7    Q.  What data did you use to determine that the document you

8    produced as the Southern Arizona Plan was the same document

9    with all these other names?

10            THE COURT:  I'm sorry.  You're asking him what data

11   did you use to determine?

12   Q.  (BY MR. BARTON)  Is that what you're saying?  Are you

13   saying --

14            THE COURT:  Well, no.  I'm trying to understand the

15   question myself.  You're asking him "What data did you use to

16   determine that the document you produced as the

17   Southern Arizona Plan was the same document with all these

18   other names?"  Are you asking him what programs did he use to

19   examine the computers?  I'm very uncertain as to what you're

20   asking.

21   Q.  (BY MR. BARTON)  Let me take one step back and rephrase the

22   question then.  If I understand your last testimony correctly,

23   is it that you're saying that the Southern Arizona Plan you

24   produced had different names, but it was the same document?

25   A.  No, that's not what I said.

1   Q.   Okay.   What exactly are you saying about the names

2   associated with the Southern Arizona Plan you produced?

3   A.   Okay.   Let me try it again.   What I said was --

4           THE COURT:   I'm clear on it.   If you're doing this for

5   my purposes, Mr. Barton, I'm clear on what he said.

6   Q.   (BY MR. BARTON)   Okay.   I'm sorry I don't understand.   I'm

7   not clear yet.

8           THE COURT:   All right.   You can answer one more time,

9   one last time.

10  Q.   (BY MR. BARTON)   Okay.

11  A.   I found -- excuse me -- I found in multiple locations on

12  the hard drive, on the flash drive, different formations of the

13  name of a Southern Plan.   I didn't say multiple documents.   I

14  found the one Southern Plan document, but I found other

15  references to the names with the words in different order.

16  They were just -- They might have been snatches of unallocated

17  space or something along those lines, but they were not

18  documents.

19  Q.   Understood.   So they were names of documents, correct,

20  names of files, correct?

21  A.   No.   They were different ways of referencing that plan.

22  Q.   Were they associated with any specific documents?

23  A.   No.   No.

24  Q.   So how do these names get in the computer if they weren't

25  associated with a document?

1          MR. UPPAL:  Objection, Your Honor.  Mr. Barton was

2     cutting off the rest of the answer from the expert.

3          THE COURT:  Well, I think, Mr. Barton, I understand

4     what this witness has testified to.  I think you're possibly

5     having a -- And I can't articulate it any better than the

6     witness can, but I think you're having a difficulty

7     understanding what the content of his analysis revealed.

8          MR. BARTON:  I really am because I haven't had a

9     chance to understand the subpoena.  It's never been disclosed.

10    And I haven't had a chance to depose him either.  So that is

11    correct I am struggling here to understand his opinion.  And I

12    don't understand how he's testified that there are --

13         THE COURT:  I don't think he's testified that there

14    are multiple documents.  He found references to the names

15    throughout the variations in unallocated space or other places.

16    It's not necessarily that he pulled up the plan.  That's my

17    understanding of what he has testified to.

18         THE WITNESS:  May I try an analogy, Your Honor?

19         THE COURT:  You can.

20         MR. BARTON:  Sure.

21         THE WITNESS:  If I have an F-150 Ford truck and I

22    refer to it as a pickup, that doesn't mean I have a truck

23    called pickup, but I'm referring to that object.  Does that

24    make any sense?

25    Q.  (BY MR. BARTON)  Sure.  What I'm trying to understand is

1    what other documents referred to the Southern Arizona Plan?

2                THE COURT:  You're going to have to identify or define

3    document.

4    Q.  (BY MR. BARTON)  File types.

5    A.  I'm -- If I haven't been answering you, it's because I just

6    don't understand what you're getting at, because I thought I

7    made it simple.

8    Q.  Hopefully we'll be able to explore this more at a later

9    date.  Bottom line is it's true that the names which you found

10   in Exhibit -- Paragraph 29 of your report, those names that you

11   found could have been associated with the Southern Arizona Plan

12   that you've also found or any other document that had that

13   name, correct?

14   A.  The names I found in what?  The event log?

15   Q.  In the event log.

16   A.  They -- All I can tell you is that they refer to a document

17   that had that name.

18   Q.  Correct.  You can't say it is the document that was the

19   Southern Arizona Plan you produced, because that document, as

20   you've already testified, had no metadata attached to it,

21   correct?

22   A.  The file that was created out of unallocated space has no

23   metadata, correct.

24                MR. BARTON:  Okay.  No further questions.

25                THE COURT:  All right.  Very limitedly, Mr. Uppal.

1          MR. UPPAL:  Yes, Your Honor.

2                 REDIRECT EXAMINATION

3    BY MR. UPPAL:

4    Q.  Mr. Cardwell, with respect to the series of questions that

5    you've just been asked by Mr. Barton, would you be able to

6    answer some of those questions if in fact the computer that

7    defendant Clawson used to create these three plans had been

8    preserved and imaged?

9    A.  I could.  We would have -- I would expect to see multiple

10   copies of the document, whether they were in active space or

11   whether they are in carved space.  We'd be working with

12   multiple copies, and we'd have a better idea of what happened.

13   Q.  Right.  So if defendant wants to argue that there's

14   allegedly no connection between the Windows event log and the

15   three plans attached to your affidavit, if the defendants had

16   simply imaged and preserved that computer, you'd be able to

17   address that issue, wouldn't you?

18   A.  Yes.

19   Q.  So in your expert opinion, is your inability to address

20   some of these types of issues attributable to the fault of the

21   defendants?

22   A.  It is very much related to that.

23   Q.  Mr. Barton used a phrase prior to the break in which he

24   asked you whether it was possible, not probable, but possible

25   if some of these documents could have been deleted in the

1    normal course.  Do you remember that line of questioning?

2    A.  I do.

3    Q.  Okay.  After defendants are on notice that they are being

4    sued, if they delete documents such as the plans that we've

5    been talking about, the Southern Arizona Plan, the

6    Northern Arizona Plan, the Phoenix Plan, would you consider

7    that deletion in the normal course?

8    A.  No.  As a rule of thumb, if I find a carved document in

9    unallocated space with no corresponding active document, my

10   first thought is spoliation, okay, because even if the document

11   was not saved on the laptop, it was created and worked on on

12   the laptop.  And anytime you open a document and review it in

13   Windows, it creates a temporary copy.  And, frankly, I'm very

14   surprised that I didn't find any of those temporary copies in

15   unallocated space on the hard drive of the laptop.

16           I can't say why they disappeared, but they should be

17   there.  They may have been overwritten.  They may have been

18   wiped.  I don't know.  But it's odd that I wouldn't see those.

19   But my bottom line is if it exists only in unallocated and no

20   trace of it on the computer that it's been done on, it's

21   spoliation.

22   Q.  Right.  And Mr. Barton also asked you whether it's

23   possible -- again he didn't ask probable -- but he asked is it

24   probable that Mr. Clawson's family members might have deleted

25   the documents and plans we're talking about.  Do you remember

1    that line of inquiry?

2    A.  I do.

3    Q.  Now, indulge that line of inquiry for a minute.  If

4    Mr. Clawson's family members had deleted those documents,

5    that -- wouldn't that have to mean that defendants and their

6    counsel failed to preserve evidence?

7    A.  Yes.  And it would also mean that if someone else did it,

8    they would have to have access to his computer and his thumb

9    drive and would have to plug the thumb drive into the computer

10   and then would have to specifically bring up Windows Explorer

11   to see the files on the thumb drive and delete it.  That just

12   seems like an entirely improbable chain of events to me.

13   Q.  Right.  Is the point that you're making that it's not

14   enough for a family member to have been given access to the

15   laptop after it should have been imaged but rather that the

16   documents that you're talking about, those three plans, were

17   found in unallocated space on the thumb drive?  Is that right?

18   A.  That's right.

19   Q.  So Mr. Clawson would have had to have turned over his thumb

20   drive to his unidentified family members and let them have at

21   it to wipe them or to delete them?

22   A.  Yes.  That's a bit hard to imagine realistically.

23   Q.  Right.  And once again that flash drive is the kind of

24   storage media that, once you know you're being sued, you're

25   supposed to preserve and make sure that these types of things

1    don't happen; is that right?

2    A.   Yes.  Anything that even smells like it might be useful.

3    Q.   Do you remember -- I know you didn't follow all of it, and

4    it didn't make sense to you, but do you remember Mr. Barton's

5    line of inquiry about whether it was possible, again not

6    probable, but possible if multiple documents could have been

7    created and given the same file name and then deleted?

8    A.   Yes.

9    Q.   And if that had been done, wouldn't you have expected to

10   have found those multiple documents with the same file name in

11   unallocated space?

12   A.   Not with the file name, again, but, yes, exactly.  What I

13   was -- The point I was trying to make a few minutes ago was

14   when you have -- if you create a new file and save it to the

15   same name as one that already exists on your computer, the

16   first one's gone.  It's overwritten.

17         However, if you delete that first file, create a new

18   one of the same name, save it, and then delete it, you're going

19   to have two documents complete in unallocated space because

20   they do not overwrite each other.  They have no names.  They

21   just remain where they are on the hard drive, but they're now

22   in unallocated space.

23         So what I would have as many unique documents in

24   unallocated as were on the original drive if they were all

25   saved with the same name at different times.

1          MR. UPPAL:  Thank you, Mr. Cardwell.  No further

2     questions.

3          THE COURT:  All right.  You may step down, sir.  Thank

4     you.

5          THE WITNESS:  Thank you, Your Honor.

6          THE COURT:  All right.  Mr. Uppal.

7          MR. UPPAL:  Your Honor --

8          THE COURT:  May this witness be excused?

9          MR. UPPAL:  Yes.

10         THE COURT:  All right.

11         MR. UPPAL:  As far as we're concerned.

12         THE COURT:  Thank you, sir.  You may be on your way

13    then.

14         MR. UPPAL:  Your Honor, I believe you were

15    prompting me to call my next witness?  Am I correct?

16         THE COURT:  I am.  And how much longer are you going

17    to be?  My understanding is you have only Mr. Clawson?

18         MR. UPPAL:  That's right.

19         THE COURT:  And so, counsel, let me inquire as to your

20    line of questioning as to Mr. Clawson.  Again, Mr. Uppal and

21    Mr. Barton, I do remind you that the matter has actually been

22    fully briefed.  And so I don't necessarily think that an

23    extended amount of testimony from Mr. Clawson is going to aid

24    the Court.  There are a couple of narrow areas that I certainly

25    would permit examination on.  But please tell me what it is

1    that you intend to do here.

2              MR. UPPAL:  Your Honor, my intent was, since we are

3    arguing to the Court that defendants and their counsel have

4    perpetrated a fraud on the Court and lied to the Court and to

5    us, my lines of inquiry with Mr. Clawson were going to be

6    consistent with the motion that we have filed.  But of course

7    on the motion I'm limited as to what I can present to the

8    Court.  So I completely understand your point that it's been

9    fully briefed.

10             THE COURT:  Let me give you an example.

11             MR. UPPAL:  Yes, Your Honor.

12             THE COURT:  We have two competing affidavits.  The

13   record is, I think, complete with respect to that.

14             There may be a limited inquiry as to how it came to be

15   that the second affidavit was created, under what circumstance.

16   And then I think with respect to the allegation of spoliated

17   electronic discovery, there can be some limited inquiry.

18             The problem that I foresee with Mr. Clawson, because

19   you have the client here, is I think it would be more, I

20   think -- it would be better to put him in a sealed proceeding.

21   Then we can proceed in that nature.  Otherwise I think because

22   he is not an attorney and he's on the witness stand, there may

23   be issues of attorney-client privilege that he may

24   inadvertently provide.

25             And I understand that your issue with respect to fraud

1    on the Court can be an exception, but I don't want to create

2    too much of a conflict or a potential conflict for counsel

3    here, because if that were to occur, then the whole process

4    would presumably start all over again, Mr. Uppal.

5           And so, again, I remind you that the matter has been

6    fully briefed.  The parties have fully responded.  There have

7    been a number of exhibits.  I can look at the entirety of the

8    docket.  The affidavits, the competing affidavits, speak for

9    themselves, including the affidavit attached to the responsive

10   pleading.  And so I'm inclined then to proceed in that way.  So

11   what is it in particular that you wish to ask Mr. Clawson?

12           MR. UPPAL:  Your Honor, with the admonition that you

13   have given, I would propose that the focus of my questioning,

14   although not exclusively, but the focus of my questioning be as

15   to the what I would call false excuses that defendants and

16   their counsel have given to try and explain away the false

17   sworn statements that have been presented to my client and to

18   the Court and counsel's participation in those events.

19           THE COURT:  Well, I think if you're going to operate

20   in that way and I'm going to give you limited flexibility in

21   doing so, limited to the documents that are put forth in the

22   responsive pleadings to the sanctions motions, the attachments

23   thereto.

24           And so, for example, you may ask Mr. Clawson how it is

25   that he came to develop that affidavit that is attached to the

1   responsive pleading and so in that narrow type of questioning.

2   But, again, I think in an abundance of caution, we should

3   proceed under seal.

4            And so I'm not sure who the gentleman is who's seated

5   in the back of the courtroom, but if he is not a part of

6   plaintiffs' or defendants' firm, then I would ask for him to

7   step out, and we can seal the proceeding.

8            MR. UPPAL:  He's not affiliated with us, Your Honor.

9            MR. BARTON:  Nor us, Your Honor.

10           THE COURT:  All right.  Because we're going to proceed

11  in a sealed fashion, I'm going to have to close the courtroom,

12  and I ask you to step outside for the duration of the hearing.

13           UNIDENTIFIED MALE SPEAKER:  Thank you, Your Honor.

14           THE COURT:  I appreciate your interest.  We don't

15  often get public visitors in our federal court, and I wish we

16  had more, so thank you.  You may step out.  You may step out.

17       (Proceedings sealed.)

1

2

3

4

5

6

7          (Sealed testimony concluded.)

8               THE COURT:  And I presume, Mr. Uppal, this is your

9     last witness?

10              MR. UPPAL:  Yes, Your Honor, with the exception of if

11    Ms. Lancero is going to be cross-examined.

12              THE COURT:  All right.  And so the way that we will

13    proceed, I know that next Thursday is scheduled as a final

14    pretrial conference.  We will continue with the examination by

15    Mr. Barton, if he has any, of Ms. Lancero, and then the -- then

16    we will proceed to the final pretrial conference.

17              And are there any other issues that we need to take up

18    at this time?

19              MR. BARTON:  There are, Your Honor, two issues, if I

20    may.  The first issue is that we need to know if this thing

21    that we've been doing is going to be repeated at trial.  As

22    we've indicated, we certainly understand that in our pretrial

23    documents we've indicated that Mr. Clawson is subject to

24    cross-examination on these issues.  We understand that.  But if

25    we are going to be -- if the Court is going to allow Mr. Uppal

| | |
|---|---|
| 1 | to call myself and Ms. Lancero as witnesses at trial, we need |
| 2 | to withdraw from this case, because Rule 3.7 does not allow |
| 3 | us to advocate for a client where we're going to be a witness |
| 4 | as well.  So that's issue number one. |
| 5 | THE COURT:  Well, at this juncture, Mr. Barton, I |
| 6 | appreciate the question, but I'm not at this time able to rule |
| 7 | on that.  Did you have another matter? |
| 8 | MR. BARTON:  Sure.  You've sealed the proceedings |
| 9 | today to protect against any disclosure of confidential |
| 10 | information by Mr. Clawson. |
| 11 | THE COURT:  Let me clarify.  I sealed the testimony of |
| 12 | Mr. Clawson. |
| 13 | MR. BARTON:  Correct.  Thank you.  You sealed the |
| 14 | testimony of Mr. Clawson.  I'm curious if the Court will grant |
| 15 | or will agree to our motion we've already filed to seal the |
| 16 | testimony of Ms. Lancero as well. |
| 17 | THE COURT:  No.  And here's why, Mr. Barton.  I |
| 18 | appreciate the question, because it permits me to clarify.  I'm |
| 19 | going to look closely at the transcript of today's testimony to |
| 20 | determine whether or not I should unseal it, because the reason |
| 21 | I sealed it was in an abundance of caution because he is a lay |
| 22 | witness.  He's not an attorney.  And he may have stated |
| 23 | something that could have been privileged.  And I wanted to |
| 24 | protect against that.  And so I will examine the record and his |
| 25 | testimony to determine whether or not it is necessary.  And if |

1    it is not, then I will unseal that testimony as well.

2          MR. BARTON:  Thank you, Your Honor.  I'm assuming then

3    lastly that the pretrial conference will be indeed that, a

4    pretrial conference, other than Ms. Lancero?

5          THE COURT:  I'm sorry.  Could you ask the question

6    again.

7          MR. BARTON:  For the next hearing, I just want to make

8    sure I know what's up at the next hearing.  What we're up to do

9    at the next hearing is conclude Ms. Lancero's testimony --

10         THE COURT:  Yes.

11         MR. BARTON:  -- and then do the final pretrial

12   conference?

13         THE COURT:  Yes.

14         MR. BARTON:  Okay.  Thank you.

15         THE COURT:  All right.  Mr. Uppal.

16         MR. UPPAL:  Your Honor, quick housekeeping issues.

17         Defendants in quick succession have filed, I believe,

18   two motions, I believe both of which you have denied.  One was

19   a motion to seal, which Mr. Barton was just asking you about

20   Ms. Lancero's testimony.  And the other one was a motion for

21   reconsideration.  I heard both -- Your Honor denying both of

22   those motions, so --

23         THE COURT:  That's right.

24         MR. UPPAL:  -- I don't plan to respond to them because

25   they're moot.

1          THE COURT:  Yes.  Please don't respond.

2          MR. UPPAL:  Thank you, Your Honor.

3          THE COURT:  And so I will also -- And if I did not

4    clearly state, I will also continue Ms. Lancero's testimony for

5    next Thursday before the final pretrial conference is to

6    proceed.

7          And if there is nothing further, then we are

8    adjourned.

9          MR. BARTON:  Thank you, Your Honor.

10        (Proceedings recessed at 3:01 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **C E R T I F I C A T E**

2

3          I, LINDA SCHROEDER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 17th day of March,

12   2018.

13

14

15                                   s/Linda Schroeder
                                _____
16                              Linda Schroeder, RDR, CRR

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**