UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Swisher Hygiene Franchise Corp., et al., | ) ) ) | |
| Plaintiffs, | ) ) | CV-15-1331-PHX-DJH |
| vs. | ) ) ) | Phoenix, Arizona March 22, 2018 9:32 a.m. |
| Troy Clawson and Teri Clawson, husband and wife, et al., | ) ) ) ) | |
| Defendants. | ) ) ) | |

_____)

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE


REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS

MOTION HEARING – DAY 3

(Pages 221 through 277, inclusive.)


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    <u>A P P E A R A N C E S</u>

2    For the Plaintiffs:

3            Fisher & Phillips
             By: PAVNEET SINGH UPPAL, ESQ.
4                ALANNA REBECCA BROOK, ESQ.
             3200 North Central Avenue, Suite 805
5            Phoenix, AZ  85012

6            Fisher & Phillips
             By: ANDREW FROMAN, ESQ.
7            101 East Kennedy Blvd., Suite 2350
             Tampa, FL  33602

8
     For the Defendants:
9
             BurnsBarton
10           By: DAVID T. BARTON, ESQ.
             45 West Jefferson Street, 11th Floor
11           Phoenix, AZ  85003

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE CLERK:  This is case number CV 15-1331, Swisher

2   Hygiene Franchise Corporation and others versus Clawson and

3   others, on for oral argument.  Counsel, will you please

4   announce for the record.

5        MR. UPPAL:  Your Honor, good morning.  Pavneet Singh

6   Uppal on behalf of the Swisher plaintiffs.  With me are my

7   colleagues Andrew Froman and Alanna Brook.

8        THE COURT:  Good morning.

9        MR. BARTON:  Good morning, Your Honor.  David Barton

10  on behalf of the defendants in this case.

11       THE COURT:  Good morning.  All right.  This was to be

12  a continuation of the hearing on plaintiffs' second motion for

13  sanctions and motion for default judgment.  I have just

14  received Mr. Barton has filed a notice regarding Ms. Lancero's

15  testimony.  It appears that Mr. Barton is not going to examine

16  Ms. Lancero, and so her record is developed in the prior

17  testimony.  And so we will not hear from Ms. Lancero.

18       I have also received filed last evening was a motion

19  to withdraw from Mr. Barton, and of course the motion is not

20  ripe, and plaintiffs have not had an opportunity, I'm sure, to

21  review that motion or to formulate a response.  And so at this

22  juncture the motion is not ripe.

23       And so given that there is no testimony to be taken, I

24  will give the parties an opportunity to make a summation of no

25  more than ten minutes.

1          And, Mr. Uppal, if you wish, you may have five minutes

2     for any rebuttal statement.

3          And we will proceed in that fashion.

4          MR. UPPAL:  Your Honor, thank you.  First I'd like to

5     briefly address the motions that the BurnsBarton firm filed

6     yesterday.  We agree with their assessment that they are

7     necessary plaintiffs to this case, that is, both Mr. Barton and

8     Ms. Lancero, and we have listed them on our final pretrial.

9     And we have told them long ago that they will be witnesses in

10    light of their conduct and in light of their statements, and we

11    tend to agree with the BurnsBarton's assessment that because

12    they are witnesses in this case who will have to testify at

13    trial, that pursuant to ER 3.7, it is necessary for them to

14    withdraw.

15         So while we have not filed with the Court because that

16    motion was filed late at night, at least with respect to their

17    ethical obligation to withdraw, we tend to be in agreement with

18    them.

19         So, Your Honor, with that, I'd like to proceed to the

20    summation of the defendants' fraud on the Court and defense

21    counsel's participation in and furtherance of that fraud.

22         Your Honor, the chronology here of events as well as

23    the underlying conduct is extremely important.  Your Honor will

24    recall that this case began in state court when the Swisher

25    plaintiffs filed a motion for preliminary injunction which was

1    then removed to federal court and assigned to Your Honor.

2           On July 31, 2015, in an effort to defeat and fight

3    that preliminary injunction, the defendants filed a completely

4    false albeit sworn affidavit dated July 31, 2015.

5           Mr. Clawson signed that affidavit, but it was filed on

6    behalf of both defendants.  And that affidavit contains a

7    knowingly false statement and representation not only to

8    Swisher but to Your Honor.  At Paragraph 17 of that July 31,

9    2015, affidavit, defense counsel and their clients represented

10   to the Court the following:

11          I have not -- "Nor have I identified any Swisher

12   customers that ACS should go after."  Once again, that's the

13   quote:  "Nor have I identified any Swisher customers that ACS

14   should go after."

15          Not only is that representation false, it in fact is

16   preposterous, because now you have before you the

17   Northern Arizona Plan, the Phoenix Arizona Plan, and the

18   Southern Arizona Plan, which together list over 200 Swisher

19   customers -- that's just an approximation -- over 200 customers

20   which not only did Mr. Clawson identify, but, Your Honor, he

21   e-mailed those customer lists, those integrated customer lists

22   containing customer information, revenue, who at Swisher was

23   servicing the customers, how susceptible they were to being

24   solicited or transferred over from Swisher to ACS, whether they

25   were happy or not, and a variety of other information.

1          He identified those over 200 customers to the

2     president of ACS, Brad Zall, an individual, I would say Your

3     Honor should note, who has pointedly absented himself from all

4     of these proceedings.

5          Also, what is their excuse for having filed this false

6     affidavit on July 31, 2015?  It boils down to I forgot.

7          So let's test the credence of that representation to

8     the Court.  I would submit there's one lie on top of another

9     here to the Court.  They have the audacity to represent to the

10    Court that they weren't trying to make a false representation

11    in an effort to defeat the preliminary injunction but that Your

12    Honor should just credit their explanation that Mr. Clawson

13    simply forgot when he on July 31, 2015, said to the Court that

14    he had not identified Swisher customers despite having

15    identified 200 of them.

16         So let's look at that.  Your Honor will recall that

17    Mr. Clawson was on the stand.  He had to testify under oath

18    about this issue.  And he told Your Honor that he created those

19    three plans, the Northern Arizona Plan, the

20    Southern Arizona Plan, and the Phoenix Arizona Plan, in June of

21    2015.  Of course we don't know that because they deleted them.

22    But just indulging the testimony for a moment, Mr. Clawson

23    testified that the president of ACS, Brad Zall, instructed him

24    to create a business plan and that he sent Mr. Clawson home to

25    create these plans.  That's how important these plans were.

1    You know, Mr. Clawson needed to devote his full-time energy and

2    focus.  In fact, he left the workplace and went home.  And then

3    Your Honor will recall that Mr. Clawson testified that it took

4    him days, at least several days, to create these plans, which

5    he purportedly created in June of 2015.

6         So having spent days creating these plans at the

7    specific instruction of his new boss, the president of ACS, and

8    despite the fact that there's three plans and they all look

9    similar and they all list, you know, more than 200 customers

10   altogether, somehow, despite having spent days at home creating

11   these plans in June of 2015, Mr. Clawson and his counsel

12   magically forget all about having created these plans as of

13   July 31, 2015.

14        So in response to this false representation, we had no

15   choice, Your Honor, but we made the decision then to withdraw

16   the preliminary injunction because we didn't have the evidence

17   at that point.  And you assume that people are not going to lie

18   under oath to a federal judge.

19        The next thing that happens is on April 26, 2016, we

20   get an extremely belated disclosure from the BurnsBarton law

21   firm, which is entitled a supplemental disclosure, which has

22   been introduced as Exhibit 5 to this evidentiary hearing.

23        In that disclosure the BurnsBarton law firm finally

24   discloses that -- some information that proves that the July

25   31, 2015, affidavit is false.  We know that because that

1    disclosure contains an e-mail from Mr. Clawson to the president

2    of ACS dated July -- excuse me -- dated June 11, 2015, in which

3    Mr. Clawson attached both the Northern Arizona Plan and

4    Southern Arizona Plan and e-mailed them to his boss.  Right.

5    So, again, that's no surprise because we now know that

6    Mr. Zall, the president of ACS, had ordered the creation of

7    these plans, and it took several days to do so.

8           In that same e-mail where Mr. Clawson forwards the

9    Northern Arizona Plan and the Phoenix Arizona Plan to his boss,

10   he also writes "I'll work on Southern Arizona tomorrow," which

11   then immediately begs the question of, okay, you lied to us

12   previously saying you hadn't identified any customers; now you

13   are belatedly producing these documents that you should have

14   sent over long ago; so where is the Southern Arizona Plan?

15          Now, one other thing happens after that disclosure.

16   The BurnsBarton law firm takes over as counsel for both

17   defendants.  The Quarles & Brady firm which had originally

18   appeared on behalf of ACS withdraws.  And why do they withdraw?

19          Well, Your Honor knows about this, because although I

20   would submit that BurnsBarton never has satisfied its duty of

21   candor to the Court in this entire proceeding, Mr. Clawson was

22   forced to testify under oath that in late April of 2016 there

23   was a meeting between himself, Mr. -- excuse me -- attorney

24   David Barton, and attorney Craig O'Loughlin, at which

25   Mr. O'Loughlin and Mr. Barton questioned Mr. Clawson about the

1    Southern Arizona Plan.  And then you will recall that there was

2    a flurry of alleged privileged-based objections from

3    Mr. Barton.

4          But what we know is that not long after that meeting,

5    the Quarles & Brady firm withdrew, because they were having no

6    part of this.  BurnsBarton took over as counsel for both

7    defendants.  And then let's look at what BurnsBarton did.

8          BurnsBarton then on June 13, 2016, at docket 53 files

9    a brief addressing the whereabouts and existence of the

10   Southern Arizona Plan which is directly at issue.  And in a

11   pleading signed by David Barton and backed up by a sworn

12   verification by defendant Clawson, they represent to Your

13   Honor, "Although Clawson's e-mail to Zall stated he would work

14   on Southern Arizona tomorrow, Clawson never actually ended up

15   formulating a plan for Southern Arizona."

16         Now, we know that that statement is, although it's

17   sworn, is utterly false and part and parcel of the fraud

18   perpetrated upon the Court and upon my clients.

19         Why?

20         We don't know this because of any act of the

21   defendants or their counsel.  They have never come clean in

22   this action.  The only reason that we know that that statement

23   is false is because Swisher's ESI expert found the

24   Southern Arizona Plan in a flash drive after the defendants had

25   tried to cover it up by deleting it.

1          Why did they cover it up?

2          Because we know from the Windows log and from the

3    testimony of Mark Cardwell, who appeared before the Court, that

4    that Southern Arizona Plan was in existence after this case was

5    filed and after the defendants were served.  But they deleted

6    it sometime after.  They never turned it over.  They never came

7    clean to Your Honor.  And in fact I would point out to this day

8    they continue to perpetrate this fraud upon the Court.

9          Your Honor will recall that I pointedly asked

10   Ms. Lancero now that you have the Southern Arizona Plan in

11   front of you, are you still claiming right now to the Judge

12   that this plan is not formulated?

13         And she responded it's words on a page.

14         And when I pressed her, she said, yes, it doesn't look

15   formulated.

16         I asked the same question of Mr. Barton.  I said:

17   Does this plan look formulated to you?  You have the

18   Southern Arizona Plan in front of you.  We know it resembles

19   the other plan that was created by the defendants.  Are you

20   still claiming that it's accurate to represent to this Court

21   right now as of today that the Southern Arizona Plan is not

22   formulated?

23         And what did he say?

24         There was no remorse expressed.  There was no

25   acknowledgment.  There was a continuation of the cover-up and

1    the fraud, and Mr. Barton represented to Your Honor -- I'm

2    paraphrasing here -- that, yes, in his view it is still

3    accurate to represent that that plan was never formulated.

4            Now, Your Honor, if the oath and verifications and

5    sworn statements are to have any meaning, words must have

6    meaning as well.  It is utter nonsense to try and allege that a

7    plan which exists has not been formulated purportedly because

8    it wasn't finished, because that's not the word -- that's not

9    the word -- what formulated means.  Formulated is not tied to

10   the word finished.

11           But the other aspect of this is Mr. Clawson is

12   simultaneously claiming that one of the other plans likewise

13   was not finished.  So the fact that he wants to subjectively

14   allege that the Southern Arizona Plan is not finished does not

15   render it not formulated, because one of the other plans that

16   they did turn over likewise wasn't finished.

17           So all this really turns on, their argument that it

18   wasn't formulated, is based on their preposterous argument that

19   it wasn't e-mailed to or sent to the president of ACS, Brad

20   Zall.

21           There is no dictionary definition.  There is no

22   logical connection.  There is no sequence.  Words must have

23   meaning, and the word formulated does have a meaning.  And it

24   does not turn on whether or not a particular document was sent

25   to or e-mailed to the president of the defendant.

1          I suppose by that token you can argue that if one

2     document was printed on red paper and another document was

3     printed on yellow paper, because I chose to print it on yellow

4     paper, that renders it unformulated.  These arguments make

5     absolutely no sense.  All they are are part and parcel of a

6     continuation of the fraud on the Court.

7          I'd also like to talk about -- and I think it's very

8     significant in terms of the defendants' fraud -- what they did

9     and didn't do with respect to these discoveries.

10          First of all, when that July 31, 2015, affidavit

11     falsely stating that no customer -- no ACS customers had been

12     identified was filed with the Court, when they had to withdraw

13     that because they were going to have to turn over, in response

14     to Swisher's discovery, you know, all documents pertaining to

15     this matter, and when they found that e-mail, they knew that

16     that affidavit of July 31, 2015, was false, that it had to be

17     withdrawn.  But they didn't point out to Your Honor why they're

18     withdrawing it.  They didn't give Your Honor a red line.  They

19     didn't give Your Honor any indication or notice that they had

20     submitted a false statement to Your Honor.

21          Instead, they filed a notice of errata taking that

22     statement out.  There is no way for Your Honor to have known

23     that they filed a false statement in this court but for

24     Swisher's filing of its first motion for sanctions.

25          Similarly, they continue in that same vein here today

**UNITED STATES DISTRICT COURT**

1    alleging that the Southern Arizona Plan, despite its

2    resemblance to the other plan, despite the fact that it has

3    about a hundred Swisher customers on it, to this day they claim

4    that it's not formulated.  And they deleted that plan.

5         And I won't recap the testimony of Mark Cardwell

6    because you already heard it.  But what I do want to turn to is

7    defense counsel's participation in that.  Your Honor knows that

8    defense counsel, by their own testimony, instructed their

9    client, Mr. Clawson, to have that computer imaged.  Mr. Clawson

10   never imaged that computer.

11        However, what we do know from Mr. Clawson's testimony

12   is that on multiple occasions, at least several times, he

13   informed Ms. Lancero, who has absented herself from this

14   hearing today, of the fact that he is not able to image the

15   computer.

16        What does Ms. Lancero and Mr. Barton do in response?

17        Absolutely nothing.  They take no steps.  They tell

18   their client to have the computer imaged, which is odd in

19   itself, because they know that Mr. Clawson is not a computer

20   expert.  They presumably know that when it comes to matters

21   such as imaging, you need a chain of custody.  You need to have

22   the knowledge to image a computer.  It's not a matter of just

23   copying documents onto a flash drive.  It is a forensic

24   process.  And they just turn him loose.  They refer him to some

25   Web site or something.

1          And he -- That in itself points to their culpability

2    in this.  But more to the point, he tells them repeatedly I

3    haven't been able to do it, and they do nothing.

4          And if Ms. Lancero's testimony is to be believed,

5    after repeatedly being, you know, told by Mr. Clawson that he's

6    not able to image the computer, she doesn't have a discussion

7    about this with Mr. Barton.  How is that possible?

8          Even after our expert finds the fact that the

9    Southern Arizona Plan has been deleted, they still do nothing.

10   They don't look at the computer.  They don't try to extract the

11   document.  If you were to believe them, they don't even have a

12   discussion with their client.  None of this adds up.  Their

13   stories are wildly inconsistent.  They are irreconcilable.  And

14   they are lies.  And they are plainly lies that should be

15   sanctioned by the Court and should not be countenanced.

16   Because if this kind of conduct is permitted, a civil system

17   that depends on voluntary discovery and of course depends on

18   verifications and representations to the Court being reliable

19   breaks down.

20         The defendants and their counsel have together

21   subverted the process here.  They have lied to us.  They have

22   lied to Your Honor.  And I would submit to Your Honor that the

23   severest sanction should be issued in this case.

24         And finally I would leave it on this point, Your

25   Honor.  If there's any doubt as to the totally meritless nature

1    of the defendants' excuses and the completely egregious nature

2    of their misconduct, I would suggest that Your Honor should

3    take perhaps in camera testimony from Craig O'Loughlin, the

4    lawyer from Quarles & Brady who withdrew not long after there

5    was a discussion in his office between himself, Mr. Barton, and

6    Mr. Clawson regarding the Southern Arizona Plan, because it is

7    quite clear why he withdrew.  And the full extent of that

8    discussion hasn't yet come out.  But it clearly would further

9    buttress and reinforce the fact that defendants and their

10   clients have engaged in the misconduct which is at issue in our

11   motion for default and sanctions.

12            Thank you, Your Honor.

13            THE COURT:  Thank you, Mr. Uppal.

14            Mr. Barton.

15            MR. BARTON:  Your Honor, quite frankly, this is a

16   travesty of justice.  It is disappointing that counsel can

17   engage in such ad hominem attacks in an attempt to deflect the

18   Court's attention from the real issues at play in this case.

19            I will admit, as we have throughout this case, that

20   there have been mistakes.  But we are here only because we

21   tried to fix them and because we exercised the greatest candor

22   with this Court that we knew possible in order to fix them.

23            We're also here because plaintiffs, through this side

24   show, are attempting to deflect the Court's attention from

25   their own problems with the case.  Let me explain.

1          First of all, we're arguing about the fact that Troy

2   Clawson deleted files apparently from his personal computer.

3   We're not talking about the laptop that Troy Clawson used

4   during his entire employment at Swisher.

5          In fact, Swisher doesn't even want to bring that

6   laptop to your attention.  They haven't brought any evidence to

7   you to suggest that he deleted anything from that file, nor

8   have they brought any evidence to you to suggest that that work

9   computer had any files downloaded, transferred, deleted,

10  omitted, that any of the confidential information that he used

11  during all of his employment with Swisher was somehow destroyed

12  in this case.

13         What they are complaining about is that after Troy

14  Clawson left Swisher, he used his personal laptop to prepare

15  some business plans for his employer.  And after he sent two of

16  those plans to his employer, he deleted them.  He's admitted

17  that.  He's never tried to deny that.  And we produced those

18  plans voluntarily in this case.

19         When we produced those plans, after they were produced

20  by Accurate, we recognized that there was a problem with a

21  prior declaration that Mr. Clawson had filed.

22         The problem was that in talking about a completely

23  different document, the working capital calculators, which are

24  documents that are on his work laptop, which are documents that

25  do contain client information that could have been used to

1    solicit Swisher customers, in talking about those documents,

2    the working capital calculators, Mr. Clawson said I did not

3    direct Swisher -- I did not direct Accurate to target any

4    customers for Swisher.  He has explained that repeatedly.

5           It's true that he forgot about the document, but

6    that's not his primary explanation.

7           Mr. Clawson's explanation has always been that in the

8    context of that Paragraph 17 of his declaration, which was

9    talking about the working capital calculator documents, he did

10   not use them to direct Accurate to target Swisher customers.

11   And that is true.

12          Now, it's also true that the declaration is not --

13   could be read inaccurately, which is why we fixed it.  We

14   didn't want there to be any debate about whether Mr. Clawson

15   was being honest or exercising candor with this Court.

16          So voluntarily we submitted to the plaintiffs a

17   revised version of the affidavit saying, with a cover e-mail,

18   that it was inaccurate and that we were fixing it and that we

19   were filing an amended declaration with the Court, yes, using

20   the notice of errata procedure, because what other procedure

21   were we to use, Your Honor?  That is the only procedure you can

22   use to fix a document that's been filed with the Court that

23   needs to be fixed.

24          So we filed a notice of errata with the Court.  We

25   sent plaintiffs an e-mail explaining that it was in error and

1   sending them a red-line version showing exactly what the change

2   was that was made.

3          And importantly, Your Honor, we didn't have to do

4   that.

5          Why?

6          Because that declaration had been submitted in

7   response to a motion for preliminary injunction that had been

8   withdrawn.

9          And this is where the lies began.  The lies began,

10  because then plaintiff filed a motion for sanction in which

11  they represented to your court -- to the Court in document 48,

12  Lines 5 through 6, that they were prejudiced by this change in

13  this declaration because they withdrew their application for

14  preliminary injunction solely because of Troy Clawson's

15  declaration.  That is a bald-faced lie.  He just used it again.

16         But look, Your Honor, at document 27 that was

17  previously filed in this court by plaintiffs.  In document 27

18  they go on for three pages explaining why they withdrew their

19  application for preliminary injunction.  And not once did they

20  mention Troy Clawson's declaration, not once.

21         They talk about the fact that the Court hadn't got to

22  it, that time was of the essence, and that since so much time

23  had passed since they'd filed their motion for preliminary

24  injunction, they were withdrawing it for that reason and that

25  reason only.

1          Now they come to the Court, when it's convenient to

2    tell you that Troy Clawson's declaration somehow prejudiced

3    them, they come to the Court and create a completely new

4    explanation, a false explanation, by telling you that they

5    withdrew it because of Troy Clawson's declaration.  That is a

6    false misrepresentation to the Court.

7          So we're here because we tried to fix a mistake.  We

8    submitted an amended declaration.  We pointed out the mistake.

9    And we corrected it with the Court.

10          They filed a motion for sanctions, and in that motion

11   for sanctions we responded, and, yes, we said the plan had not

12   been formulated.  As I said in my testimony, we absolutely

13   believed that to be true when we filed it, and Troy Clawson for

14   whatever reason did as well.

15          When we learned later in January that their expert had

16   untimely disclosed -- And this is important as well, Your

17   Honor.  I'm being accused of misconduct and attempt to

18   cover-up.  What's really being covered up here is the fact that

19   Mr. Caldwell, the expert for the plaintiffs, had had their --

20   our computers and all of our hardware in his possession, all of

21   our media, as he describes it, in his possession since

22   September.  And when he made his disclosures on September 21st,

23   he said nothing about a Southern Arizona Plan.

24          It wasn't until January of 2017 when the plaintiffs

25   were sending us correspondence with regard to settlement that

1    they mentioned they had found a document titled

2    Southern Arizona Plan.  And let's talk about that for just a

3    second.  Look at Mr. Caldwell's report carefully, because

4    there's an important distinction.

5           First, Mr. Caldwell tells you he was able to recover

6    the Southern Arizona Plan, meaning it had not been written

7    over.  It was still there.  There was nothing Troy had done to

8    try and erase it.  He hadn't used any software to try and omit

9    it completely.  It was still there, just deleted.

10          And as Mr. Clawson explained, that's his ordinary

11   practice.  When he doesn't need a document anymore, he deletes

12   it.  He's not denying that.  He admits he deletes it.  And

13   he'll say that to the jury.

14          We're not trying to hide the fact that the document

15   was deleted.  We in fact instructed and agreed that

16   Mr. Caldwell could look for deleted files on both of those

17   drives, Mr. Clawson's personal computer and the thumb drive

18   that he tried to make a back-up of the computer on.

19          So there was no attempt to hide a document here.  We

20   encouraged them to find deleted documents.  We agreed to allow

21   them to search for deleted documents.

22          Now, what Mr. Caldwell's report, if you look at it

23   carefully, misses is that he says I was able to recover that

24   deleted file from the unallocated space, but it has no metadata

25   to it.

1          What he didn't tell the Court and what he was not

2    asked to look at, you'll remember, is that when he turned over

3    the e-mail after we first uncovered the e-mail that went to

4    Bradley Zall, we also turned over the e-mailed metadata that

5    went with it.  And that metadata shows exactly when the plan

6    was created, the embedded metadata, which Mr. Caldwell

7    plaintiffs had not asked to testify about even though they had

8    it.  They didn't even give him that metadata to review.

9          And that metadata, as we point out in our response to

10   the second motion for sanctions, shows that that document, the

11   Northern and Phoenix plans were created on June 11th, 2016, as

12   Mr. -- 2016 -- excuse me -- June 11th, 2015, as Mr. -- as

13   Mr. Clawson testified.

14         There's been no attempt to cover up metadata here.

15   There's been no attempt to hide information.

16         Why didn't we produce this information?

17         Because we had already turned over an image of

18   Mr. Clawson's hard drive and his thumb drive to plaintiff and

19   their expert.

20         Why did we not ask him to do more to image the

21   computer?

22         Because when we learned that he hadn't been able to do

23   so, we took the computer into our possession and made it

24   available to plaintiffs' counsel to image.  There wasn't any

25   effort to hide things.

1          We simply did what we could to preserve the data and

2     give it to plaintiffs' counsel as-is.

3          So Troy produces his e-mail.  We fix the error in his

4     declaration.  We turn over the data to plaintiffs' counsel so

5     they can search it themselves.

6          They then find apparently a document entitled

7     Southern Arizona Plan.  And here's where Mr. Caldwell's report

8     goes awry.  Caldwell says I found documents, but it has no

9     metadata with it.  That's the recovered document he found.

10         He doesn't bother to look at the e-mail we sent him

11    previously that had the metadata embedded with it.  He says on

12    the thumb drive I found the documents, but they had no

13    metadata.  Then he makes a leap to the Windows operating system

14    records, and he says in the Windows operating system I see that

15    a document titled -- mind you -- titled Southern Arizona Plan

16    could have been accessed later.

17         Notice there's a distinction there.  He can't connect

18    the two.  He cannot say for certain that that document

19    Southern Arizona Plan is the same Southern Arizona Plan that

20    was titled that he found in the Windows operating system.  He

21    can't say that.  He doesn't say that.

22         So, yes, would I be very grateful if Troy Clawson had

23    done a better job of saving all of his documents from his

24    personal computer to his thumb drive?

25         Absolutely.

1          But there's no doubt that when we asked him to save

2     any documents off his personal computer, not his work computer,

3     his personal computer, that related to Swisher to his thumb

4     drive, he made an effort.  When we learned about it, we turned

5     over the entire shooting match to their expert so they could

6     look at it.

7          Then their expert misleads us.  He prepares a report

8     that says absolutely nothing about deleted files of the

9     Southern Arizona Plan.  And he files it on the deadline,

10    December 21st, 2016.

11         Then only after we file a motion for summary judgment

12    do they come out with a complete report that says, hey, we

13    found this Southern Arizona Plan, and here it is, months after

14    the deadline had passed and after my deadline to produce my own

15    expert witness had passed.

16         Now suddenly their expert is coming forward and

17    saying:  Hey, we found these documents.  They have been

18    deleted.  And it looks like he deleted them to try and hide

19    them.

20         What's really trying to be hid here is the fact that

21    their expert's opinion was late.

22         Why do we know that?

23         Because we filed our motion to strike their expert's

24    opinion when they submitted it in response to the motion for

25    summary judgment.  And only then did they file a second motion

1   for sanctions trying to distract the Court's attention from the

2   fact that their expert opinion was late by saying we had

3   perjured ourselves and that somehow this law firm, my law firm,

4   was engaged in that fraud.  They've now attacked me and my

5   firm.  That puts us in an impossible position, because now we

6   have to defend ourselves in addition to our clients.  We can't

7   do that in a single trial.  We can't do that in a single court

8   of law.

9           It's a very clever tactic by plaintiffs' counsel,

10  who's trying to hide the fact that the merits of this case are

11  deplorable.  They're using a document that was created after

12  the fact and deleted after that to suggest that while Troy

13  Clawson was working at Swisher, he somehow had access to

14  confidential information.

15          Well, the jury can be judges of that, because

16  Mr. Clawson will get up there and tell you that he's got

17  binders of every client -- virtually every client he works

18  with, that he keeps cards from virtually every client, that he

19  has a memory of all the businesses, that you can go to any

20  restaurant, and you can pull it up, and you can figure out what

21  they do and how much business they do simply by knowing the

22  business like he does, which he's been in for 30 years.  The

23  jury can be that judge.

24          Mr. Clawson has not perjured himself.  He explained

25  that when he read the declaration we prepared saying that the

245

1    plan had never been formulated, that he didn't think it was

2    inaccurate, because in his mind it had not been formulated.  He

3    hadn't finished it.  He hadn't submitted it to Mr. Zall.  And

4    there's no dispute that that's true.

5            And he explained to Your Honor when he testified that

6    when he said he hadn't finished it, he hadn't finished it

7    because Southern Arizona is a much larger market than Northern

8    Arizona.  There were a lot more customers he was planning to

9    add to that plan, but he never did.  He never got around to

10   finishing it.

11           Now, that may be an explanation that plaintiffs don't

12   want to believe, but it's not perjury.  It is not a knowing

13   false statement.

14           And certainly when we put those words on a page, we

15   certainly did not believe that there was a

16   Southern Arizona Plan.

17           When we learned about it later in January when they

18   sent us their e-mail, Exhibit 20 -- sorry -- Exhibit 39 before

19   you and they told us that there was a Southern Arizona Plan, as

20   you heard, we had an immediate conversation with Mr. Clawson to

21   say:  What's up?  What's this Southern Arizona Plan they say

22   exists?

23           And I even wrote to plaintiffs' counsel and said what

24   are you talking about?  That's Exhibit 20.  I said tell me what

25   this Southern Arizona Plan is, because we had never known that

1    there was such a thing.

2         In our mind it didn't exist.  And that's what we told

3    the Court.

4         So here we are.  Plaintiff is now accusing me of fraud

5    on the Court because I tried to fix an error.  He's accusing my

6    client of fraud on the Court because they wanted to fix an

7    error, a mistake based upon a large paragraph.

8         They want to focus on a single line in a paragraph

9    relating to something completely different and say that because

10   Mr. Clawson didn't remember the business plans he created when

11   he was talking about the working capital calculators that he

12   didn't take, that somehow that is a knowing and intelligent

13   fraud upon the Court.

14        Your Honor, that's not the standard.  The standard

15   which we've cited to the Court is in Englebrick versus

16   Worthington.  They have a burden of proving that there is "a

17   pattern of disregard for Court orders and deceptive litigation

18   tactics that threaten to interfere with the rightful decision

19   of the case."

20        I would submit to the Court that there's actually a

21   pattern here of attempting to be very candid with opposing

22   counsel and the Court, but plaintiff is trying to use our

23   attempts to fix the record as a fraud upon the Court.  And

24   their tactics, quite frankly, have succeeded, because now I'm

25   in a position where, because I've been made a witness, I need

1   to withdraw.  And that, quite frankly, is unfair.  It's unfair

2   to my client.  It's unfair to the administration of justice.

3   It's unfair, and it's improper.  And it's all a tactic to try

4   and cover up a late-disclosed expert report and trying to blame

5   us for trying to fix the record when we got involved in the

6   case.

7           There is no fraud here.  There's no perjury here.

8   There are mistakes that we have fixed.  That's all.

9           Thank you, Your Honor.

10          THE COURT:  Thank you, Mr. Barton.

11          Mr. Uppal.

12          MR. UPPAL:  Your Honor, I don't believe I'll need my

13  full five minutes.  There's just a few issues that I want to

14  cover.  Your Honor just heard Mr. Barton again repeat we had no

15  knowledge of the Southern Arizona Plan until January of 2017.

16  That's when I wrote Mr. Barton a letter saying that our ESI

17  expert had found something titled -- he hadn't yet found the

18  plan -- but he had found something titled Southern Arizona Plan

19  or close to it.

20          Mr. Barton's representation to the Court, which he

21  just repeated, we had no knowledge of the Southern Arizona Plan

22  until January of 2017 is contrary to the testimony that has

23  been presented to the Court under oath during the evidentiary

24  hearing.

25          Your Honor will recall that I questioned Ms. Lancero

1    about this issue.  I asked her if the April 26 -- if the e-mail

2    between Mr. Clawson and Mr. Zall, when they found it and when

3    they disclosed it to us on April 26, 2016, whether that

4    discovery triggered a conversation between her, that is,

5    Ms. Lancero, and Mr. Clawson regarding the

6    Southern Arizona Plan, because Your Honor knows in that e-mail

7    Mr. Clawson sends the Northern Arizona Plan and the Phoenix

8    Arizona Plan and says I'll work on Southern Arizona tomorrow.

9          Ms. Lancero testified in the affirmative that as they

10    turned over that April 26, 2016, supplemental disclosure, it

11    did trigger a conversation between her and Mr. Clawson.  So

12    then I asked her wouldn't you have had to have had this

13    discussion with Mr. Clawson about the Southern Arizona Plan

14    prior to June 11, 2016?

15          That's the date, June 11, 2016, when Mr. Clawson

16    verified to Your Honor.

17          She responded probably.

18          And Your Honor will also remember that Ms. Lancero

19    described the conversation when she asked Mr. Clawson about the

20    Southern Arizona Plan, and he told her it had been started,

21    that it hadn't yet been finished and that it was words on a

22    page.

23          And that's not what they represented to the Court or

24    to us.

25          If they had stated in a representation, instead of

1    saying it was never formulated, if they had said it was never

2    finished, that would have revealed the existence of the

3    document.   If they had repeated what Mr. Clawson said that it

4    was started instead of saying it was never formulated, that too

5    would have revealed the existence of the document, which is

6    exactly what they were trying to cover up in falsely stating

7    that it was never formulated.

8           Second point I want to address quickly is I have never

9    really understood opposing counsel's argument that they should

10   somehow be excused from their misconduct because the misconduct

11   was not set forth in Mr. Cardwell's first expert disclosure by

12   the expert disclosure deadline.

13          We'll truly and freely acknowledge that Mr. Cardwell

14   did not discover defendants' and the BurnsBarton's cover-up and

15   misconduct by the expert disclosure deadline.

16          Why?

17          Because they didn't reveal it.   They didn't come

18   clean.   They deleted the document.

19          And Mr. Cardwell testified how difficult it is to

20   uncover information that's supposed to be preserved, as to

21   which there's an affirmative duty to preserve, which is

22   deleted.

23          And certainly they could have made things easier by

24   telling us of the existence of the Southern Arizona Plan

25   instead of saying it was never formulated and instead of

1    deleting it.

2          And finally, Your Honor, it is undisputed the only

3    testimony on this issue as to the defendants' failure to

4    preserve the Southern Arizona Plan is from Mr. Cardwell.

5          Mr. Cardwell's affidavit that's already been filed at

6    docket 103-1 states:  "The Accurate Southern Arizona Plan

7    existed as an active file in allocated space as of August 13,

8    2015."

9          And that tells us that it was deleted after August 13,

10   2015.

11         Your Honor, as of August 13, 2015, defense counsel had

12   already told their client to image the computer.  They had

13   already been repeatedly told by Mr. Clawson that he hadn't done

14   so.  And they took no steps to have it imaged or preserved when

15   they were under a duty to preserve it.

16         Finally, Your Honor, Mr. Cardwell -- excuse me --

17   Mr. Barton has again represented to Your Honor that he had no

18   knowledge of the Southern Arizona Plan until January of 2017.

19   I already went over how that's not true based on Ms. Lancero's

20   testimony.  But it's also not true based on Mr. Clawson's

21   testimony.

22         There is no rational basis, there is no honest basis

23   for Mr. Clawson -- excuse me -- for Mr. Barton to tell you that

24   he had no knowledge of the Southern Arizona Plan until January

25   of 2017 when his own client testified that there was a

1    discussion in the Quarles & Brady law office between himself,

2    attorney Barton, and attorney Clawson where they specifically

3    asked him about the Southern Arizona Plan.

4            Thank you, Your Honor.

5            MR. BARTON:  If I may, Your Honor, I need to address

6    one thing.

7            THE COURT:  No.  Mr. Barton, I think I've permitted

8    counsel enough time, and the moving party receives the ability

9    to present a rebuttal argument.

10           I have on several occasions mentioned to counsel that

11   the matter has been fully briefed.  I have reviewed and

12   rereviewed.  I have looked at the attachments, and there are an

13   abundant number of attachments.  I have reviewed the testimony.

14   And I am prepared at this juncture to rule.

15           The ruling of the Court -- And I appreciate the

16   summation of both parties because, in the first instance, I

17   will say that it will avoid in some context the necessity for

18   me to repeat the procedural posture of the case.  Mr. Uppal has

19   correctly pointed out how things arrived in the court.

20           The plaintiffs did file the complaint.  The original

21   complaint was filed in June, June 21st of 2015.  The first

22   amended complaint was filed in July of 2015.

23           And I think it's important to consider what this case

24   is all about.  And there are a number of allegations in the

25   complaint.  And the complaint largely involves unfair

1    competition.  And the original complaint -- Well, let's go back

2    to the preliminary injunction.

3            The preliminary injunction sought to enjoin defendants

4    Clawson and ACS from, number one, soliciting any Swisher

5    employee for two years and, secondly, using or disclosing any

6    information gathered, prepared, or assembled on behalf of

7    Swisher.

8            Now, defendants, who at the time were represented by

9    Quarles & Brady and in particular Mr. Craig O'Loughlin,

10   answered that complaint at document 24 stating that the

11   preliminary injunction request was an extraordinary request,

12   and there was no basis for it.  And attached thereto was the

13   Exhibit A, which was the original affidavit that was signed by

14   Troy Clawson and dated July the 31st of 2015.  That was filed

15   along with the answer on August the 4th of 2015.

16           Now, plaintiffs did withdraw their application for

17   preliminary injunction for various reasons.  And that occurred

18   on August the 25th.  I rereviewed the record, and it is true,

19   Mr. Barton, that plaintiffs indicated a number of reasons,

20   including the delay, the delay that occurred in the state court

21   process, what had occurred with, I think, the originally

22   assigned judge and reassigned judge and then what happened

23   after the removal.

24           And then, as matters tend to go, the parties undertook

25   discovery.  And that discovery largely took place in and around

1    October 27 -- excuse me -- October, 2017.

2           And it was on the docket noted that on May the 4th of

3    2016, the Quarles & Brady law firm, Mr. O'Loughlin, withdrew as

4    the defendants' counsel, and the Burns and Barton law firm and

5    namely Mr. David Barton and Katya Lancero appeared as

6    defendants' counsel, and thereafter discovery continued.

7           Now, what occurred next was on June the 2nd of 2016.

8    Let me back up and correct myself.

9           Discovery began in earnest sometime in October of

10   2016, not '17.  But, in any event, there was a motion for

11   sanctions filed by the plaintiffs on June the 2nd of 2016.

12   This was plaintiffs' first motion for sanctions, and that is at

13   document 48.  That motion alleged that the defendants committed

14   fraud on the Court, that there was a filed perjured affidavit

15   with the Court, and that defendants inappropriately filed a

16   revised affidavit under a notice of errata.

17          And in the allegation it essentially states that the

18   parties did so without informing the Court that the original

19   affidavit that was being replaced in the notice of errata

20   contained material false statements alleging that the

21   defendants therefore in the first instance filed a perjured

22   affidavit as part of the answer in opposition to plaintiffs'

23   preliminary injunction.

24          Now, notably that notice of errata was filed by the

25   Burns and Barton law firm, and it was filed on April the 27th

1    of 2016.  And the plaintiffs' motion for sanctions was not

2    filed until several months later.

3         Now, in that motion -- I think this is noteworthy --

4    the sanctions sought were a negative inference jury instruction

5    regarding defendant Clawson's perjury and defendant ACS's

6    subornation of that perjury.  They also sought an order

7    precluding the defendants from arguing they did not make use of

8    Swisher's confidential information and any other sanctions that

9    the Court thought appropriate.

10        I want to make sure that we don't lose sight of what

11   was contained in that original affidavit that was attached as

12   an exhibit to the answer.  The parties have primarily focused

13   on Paragraph 17, but I also think, because it is pertinent to

14   the claims in the first amended complaint, that there is also

15   an acknowledgment; Mr. Clawson acknowledged that he was asked

16   to and did in fact sign a non-compete agreement.  And he goes

17   through some lengths to in some ways sort of downplay the

18   importance of that non-compete agreement but nevertheless

19   acknowledges that he signed it.

20        In addition to that, there are several paragraphs

21   about his conduct and allegations about orchestrating the

22   departure of Swisher employees.  And a number of those

23   employees are listed as to whom he assumes that there's an

24   allegation that he is trying to lure or target.

25        And those individuals are named in Paragraph 13.  And

1    there are a variety of statements about conversations he had

2    with those employees either before he left or after he left.

3            And then there is of course Paragraph 17.  And here it

4    states that "Swisher also alleges that Tony Khoury purportedly

5    said that I told him that I had taken all of Swisher's working

6    capital calculator documents and that ACS and I were using

7    those documents to identify Swisher's customers to target.  I

8    never made any such statements to Tony, and I never gave any of

9    those documents to ACS.  As noted above, I have not solicited

10   Swisher customers either before or after I left Swisher nor

11   have I identified any Swisher customers that ACS should go

12   after."

13           And then he states that "I'm not in possession of any

14   Swisher confidential information or property, nor did I ever

15   provide any Swisher confidential information or property to

16   anyone at ACS."

17           19, Paragraph 19, states "Further ACS has informed me

18   that they are not interested in having me solicit any Swisher

19   employees or customers."

20           The parties have focused on the last line of 17, "nor

21   have I identified any Swisher customers that ACS should go

22   after," but I look at that statement in the context of the

23   overall original affidavit and the allegations in the complaint

24   and the matters that have been discussed here.

25           Well, what occurs next is the defendants respond to

1    that first motion, and that was filed on June the 13th of 2016

2    at document 53.  And here the defendants' response essentially

3    states that "Defendant Clawson did not knowingly make a

4    perjured statement in his affidavit."  And then they state

5    "And, in any event, he and defendant ACS corrected the

6    affidavit."

7           Secondly, they say, "Clawson did not take any Swisher

8    confidential information with him, and he did not use the

9    information to write his business plans that were sent to CEO

10   Bradley Zall," stating that Mr. Clawson used his business cards

11   to develop the plan.

12          Defendants further state "For almost four hours on

13   June 11, 2015, Clawson mulled over his binders of business

14   cards, using them to draft a plan for developing Accurate's

15   business.  Clawson picked the businesses he felt would bring

16   Accurate the most success.  Importantly, about 15 of the

17   businesses he listed in his plan were not Swisher customers."

18          At the end of Page 3, Lines 24 to 26, defendants state

19   "Although Clawson's e-mail to Zall stated that he would 'work

20   on Southern Arizona tomorrow,' Clawson never actually ended up

21   formulating a plan for Southern Arizona."

22          And that last phrase is and has been greatly debated

23   in these proceedings.

24          Now, at some point the Court then issues its order

25   that the motion is moot.  Then the parties continue throughout

1   the course of the case to pursue discovery, even engaging in

2   settlement negotiations and filing dispositive motions which

3   are currently pending.

4          Then plaintiffs file their second motion for sanctions

5   on March 9th of 2017 and coupled with a motion for default

6   judgment.  And plaintiffs bring this motion because their

7   expert uncovered electronic discovery that was not produced by

8   defendants and state that that discovery was found to have been

9   deleted by defendant Clawson.

10          Plaintiffs then reiterate the other grounds discussed

11   in their first motion for sanctions.  And given the new

12   discovery of spoliated electronic discovery, they are now

13   seeking default judgment in favor -- in their favor as a

14   sanction for defendants' conduct.

15          And the defendants responded on March the 23rd of

16   2017, and that is at document 115.  Now, defendants respond

17   that the Court should deny this motion for five reasons, and

18   let me just highlight several of those reasons.

19          The first they state is "The mistake at issue is one

20   of poor word choice, not fraud.  Counsel should have used the

21   word 'finished' instead of 'formulated' in the legal brief

22   submitted to the Court."

23          Two, "Defendants preserved an e-mail -- in an e-mail

24   the Phoenix Arizona and Northern Arizona action plans along

25   with their embedded electronically stored information."

1          A fourth reason, "Plaintiffs actually have the

2  Southern Arizona Plan and its embedded metadata with a creation

3  date in their possession, and thus no violation of Rule 37(e)

4  of the Federal Rules of Civil Procedure occurred," and, five,

5  "Defendants did not act with the intent to deprive plaintiffs

6  of the Southern Arizona Plan."

7          Now, the Court has heard from several witnesses here,

8  Ms. Katya Lancero, Mr. David Barton, defendant Troy Clawson,

9  and plaintiffs' computer forensic expert, Mr. Clawson.

10          And I find the following as to the allegations:

11          After Swisher purchased Pro-Clean, Swisher provided

12  Mr. Clawson with a confidentiality and non-compete agreement.

13  That agreement contains restrictive covenants.  And Clawson

14  signed the agreement on September 19th, 2011.

15          Now, defendants claim that on leaving Swisher,

16  defendant Clawson returned all of the equipment to Swisher,

17  including a laptop and a thumb drive that contained the working

18  capital calculator documents.

19          Plaintiff Swisher alleges Clawson never returned the

20  thumb drive or the working capital calculator documents.

21          Shortly after Mr. Clawson joined the defendants ACS,

22  the ACS president issued Clawson a letter warning that he was

23  prohibited from using Swisher's confidential information and

24  soliciting Swisher's customer, which Clawson signed.

25          Now, plaintiffs alleged in the amended complaint that

1    Clawson violated the terms of the agreement that prohibit the

2    disclosure or use of Swisher's confidential information and

3    prohibited him from soliciting Swisher's employees to leave and

4    join him at ACS.

5           Plaintiffs further allege that ACS participated in

6    soliciting Swisher employees and encouraging former Swisher

7    employees to use Swisher's confidential information to benefit

8    ACS.

9           Plaintiffs filed an application for preliminary

10   injunction which was not considered by the Court because,

11   amongst other reasons, it was improperly filed, and after the

12   preliminary injunction was filed, Clawson signed an affidavit.

13   And as stated before, that affidavit was signed on July 31st of

14   2015 and was attached to the defendants' answer.

15          That affidavit ends in a declaration that it is signed

16   under penalty of perjury, and the Court has already discussed

17   the provisions of that affidavit.

18          Now, plaintiffs did state that this first affidavit,

19   among other reasons, prompted it to withdraw and not refile its

20   preliminary injunction, which resulted in prejudice to them,

21   they argue.

22          Now, the Court recognizes that the plaintiffs did

23   detail other reasons for withdrawing their preliminary

24   injunction motion, including the delay in the state court

25   proceedings.  But I also find it reasonable on this record that

1   the first affidavit contributed to the plaintiffs' decision not

2   to refile their preliminary injunction and therefore resulted

3   in some prejudice to the plaintiffs.

4           Now, defendant Clawson then signed a revised affidavit

5   which defendants, Mr. Barton and Ms. Lancero, filed as a notice

6   of errata.

7           Neither counsel Barton or Lancero explained the

8   material differences in the two affidavits which apparent --

9   which were apparently false statements by defendant Clawson.

10  And this is important because those statements are material to

11  the complaint.

12          As was mentioned before, this did prompt the first

13  motion for sanctions, arguing that the defendant Clawson

14  submitted a perjured sworn affidavit to the Court when he

15  previously stated he had not identified any Swisher customers.

16          The Court finds that defendants Clawson created a

17  false affidavit signed under penalty of perjury which contains

18  multiple false statements.  And the Court has already

19  identified the false statements and in particular at:

20          "Paragraph 17.  I have not solicited Swisher customers

21  either before or after I left Swisher, nor have I identified

22  any Swisher customers that ACS should go after.

23          "18.  I'm not in possession of any Swisher

24  confidential information or property, nor did I ever provide

25  any Swisher confidential information or property to anyone at

1    ACS.

2           "19.  Further, ACS has informed me that they are not

3    interested in having me solicit any Swisher employee or

4    customer."

5           That paragraph is relevant because, after all, the

6    e-mail at discussion here is an e-mail between Bradley Zall and

7    Mr. Clawson, Bradley Zall being the president of ACS.  And it

8    seems at odds to suggest that he has not provided or that ACS

9    informed him that they are not interested in having him solicit

10   any Swisher employees or customers, yet he's creating these

11   customer service lists that include Swisher customers.

12          Now, on April 26th of 2016, an e-mail written by

13   defendant Clawson to the president of ACS -- as I mentioned,

14   that e-mail is dated June 11 of 2015 -- was produced in

15   discovery to plaintiffs.  And this e-mail contains 129 Swisher

16   customers, including confidential information about those

17   customers, and referred to a plan of action regarding those

18   customers.  It also notably includes a list of salaries of

19   current Swisher employees and lists in particular individuals,

20   quote, worth bringing over and the cost of doing so.  And there

21   are employees that are named, a list outlining compensation at

22   Swisher that they are currently receiving.  And then it states

23   "We really need to consider Jay Dowling, his compensation and

24   commission."  I note Jay Dowling is a name predominantly listed

25   in the first affidavit as well as the amended affidavit.

1          Now, as to the Southern Arizona Plan, that

2     Southern Arizona Plan was uncovered after plaintiffs' forensic

3     computer expert examined defendant Clawson's thumb drive and

4     his computer.  I have considered the testimony of the computer

5     forensic expert, Mr. Cardwell.

6          And Mr. Cardwell testified that he late found the

7     Southern Arizona Plan and that the Southern Arizona Plan was

8     previously deleted and stored in unallocated space of

9     defendant's thumb drive.  He testified that in his experience,

10    the unallocated space area where it was found is not easily

11    accessible.  And after a series of questions, he stated his

12    conclusion was in his experience it led him to believe that

13    this document was purposely hidden.

14          And I do not -- excuse me -- I do not find it

15    convincing any allegation that a family member, a wife or

16    children of Mr. Cardwell accessed his thumb drive and deleted

17    the Southern Arizona Plan.

18          Mr. Cardwell testified that that scenario is highly

19    unlikely, because any other person such as a wife or child

20    would have to know where to go to access the specific file and

21    then delete it.  That is just not credible in this

22    circumstance.

23          Now, defendant Clawson did testify that the

24    Southern Arizona Plan was more valuable than the

25    Northern Arizona Plan and the Phoenix Plan because of the

1   number and type of customers and accounts included in that plan

2   or that would be included in that plan, yet he testified that

3   he forgot about starting the Southern Arizona Plan.  He went on

4   vacation, and he never finished the plan.

5           When asked by Ms. Lancero, Mr. Clawson -- about the

6   Southern Arizona Plan because it was reflected in that e-mail

7   that was sent to Mr. Brad Zall, "Also I am adding --" well, the

8   last sentence says, "I'll work on Southern Arizona tomorrow."

9           So as plaintiffs correctly point out, this discovery

10  of this e-mail communication and the attached plans prompted

11  Ms. Lancero to ask about the Southern Arizona Plan.  And

12  apparently at this juncture the description words on a page

13  comes about.  Ms. Lancero testified to it as her recollection

14  of the description.  Mr. Clawson then testified that that was

15  his recollection about what he said.

16          I find Mr. Clawson's testimony less than credible.

17  First, the Southern Arizona Plan, once discovered, it shows

18  that it is remarkably similar to the Northern Arizona Plan and

19  the Phoenix Plan.

20          Second, if one is to believe that a person has just

21  newly accepted a job and his job was to create business, and

22  he's having direct communication with the president of this

23  company, and his testimony that the Southern Arizona Plan was a

24  more valuable plan, it seems inconsistent that Mr. Clawson

25  would have forgotten about that plan.

1          I also find it less than credible that these

2     statements words on a page to describe the

3     Southern Arizona Plan could have been used because they never

4     have before appeared in the record.  We've had all of this

5     conversation about formulated, finished, sent, and the

6     description of words on a page just -- it seems unfathomable to

7     me.  Really it does.

8          Well, I also find that Mr. Cardwell did state that the

9     Southern Arizona Plan was deleted on August the 13th of 2015.

10    I reviewed -- I have reviewed his declaration, and I find it to

11    be credible, that is, document 89-1.

12         He states a number of important things here.  He finds

13    that the Accurate Phoenix Arizona Plan existed as an active

14    file in allocated space as of October 20th of 2015.  The

15    Accurate Southern Arizona Plan existed as an active file in

16    allocated space as of August 13th of 2015.  And the

17    Northern Arizona Plan existed as an active file in allocated

18    space as of December 16th of 2015.

19         He was unable to find active files with those plans.

20    And basically he states that in looking through the storage

21    media, they -- they are no longer in allocated space on the

22    storage media means that they were deleted.

23         Finally, based on the Windows event log, he states the

24    Accurate Phoenix Arizona plan must have been deleted on or

25    after October 20th of 2015.  The Accurate Southern Arizona Plan

1    must have been deleted on or after August 13th of 2015.  And

2    the Accurate Northern Arizona Plan must have been deleted on or

3    after December 16th of 2015.

4         That declaration was signed on February 8th of 2017.

5    And I read that declaration in conjunction with the letter

6    dated January 20th, 2017, signed by Mr. Barton where it states

7    in the third paragraph "We have confirmed with Troy Clawson

8    that although he deleted the Accurate Phoenix Arizona Plan and

9    Accurate Northern Arizona Plan from his thumb drive, he did so

10   in the usual course and according to his custom on June 11th,

11   2015, well before Swisher filed the complaint on June 24th,

12   2015."

13        It is in complete contradiction with the forensic

14   computer expert.

15        So I find that based on this evidence and the

16   testimony, Mr. Clawson did deliberately destroy the

17   Southern Arizona Plan.  He did so after the filing of the

18   complaint.  He engaged in spoliation of electronic discovery.

19   He did so even after he was instructed by counsel to preserve

20   that evidence.

21        And so I find that he knowingly and recklessly engaged

22   in a violation of the discovery rules, and this is relevant

23   because it is a central component of the plaintiffs' complaint.

24        It has prejudiced the plaintiffs.  I found earlier

25   that there was some prejudice with respect to consideration of

1     a renewed preliminary injunction order.  I also find that had

2     plaintiffs not engaged this forensic computer expert, the

3     Southern Arizona Plan and what is contained on it may have

4     never been discovered.  And had it not been found, clearly

5     plaintiffs would have suffered further prejudice.  This is a

6     critical piece of evidence in their case, and it supports their

7     claim.

8           Now, as to counsel's conduct, Mr. Barton and

9     Ms. Lancero, I do find the following:

10          As to the affidavit being filed as a notice of errata,

11     this was filed under Mr. Barton's signature, and it is a

12     one-page notice of errata that states "Notifying the Court of

13     an error appearing on Page 4 in the affidavit" and nothing

14     more.

15          I find this at the very least a misuse of a notice of

16     errata, which are used to correct generally slight errors such

17     as typographical errors or perhaps a misstatement of a date or

18     a year, and at worst it was an attempt to replace a perjured

19     sworn affidavit without alerting the Court to the fact that it

20     was perjured or that there were material misstatements of fact

21     that go specifically to a claim in the complaint.

22          Now, based on the entirety of the record, I also find

23     the latter to be true.

24          As to Ms. Lancero, I think it was Mr. Barton who

25     remarked at the last hearing that she is a third-year

1    associate, a graduate of U of A.  And I think at the outset of

2    this case then she probably would have been maybe in her first

3    full year of practice.  Now, she testified that she informed

4    defendant of his obligation to preserve evidence at the outset

5    of the case.  She told him to image his computer.  But she

6    never verified that he did so, nor did she ask him to produce

7    it during the active discovery phase of this case.

8            And as Mr. Clawson testified and as Mr. Uppal pointed

9    out, there was no instruction.  There was sort of Mr. Clawson

10   left to his own determination of how this imaging of the

11   computer should take place, what he should do with it.

12           Now, she also testified in response to a question

13   about whether Mr. Clawson created a Southern Arizona Plan, and

14   she said, "He didn't actually finish creating it, but he

15   started one."

16           Ms. Lancero testified that Mr. Clawson, when asked

17   about the existence of the Southern Arizona Plan referred to in

18   his e-mail to the president, Mr. Zall, she, as we indicated

19   earlier, stated this was -- she indicated he stated something

20   to the effect that these are words on a page and that

21   Mr. Clawson told her he stopped working on it due to vacation

22   plans.

23           Now, if it occurred, these statements words on a page,

24   a reaction to a question about the existence of a

25   Southern Arizona Plan, apparently it did not cause her to

1    inquire further about the content of these words on a page, nor

2    did she consider the statement made by Mr. Clawson that he

3    started a Southern Arizona Plan required further inquiry.

4           And as the Court had pointed out earlier, much has

5    been made about the lines in document 53, defendants' verified

6    response to the plaintiffs' motion for sanctions.  "Although

7    Clawson's e-mail to Zall stated that he would 'work on Southern

8    Arizona tomorrow,' Clawson never actually ended up formulating

9    a plan for Southern Arizona."

10          This is important to put in context with Ms. Lancero's

11   and Mr. Barton's testimony, because in response to a question,

12   Ms. Lancero testified that after viewing the recently uncovered

13   deleted Southern Arizona Plan, which, in her own words, is "a

14   list of customers on this one and two pages, and then a third

15   page has some words as well," she continued to testify that the

16   Southern Arizona Plan was not finished, nor was it formulated,

17   and that it was simply words on a page.

18          These statements are misleading at best and lacking in

19   candor to the Court.

20          I find so because one need only look at the

21   Northern Arizona Plan, the Phoenix Plan, and the

22   Southern Arizona Plan, and they are nearly identical.

23          I find it very incredible when I read the testimony of

24   Ms. Lancero.

25          Mr. Uppal asked:  "Ms. Lancero, now that you have the

1    Accurate Southern Arizona Plan before you, are you contesting

2    or arguing that it wasn't formulated?  Doesn't it look

3    formulated to you?

4            "Answer:  All I can say is that there's a list of

5    customers on this one and two pages, and then the third page

6    has some words as well.

7            "Question:  Is that a yes or no, Ms. Lancero?  Does

8    the Accurate Southern Arizona Plan that you have before you

9    appear to be formulated to you?

10           "Answer:  It's hard to answer.  I don't know what

11   standard to use to say whether a specific plan created by

12   someone is finished or not.  It's my understanding that it

13   wasn't finished, so you're using the term formulate and --"

14           And I also find that Mr. Barton was asked the same

15   type of question, and Mr. Barton continued to state that Mr. --

16   the statement that Mr. Clawson never actually ended up

17   formulating a plan for Southern Arizona, even in the face of

18   the actual document, Mr. Barton states "That's not a false

19   statement.  It is true today."

20           I think most importantly what is critical here is that

21   the client alerted counsel to potentially discoverable

22   information, and they ignored it.  Yet on viewing the

23   discoverable information, the Southern Arizona Plan, counsel

24   continues to, up to the point of this hearing, characterize it

25   as not finished even though it is virtually almost identical to

1    the other plans that were turned over in discovery.

2           But here is the critical point:  Whether or not it is

3    finished, formulated, words on a page, it is evidence of

4    Mr. Clawson's intent, knowledge, plan, and relevant to

5    plaintiffs' claims.  It is protected information.  It is

6    information that contains customer information, their lists,

7    salaries, employee salaries.  And it really, in many ways, it

8    isn't relevant how you characterize it.  It is discoverable.

9    It should have been preserved.  It should have been turned

10   over.  It should have been imaged.

11          When Ms. Lancero or Mr. Barton find out from their

12   client that, yes, there was something started, well, you need

13   to find out what was that something?  What were those words on

14   a page?  Is it potentially discoverable?

15          There is a duty to protect and preserve relevant

16   discoverable evidence.

17          As to Ms. Lancero's credibility, I find her not

18   credible.  She has engaged in unhelpful word play in this

19   hearing, formulated versus finished, words on a page.  Even at

20   one point -- And this is where I say that I really was quite

21   taken by the testimony here.  There was an exchange between

22   Mr. Uppal and Ms. Lancero.

23          Mr. Uppal asks:  "So, Ms. Lancero, did you carefully

24   read the plaintiffs' controverting statement of facts?

25          "Answer:  I certainly read it.  It's hard to say

1       whether the word carefully, to what extent that means."

2              That is irresponsible testimony, and it was at that

3       juncture that this Court reminded Ms. Lancero who would be the

4       person determining credibility of witnesses.  It is

5       unprofessional, and it lacks candor or appreciation for the

6       seriousness of these proceedings.

7              The facts are clear here Ms. Lancero was alerted that

8       there was a potential discoverable piece of information

9       specifically related to plaintiffs' claims, and she chose not

10      to investigate that information.  And even after it was

11      discovered, she did not relent and testified here that it was

12      not finished.

13             I find, too, that what is also troubling here is that

14      there is no contrition by defendants, by defendants' counsel.

15      There is no acknowledgment that matters could have been handled

16      more appropriately.  It would have been refreshing and

17      preferable had I heard from Ms. Lancero that:  Listen, I was a

18      first-year associate.  I thought I knew what I was doing.  I

19      made an error in judgment.

20             It would have been more understandable.  But that did

21      not occur.  I do find that there's clear and convincing

22      evidence that defendant Clawson did engage in a fraud on the

23      Court.  He did so when he filed that first perjured affidavit.

24      And I also find that plaintiffs' counsel facilitated and

25      continued to cover up that fraud.

1          It is not a pleasant task for this Court to so find.

2          As to plaintiffs' motion -- second motion for

3    sanctions, the plaintiffs are seeking an order striking the

4    defendants' answer and an entry of default judgment in their

5    favor.  They recognize, as this Court does, that this is a

6    drastic sanction.  And the Court also recognizes it has the

7    authority to do so under its inherent powers, and in response

8    to abusive litigation practices, and under Rule 37 when a party

9    fails to obey an order to provide and permit discovery.

10          I do find that under these circumstances and the

11   record developed here, this case warrants such a drastic

12   sanction.  I am going to order default judgment in favor of

13   plaintiffs.

14          As to the analysis, the five-step analysis that this

15   Court must go through in order to determine whether or not

16   default is appropriate, there is of course the consideration of

17   the public's interest in expeditious resolution of the Court's

18   docket.

19          Here the defendants' actions in the discovery process

20   have caused a delay in the proceedings.  They have been met

21   with the need to have plaintiffs hire a forensic examiner.

22   There have been two sets of motions for sanctions that have had

23   to have been filed.  And it has caused significant expense to

24   the parties, including the necessity for this hearing, which

25   has lasted now three days, albeit hours within those days.  It

1   has created additional work for the Court.  And so I find that

2   the first factor weighs in favor of default.

3           Risk of prejudice to the other party.  This requires

4   the Court to determine whether the defendants' actions impaired

5   the plaintiffs' ability to go to trial or threatened to

6   interfere with their rightful decision in the case.  Clearly

7   testimony from the evidentiary hearing, the deposition

8   testimony, the documentary evidence, combined with the efforts

9   to withhold evidence misrepresents the facts, misleads the

10  plaintiffs and the Court.  And as I have found, the defendants

11  did withhold relevant and discoverable information by ignoring

12  these requests for production of documents and by deleting

13  evidence which was crucial to the plaintiffs' case and at the

14  heart of their claims.

15          Again, had the plan never been discovered, plaintiffs

16  would have suffered prejudice that would have impaired their

17  ability to go to trial or effect the outcome of the case.  The

18  Court notes here too that the parties had undergone a number of

19  settlement discussions.

20          The public policy favoring the deposition --

21  disposition, excuse me, of cases on the merits.  Well, when you

22  balance the public policy considerations of disposing of this

23  case on its merits and the acts by the defendants here, this

24  factor does not outweigh the other factors.  Again, the conduct

25  goes directly to the heart of the allegations in the complaint.

1    Are there the -- Is there the ability of the Court to

2    enter into less drastic sanctions?

3    As I indicated before, in the first motion, plaintiffs

4    sought an adverse inference instruction against the defendant.

5    And at this juncture, that is insufficient.

6    Would there be a potential for a bench trial as a

7    sanction?

8    Well, I would submit to you a bench trial would not

9    relieve the defendants.

10    And so here, given the nature of the misconduct and

11    the fact that it was an organized or appears to be an organized

12    effort, at least on this record, among multiple participants --

13    And I must say I do find it interesting that a representative

14    from ACS, president Mr. Zall, never appeared in these

15    proceedings.

16    The Court does conclude that the severity of this

17    sanction is called for.

18    I do find that defendants, the named defendants, and

19    counsel's conduct was willful, and it was done in bad faith.

20    And so I find that this case merits this drastic sanction.

21    So for these and other reasons that will be more fully

22    developed in a written order to follow, I will grant

23    plaintiffs' second motion for sanctions and enter default

24    judgment in plaintiffs' favor.

25    I'm going to strike the answer to the complaint.  I'm

1    going to strike the motion -- Excuse me.  I'm going to deny the

2    motion to strike the forensic computer expert's report as late

3    filed.

4            I am further vacating the final pretrial conference.

5            And what will follow is my briefing schedule to

6    determine whether additional sanctions, including monetary

7    sanctions, are appropriate.

8            As I mentioned to counsel here, this is not a pleasant

9    task.  It is the second time in my career as a Federal District

10   Court Judge that I have had sleepless night because of the

11   content, the testimony, and the behaviors of counsel.

12           As I mentioned before, Ms. Lancero is a young

13   associate, but she has the same ethical obligations, and she

14   is -- she must uphold the Rules of Professional Conduct just

15   like any other lawyer.

16           Mr. Barton, I am going to order that Ms. Lancero

17   self-report to the Arizona State Bar.  I'm going to also order

18   that she provide a transcript of her testimony to the State

19   Bar.  And I will leave it up to the Arizona State Bar to

20   determine whether or not she has violated any of the

21   Professional Rules of Conduct.

22           Mr. Barton, as Ms. Lancero's supervisor, I'm going to

23   order that you do the same.

24           And with that, I will grant your motion to withdraw as

25   counsel.  And so if there needs to be a delay in having another

1    counsel appear for purposes of responding to any further

2    requests for sanctions, then we will wait to see how that

3    unfolds.

4         Is there anything further from you, Mr. Uppal?

5         MR. UPPAL:  Not at this time, Your Honor.  Thank you.

6         THE COURT:  Is there anything further from you

7    Mr. Barton?

8         MR. BARTON:  My only regret, Your Honor, is that I was

9    not able to persuade the Court or explain to the Court the full

10   events that transpired here.  And obviously we're constrained

11   by the requirements that protect my client's confidential

12   communications to us.  I understand my duty of candor.  I do

13   believe, however, that once the -- if the Court could

14   understand exactly what happened, if the record were better

15   developed -- and I take responsibility for not developing it --

16   but if the record were better developed, I think the Court

17   would understand that we've not engaged in any misconduct here.

18   We'll take that obviously to the State Bar.  Thank you, Your

19   Honor.

20        THE COURT:  Thank you, Mr. Barton.

21        (Proceedings recessed at 11:23 a.m.)

22

23

24

25

1          **C E R T I F I C A T E**

2

3          I, LINDA SCHROEDER, do hereby certify that I am duly

4     appointed and qualified to act as Official Court Reporter for

5     the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7     a full, true, and accurate transcript of all of that portion of

8     the proceedings contained herein, had in the above-entitled

9     cause on the date specified therein, and that said transcript

10    was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 22nd day of March,

12    2018.

13

14

15                              s/Linda Schroeder
                         Linda Schroeder, RDR, CRR
16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**