**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Swisher Hygiene Franchise Corporation, et al., | No. CV-15-01331-PHX-DJH |
| Plaintiffs, | **ORDER** |
| v. | |
| Troy Clawson, et al., | |
| Defendants. | |

On March 22, 2018, the Court granted Plaintiffs' Second Motion for Sanctions (Doc. 103), struck Defendants' Answers (Docs. 22 and 23), and entered Default against all Defendants. (Doc. 191). The Court memorialized the March 22, 2018 bench order in a written order that was issued on October 15, 2018. (Doc. 222). Since then, the parties have filed dozens of motions and briefs, some of which have been previously addressed. Pending before the Court are Plaintiffs' Motion for a Damages Hearing (Doc. 257); Plaintiffs' Motion for Damages and Entry of Default Judgment (Doc. 269); Defendants' Motions regarding the Unenforceability of the Covenants (Doc. 275); and Plaintiffs' Motion to Strike Defendants' Unenforceability Motion (Doc. 278). Defendants Teri and Troy Clawson filed Joinders to Defendants' Motion regarding the Unenforceability of the Covenants. (Docs. 276 and 277). The parties have also submitted additional briefing, at the Court's instruction, regarding the attorneys' fees awarded to Plaintiffs as a sanction for Defendants' misconduct. (Docs. 263, 264, 265, and 266). All of these matters are fully

1  briefed.[1]  The Court does not find additional briefing necessary as to any of these issues.[2]

2  As the procedural history of this case is lengthy, and has been explained in great detail in

3  prior Orders, the Court will not explain the history of the case here.

4      Plaintiffs request a damages hearing, and argue that because Default has been

5  entered against all Defendants, the only issue for the Court to determine is the amount of

6  damages.  (Doc. 269).  Defendants argue that, regardless of the entry of default, the Court

7  must first resolve pending legal issues and conclude that the employee non-solicitation, the

8  non-competition, and the confidentiality provisions in the Agreement are invalid as a

9  matter of law.  (Doc. 275).

10 **I.      Effect of the Entry of Default**

11     Defendants argue that the employee non-solicitation, the non-compete, and the

12 confidentiality provisions in Plaintiffs' Agreement (the "Agreement") with Clawson are

13 invalid as a matter of law.  (Doc. 275).  Defendants further argue that although the Court

14 entered default and struck Defendants' Answers, this only establishes the *factual*

15 allegations in the Complaint and not unresolved legal issues.

16     "In reviewing a default judgment, this court takes the well-pleaded factual

17 allegations in the complaint as true."  *DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854

18 (9th Cir. 2007); *see also* Fed.R.Civ.P. 55(a).  However, a "defendant is not held to admit

19 facts that are not well-pleaded or to admit conclusions of law."  *Id.*  "Thus, [a defendant]

20 may prevail on the merits if [it] can demonstrate that, taking the facts alleged in the

21 pleadings as true, [plaintiff] was not entitled to relief."  *Cripps v. Life Ins. Co. of N. Am.*,

22 980 F.2d 1261, 1267 (9th Cir. 1992); *see also Alan Neuman Productions v. Albright*, 862

23 F.2d 1388, 1392–93 (9th Cir. 1988) (reversing default judgment for plaintiff on RICO

24

25 ───────────────
[1] The parties requested oral argument in this matter.  The Court finds that the issues have been fully briefed and oral argument will not aid the Court's decision.  See Fed. R. Civ. P. 78(b) (court may decide motions without oral hearings); LRCiv 7.2(f) (same).

26

27 [2] Plaintiffs did not formally file a Response to Defendants' Motion regarding the enforceability of the covenants, instead Plaintiffs filed a Motion to Strike.  However, this issue was fully briefed at the summary judgment stage and the Court does not find it necessary to request additional briefing as to the legal issues raised by Defendants.  (Docs. 71. 88, and 108).

28

1    claims because the complaint failed properly to allege such claims).

2         Therefore, the Court must first determine the legal issues that remain unresolved

3    before entering default judgment and determining damages.

4    **II.   Plaintiffs' Motion to Strike**

5         Plaintiffs argue that Defendants' Motion improperly seeks "another bite at the

6    apple" and to circumvent the Court's Scheduling Order by filing another summary

7    judgment motion.[3]  (Doc. 278).  Plaintiffs argue that the Court already addressed the anti-

8    solicitation and confidentiality provisions as a matter of law.   Not so.   Defendants

9    previously raised the issue related to the employee non-solicitation and the confidentiality

10   provisions of the Agreement in the Motion for Summary Judgment in 2017.  (Doc. 71).  As

11   the Court stated at that time, "Defendants argue that the provisions in the Agreement that

12   Swisher seeks to enforce, the employee non-solicitation and confidentiality provisions, are

13   overbroad and unenforceable."  (Doc. 129 at 5).  The Court's Order continued:

> Defendants argue both provisions are overbroad under Arizona law and, as a
> result, are unenforceable as a matter of law. With the exception of one
> unexplained footnote, Defendants rely only on cases that apply Arizona law
> to argue that the employee non-solicitation and confidentiality provisions are
> overbroad. (Doc. 71 at 5-11). In that one footnote, they argue that if the Court
> should find North Carolina law applies, the two provisions are still
> overbroad, citing one unreported case for that proposition. (Doc. 71 at 11).
> Defendants offer no argument as to why Arizona law should apply over
> North Carolina law, nor do they explain why North Carolina law should even
> be considered as governing law in deciding these contractual issues. Instead,
> they simply assume Arizona law should apply and, but for the one footnote,
> analyze the employee non-solicitation and confidentiality provisions under
> Arizona law.
>
> In their Response, Plaintiffs point out a key omission in Defendants'

---

[3] Plaintiffs also state that "Defendants cannot submit or rely upon evidence that was never
disclosed during discovery. To hold otherwise would incentivize the kind of misconduct
and discovery abuse that Defendants have committed, and put them in a better position
following default than they would have been in had their answers not been stricken." (Doc.
279 at 4).  However, the Court will not consider any new evidence that was not previously
raised.  What the Court must decide is the legality of the covenants, which does nothing
"incentivize" the conduct of Defendants.  Moreover, Plaintiffs are correct in pointing out,
yet again, that the Court entered default against Defendants as a sanction for discovery
abuses.  That decision does not establish the legal sufficiency of Plaintiffs claims.

1
2
3
4
5
6
7
8
9
10

argument: that the Agreement contains a choice of law provision stating that it shall be interpreted and enforced in accordance with the laws of North Carolina. (Doc. 88 at 11; Doc. 8-1 at 6). Defendants, whether intentional or not, misled the Court by failing to mention this critical fact. Instead, they argue at length that the relevant provisions are unenforceable under Arizona law, without acknowledging that the Agreement itself expressly states it is governed by North Carolina law. Having failed to even acknowledge the choice of law provision, Defendants' Motion contains no argument that the choice of law provision is unenforceable and that, as a result, Arizona law should govern the Agreement. Rather, as noted above, Defendants' Motion simply assumes Arizona law governs. The Court will not make that same assumption. Given Defendants' failure to argue that the choice of law provision should be overridden and that Arizona law should control, *the Court will not decide that issue*. The Court will not decide an argument that Defendants appear to have intentionally omitted.

11

(*Id.* at 6-7) (emphasis added).

12
13
14
15
16
17

Contrary to what Plaintiffs now argue, the Court did not previously decide the validity of these provisions.[4] Therefore, the legality of the employee non-solicitation and confidentiality provisions remains an outstanding legal issue to be determined. As entry of default does not establish legal conclusions alleged in the complaint, the Court must consider Defendants' arguments now. Therefore, Plaintiffs' Motion to Strike will be denied.

18

**III.    Defendants' Motion to Determine Validity of Contract Provisions**

19
20
21

Defendants argue that the employee non-solicitation and the confidentiality provision in Plaintiffs' Agreement with Clawson are invalid as a matter of law. (Doc. 275). The Court notes that the parties now appear to agree that North Carolina law applies to the

22

23
24
25
26
27
28

---

[4] Plaintiffs alternatively argue that Defendants are barred from filing a second summary judgment motion. However, that the Court did not previously reach the ultimate issues does not mean that Defendants did not timely raise them. What the underlying motion is called—whether a subsequent summary judgment motion, a motion for judgment as a matter of law, or a motion in limine—is immaterial to the Court at this juncture. The Court agrees with Plaintiffs that the filing of a motion titled "Motion RE Unenforceability of Covenants" is strange from a procedural standpoint, but the same can be said of the progression of this case for much of the past five years. Moreover, that the Court previously denied Defendants' Motion for Summary Judgment is similarly immaterial to the present situation. *See Hoffman v. Tonnemacher*, 593 F.3d 908, 911 (9th Cir. 2010) ("Furthermore, we have held that, in effect, the possibility of summary judgment remains on the table even after a district court has denied a summary judgment motion because that order is subject to reconsideration by the court at any time.").

Agreement.  (Doc. 108 at 2; Doc. 275).  Indeed, Paragraph 20 of the Agreement provides that the "Agreement shall be construed enforced, interpreted, governed by, controlled, by, and the rights of liabilities of the parties determined in accordance with the internal laws . . . of the State of North Carolina." (Doc. 89).  Accordingly, the Court will apply North Carolina law to determine the enforceability of the Agreement's restrictive covenants.

### A.    Non-Solicitation & Non-Compete Provisions

Defendants argue that the non-solicitation provision in Clawson's contract is too broad, both in time and geographic reach.  Plaintiffs concede that they are only seeking to enforce the non-solicitation provision as to Plaintiffs' employees, and not as to customers. (Doc. 92 at 19)[5].

"North Carolina courts evaluate non-competes and non-solicitation agreements through the same lens." *Lab. Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 458 (M.D.N.C. 2015); *see United Labs., Inc. v. Kuykendall*, 370 S.E. 2d 375, 379–80 (N.C. 1988).  "North Carolina courts have long stated that restrictive covenants between an employer and an employee are not viewed favorably." *Kadis v. Britt*, 29 S.E. 2d 543, 546 (N.C. 1944); *VisionAIR, Inc. v. James*, 606 S.E.2d 359, 362 (N.C. Ct. App. 2004). "Because they restrain the ability of employees to secure gainful employment and of employers to find qualified workers, restrictive covenants must be no wider in scope than is necessary to protect the business of the employer." *Lab. Corp. of Am. Holdings*, 84 F. Supp. 3d at 458 (quoting *Manpower of Guilford County, Inc. v. Hedgecock*, 257 S.E.2d 109, 114 (N.C. Ct. App. 1979)).

In general, restrictive covenants are unenforceable in North Carolina unless they are: "(1) in writing; (2) made part of a contract of employment; (3) based on valuable consideration; (4) reasonable both as to time and territory; and (5) not against public policy." *Phelps Staffing, LLC v. C.T. Phelps, Inc.*, 226 N.C. App. 506, 509, 740 S.E.2d 923, 926–27 (2013).  North Carolina courts consider six factors to determine whether the

---

[5] Plaintiffs confirmed that they "have never attempted to enforce the non-compete or *customer non-solicitation* provisions."  (Doc. 92 at 19) (emphasis added).  Therefore, Plaintiffs have waived this issue and it will be stricken from the Amended Complaint.

1    time and geographic limitations of a restrictive covenant violate these principles: "(1) the

2    area, or scope, of the restriction; (2) the area assigned to the employee; (3) the area where

3    the employee actually worked or was subject to work; (4) the area in which the employer

4    operated; (5) the nature of the business involved; and (6) the nature of the employee's duty

5    and his knowledge of the employer's business operation." *Superior Performers, Inc. v.*

6    *Meaike*, 2014 WL 1412434, at *8 (M.D.N.C. Apr. 11, 2014).

7          For the employee non-solicitation provisions to be enforceable, the plaintiff must

8    establish that the geographic territory prohibited by the provision is no more than necessary

9    protect its business. *See Farr Associates, Inc. v. Baskin*, 138 N.C. App. 276, 281, 530

10   S.E.2d 878, 882 (2000).  "Where the alleged primary concern is the employee's knowledge

11   of the customers, the territory should only be limited to areas in which the employee made

12   contacts during the period of his employment." *Hartman v. W.H. Odell & Associates, Inc.*,

13   117 N.C. App. 307, 313, 450 S.E.2d 912, 917 (1994).

14         The employee non-solicitation agreement at issue provides that Clawson shall not

15   "employ, engage, seek to engage, solicit, or cause to be solicited as an independent

16   contractor or employee, any person who, within the preceding 6 months, has been an

17   employee or independent contractor of [Swisher] or any franchisee . . . ."  (Doc. 8-1, Exh.

18   A).  The Agreement provides that Clawson is bound by the terms during his employment

19   "and for the later of . . . 2 years after the Termination Date, or the date of final judgment

20   or order of any court or tribunal that enforces this Agreement."  *Id.*

21         Here, there is no geographic limitation in the employee non-solicitation provision.

22   Nor does it limit the locations where Clawson made contacts during his employment.

23   Defendants argue that because this provision has no limit as to geographical scope that it

24   is invalid as a matter of law.  While Plaintiffs argue that North Carolina has allowed three-

25   year restrictions against "soliciting and hiring plaintiff's former employees" enforceable,

26   this does not account for the lack of geographic restriction in the Agreement here.  *See*

27   *Kennedy v. Kennedy*, 160 N.C. App. 1, 11, 584 S.E.2d 328, 335 (2003).  Moreover, it is

28   undisputed that Swisher has franchisees throughout the United States and there is no

- 6 -

allegation that Clawson's contact throughout his employment spanned the entirety of Swisher franchisees.  Therefore, the employee non-solicitation provision is invalid as a matter of law and will be stricken from the Amended Complaint.[6]  *See Farr,* 138 N.C. App. at 282 (finding the scope of a client-based restrictive covenant "extreme," overbroad, and unenforceable because the former employer had clients all over the world, yet the employee only worked with a relatively small number of clients during his employment with his former employer).

Accordingly, Plaintiffs are prohibited from putting forth evidence of damages associated with the breach of the employee non-solicitation provision.  Moreover, as Plaintiffs have acknowledged throughout this case that they are not seeking to enforce the non-compete provision in the Agreement, Plaintiffs may not present evidence of damages arising from any breach of the non-compete provision.  (Doc. 92 at 19).

## B.    Confidentiality Provision

Defendants also argue that the confidentiality provision is overbroad, and therefore, unenforceable.  Plaintiffs argue that confidentiality provisions are given broad deference under North Carolina law.

"The equitable balance between conflicting interests of employer and employee takes into account the right of the employer to protect, by reasonable contract with its employee, the unique assets of its business, a knowledge of which is acquired during the employment and by reason of it."  *Elec. S., Inc. v. Lewis*, 96 N.C. App. 160, 165–66 (N.C. 1989).  Under North Carolina law, employers have a right to protect "confidential information regarding [their] business activities, which include[s], among other things,

---

[6] A similar provision in at least one other Swisher employee's non-solicitation clause was held unenforceable by a Washington state court applying North Carolina law.  *See Michael Lezon v. Swisher International, Inc.*, et al., No. 16-2-05132-4 KNT (May 27, 2016) (holding that the non-solicitation provision "is overbroad because, not only does it prohibit Mr. Lezon from inducing employees, independent contractors and franchisees who were employed by Swisher at the time Mr. Lezon left his employment, it also prohibits Mr. Lezon from employing or soliciting persons who worked with Swisher in some capacity within the preceding six months, regardless of whether Mr. Lezon had any dealings with them during his employment at Swisher. Swisher has cited no authority from any North Carolina court which held that such limitations are enforceable. . . . Under North Carolina law, the non-solicitation portion of the Agreement is unenforceable").

1    pricing methods, customer lists, leads lists, potential customers lists, and customer contact

2    information." *See Phelps*, 154 F. Supp. 3d at 245-47.  Furthermore, unlike non-solicitation

3    agreements, North Carolina law does not require geographic or temporal limitations for a

4    non-disclosure agreement. *Chemimetals Processing, Inc. v. McEneny*, 124 N.C. App. 194,

5    197 (N.C. 1996).  However, there are limits on the breadth of a confidentiality provision.

6    "Under North Carolina law, customer information maintained in the memory of a

7    departing employee is not a trade secret." *Asheboro Paper & Packaging, Inc. v. Dickinson*,

8    599 F. Supp. 2d 664, 677 (M.D.N.C. 2009).  Nor can an employee be "prohibited from

9    taking with him his general knowledge and expertise." *Id.* at 678.

10        The confidentiality provision here states that "Confidential Information" includes

11   "all information relating to any entity currently, formerly or prospectively having business

12   relationships with [Swisher], customers and customer lists and data," among other items.

13   (Doc. 8-1, Exh. A).  The provision explicitly excludes "information which is now or

14   hereafter becomes part of the public domain through lawful disclosure by Company or

15   another authorized person, or information that was previously independently known to

16   [Clawson] before employment with Company." (*Id.*)

17        While Defendants argue that the confidentiality provision prohibited Clawson from

18   utilizing his general skills, knowledge, and expertise, the Court disagrees.  Clawson was

19   free to use his general skills, knowledge, and expertise, as long as he did not disclose

20   "information relating to any entity currently, formerly or prospectively having business

21   relationships" with Swisher. (Doc. 8-1, Exh. A).  Moreover, the provision explicitly allows

22   Clawson to disclose information in the public record, as well as "information that was

23   previously independently known to Employee before employment." (*Id.*)  Defendants'

24   argument that the provision prevents Clawson from using a "great deal of general skill and

25   knowledge" he obtained in the 24-years of experience prior to employment with Swisher

26   is unavailing. (Doc. 275 at 10).  The confidentiality provision is valid under North Carolina

27   law.  Plaintiffs may present evidence of damages arising out of the breach of the

28   confidentiality provision.

**IV.     Plaintiffs' Motion for Damages Hearing**

Plaintiffs request a damages hearing, arguing they are entitled to roughly $651,000 in compensatory damages, $2,600,000 in putative damages, and the discouragement of around $32,000 from Clawson for past wages.[7]   (Doc. 269 at 5-6).   Defendants do not contest Plaintiffs' entitlement to a damages hearing, but argue that the Court should limit the damages Plaintiffs are able to seek.

"The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987).   Therefore, the amount of damages must be proven by the plaintiff at a damages hearing.   *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977).   It is the plaintiff's burden to prove all damages sought in the complaint, and "[a] judgment by default shall not be different in kind [or] exceed in amount that prayed for in the [complaint]."   Fed. R. Civ. P. 54(c).

Plaintiffs argue that the entry of default prevents Defendants from entering evidence or appearing in the action going forward and that the Court need not hold a damages hearing.   The law of this Circuit is clear, Plaintiffs must prove a *prima facie* case to establish that the claims in their Complaint entitle them to damages.   *TeleVideo Sys.*, 826 F.2d at 918; *see also Rubicon Glob. Ventures, Inc. v. Chongquing Zongshen Grp. Imp./Exp. Corp.*, 630 F. App'x 655, 658 (9th Cir. 2015) (holding that the "district court abused its discretion by failing to hold a hearing on damages prior to entering the default judgments . . . where the judgments were based on Plaintiffs' own conclusory declarations of their future lost profits over the course of five years").   Moreover, while a defaulting party is prevented from contesting factual allegations in the complaint, a defaulting party may contest the amount of damages sought.   *Id.*

Therefore, it is necessary to proceed to a damages hearing.   While Defendants

---

[7] Plaintiffs' Reply to their Motion, while *technically* only 11 pages in length, contains numerous editing features including extensive use of footnotes, single-spacing of headings and of some large paragraphs, and what appears to be a smaller font.   (Doc. 279).   The Court does not look favorably on obvious attempts to circumvent the rule limiting pages. *See* LRCiv. 7.2(e)(2).

acknowledge the entry of default, and that Plaintiffs are entitled to a damages hearing, they argue that Plaintiffs' recent request for lost profits were not alleged in the Amended Complaint and also that their punitive damages claims fails as a matter of law.

### A.    Lost Profits

Defendants argue that Plaintiffs are not entitled to lost profit damages because they were not alleged in the Amended Complaint.  Plaintiffs acknowledge that the words "lost profits" do not appear in the Amended Complaint, but argue that they are a quintessential type of compensatory damages.  *See Miidas Greenhouses, LLC v. Glob. Horticultural, Inc.*, 226 Ariz. 142, ¶ 7, (Ariz. Ct. App. 2010) (prayer for "'compensatory damages . . . ' encompass[ed] not only lost profits, but the lost seeds for which damage was alleged elsewhere in the complaint").

The Court will allow Plaintiffs to present evidence of lost profit damages arising out of the allegations in their Amended Complaint.  However, Plaintiffs are cautioned that the evidence of lost profits must be specifically tailored to the actual conduct and individuals at issue.  While the Court recognizes that "lost profits are necessarily an estimate," the award must be reasonable.  *Humetrix, Inc., v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001).  Therefore, Plaintiffs are cautioned that the Court will not award lost profit damages that are not specifically tied to the conduct alleged in the Amended Complaint.

### B.    Punitive Damages

Plaintiffs also seek an award of punitive damages.  Under Arizona law, punitive damages are only appropriate when "the conduct of the wrongdoer is wanton, reckless or shows spite or ill will."  *Ulan v. Richtars*, 8 Ariz. App. 351, 358–59 (Ariz. Ct. App. 1968) (internal quotation marks omitted).  To recover punitive damages under Arizona law, however, "something more is required over and above the 'mere commission of a tort."  *Agilysys, Inc. v. Vipond*, 2006 WL 2620103, at *3 (D. Ariz. Sept. 13, 2006).  In other words, a plaintiff must prove by clear and convincing evidence that the defendant engaged in "aggravated and outrageous conduct with an evil mind."  *Id.*  Importantly, punitive damages are "not to compensate the plaintiff for losses sustained, but rather to punish the

defendant for his conduct." *Medasys Acquisition Corp. v. SDMS, P.C.*, 203 Ariz. 420, ¶16.11 (2002).   A plaintiff may make the requisite showing "by either direct or circumstantial evidence which persuades the [factfinder] of the high probability of the defendant's evil mind." *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*, 184 Ariz. 120, 132 (Ariz. Ct. App. 1995).

Defendants argue that the punitive damages claim relates to conduct that has already been sanctioned by the Court, namely the spoliation of evidence and the covering up of the same. (Doc. 274 at 14).  Defendants have not established that this fact precludes Plaintiffs from establishing that punitive damages are appropriate.  Based on the findings the Court has already made in this matter related to Defendants' conduct, the Court will not prevent Plaintiffs from presenting evidence of punitive damages at the damages hearing.

### C.   Conclusion

Plaintiffs are entitled to a damages hearing on the areas specified in this Order. Plaintiffs shall not present evidence of any damages arising from a breach of the non-solicitation or non-competition provisions of the Agreement as the Court has found those provisions invalid.  Moreover, while Plaintiffs are allowed to submit evidence of lost profits, the Court expects that the amounts provided shall be tied to the conduct at issue as alleged in the Amended Complaint.

Plaintiffs argue that "the entry of default conclusively established that Defendants are liable to Swisher on its breach of duty of loyalty, aiding and abetting, and unfair competition claims, which are not dependent on Defendant Clawson's Non-Compete and Confidentiality Agreement with Swisher." (Doc. 279 at 3).  The Court agrees that Plaintiffs may present evidence of damages arising from its breach of duty of loyalty, aiding and abetting, and unfair competition claims.

As to the Plaintiffs' Motion for Entry of Judgment (Doc. 269), the Court will withhold entering judgment against Defendants until after the damages hearing is conducted.

1

**VI.    Attorneys' Fees Sanction Reconsideration**

2

       Also before the Court is the parties' briefing on the reconsideration of the attorneys'

3

fees sanction awarded to Plaintiffs.  (Doc. 256).

4

       The Court previously held that:

5

6

       The sanctionable conduct went to the heart of the claims alleged in the
Complaint.   Moreover, the Court found, based on the testimony of the

7

forensic expert, that Clawson spoliated critical evidence shortly after the
Complaint in this matter was filed. (Doc. 222).  The long journey of this case

8

through the litigation process, continuing with three days of hearings on the
motion for sanctions and the entry of default, and culminating with this

9

Order, all stemmed from that initial act in the early stages of this case.  Based

10

on the entirety of the record, the Court finds it reasonable to award to
Plaintiffs the fees and costs stemming from the conduct of Defendants and

11

finds that that conduct began when Clawson spoliated the evidence, which
the expert testified was on or after August 13, 2015.  (Doc. 184 at 54).

12

(Doc. 256 at 18).

13

       This  Court  awarded  Plaintiffs  attorneys'  fees  and  costs  in  the  total  amount  of

14

$527,087.46, jointly and severally against Defendants Troy and Teri Clawson, Defendant

15

ACS, Attorney David Barton, Attorney Katya Lancero, and the BurnsBarton Law Firm.

16

(Doc. 256).  This amount reflected fees accumulated by Plaintiffs since the spoliation of

17

evidence on August 13, 2015.  Subsequent to that decision, this Court informed the parties

18

that it intended to reconsider the decision as to the attorneys' fees award only, based on the

19

recent Supreme Court decision in *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178,

20

1186, 197 L. Ed. 2d 585 (2017).  The parties filed additional briefing in light of that case.

21

(Docs. 263, 264, 265, and 266).  After considering the parties additional briefing, and in

22

light of *Goodyear*, the Court will *sua sponte* reconsider its prior decision as to the attorneys'

23

fees award.

24

    **A.    Legal Standards**

25

       "Federal courts possess certain inherent powers, not conferred by rule or statute, to

26

manage their own affairs so as to achieve the orderly and expeditious disposition of cases."

27

*Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962).  Those powers include "the ability

28

to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc*., 501 U.S. 32, 44–45 (1991). "[A]ssessment of attorney's fees" is one such appropriate sanction. *Id.* at 45. "[A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc*., 501 U.S. 32, 45 (1991). If a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it is appropriate to assess attorney's fees against the responsible party. *Id.* at 45-46.

The Supreme Court's recent decision *in Goodyear* is instructive. "*Goodyear* emphasized that a bad faith fee award, 'when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature.'" *Lu v. United States*, 921 F.3d 850, 859 (9th Cir. 2019) (*citing Goodyear*, 137 S.Ct. at 1186). Any award "is limited to the fees the innocent party incurred solely because of the misconduct—or put another way, to the fees that party would not have incurred but for the bad faith. A district court has broad discretion to calculate fee awards under that standard." *Goodyear*, 137 S. Ct. at 1183–84. "In other words, the fee award may go no further than to redress the wronged party for losses sustained; it may not impose an additional amount as punishment for the sanctioned party's misbehavior." *Id.* at 1186.

However, the Supreme Court stressed that "courts undertaking that task need not, and indeed should not, become green-eyeshade accountants." *Id.* at 1186. "The essential goal in shifting fees is to do rough justice, not to achieve auditing perfection." *Id.* It is therefore proper for a district court to "take into account [its] overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Id*. These judgements "are entitled to substantial deference on appeal." *Id.* (*citing Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).

Only in the most exceptional cases may a court award all fees in a case. This "exceptional case" rule will be upheld so long as all fees are "in some way traceable to" bad faith activity. *Lu v. United States*, 921 F.3d 850, 861 (9th Cir. 2019). Moreover, in cases of extreme egregious conduct, it "was within the court's discretion to vindicate itself

and compensate" the plaintiff for all of its fees.  *Chambers,* 501 U.S. at 35–40 (imposing sanctions after finding that defendant misled the court, violated court orders, and engaged in dilatory tactics); *see also Miller v. City of Los Angeles*, 661 F.3d 1024, 1037–38 (9th Cir. 2011).

###   B.    Analysis[8]

The parties are well aware of the conduct at issue.  The Court has repeatedly stated that the sanctionable conduct went to the heart of the claims alleged in the Amended Complaint.  Moreover, the Court found, based on the testimony of the forensic expert, that Clawson spoliated critical evidence shortly after the Complaint was filed.  (Doc. 222).  The Court further found that "there is clear and convincing evidence that Defendant Clawson engaged in the spoliation of evidence, that he attempted to cover up that spoliation, and thus that he has engaged in a fraud on the Court. He also did so when he signed the first perjured Affidavit that was then filed with the Court."  (*Id.* at 22-23).

The long journey of this case commenced with that initial act in the early stages of litigation.  Based on the entirety of the record, the Court finds it reasonable to award to Plaintiffs the fees and costs stemming from the sordid conduct of Defendants.  As to the fees related to Clawson's misconduct, and pursuant to *Goodyear*, the Court must determine those fees that Plaintiffs would not have incurred but-for Clawson's misconduct.  *See Goodyear*, 137 S. Ct. at 1183–84 (Any award "is limited to the fees the innocent party incurred solely because of the misconduct—or put another way, to the fees that party would not have incurred but for the bad faith.  A district court has broad discretion to calculate fee awards under that standard").  In calculating this amount, the Court takes into account the Supreme Court's instruction that the "goal in shifting fees is to do rough justice, not to achieve auditing perfection," and that the Court should "take into account [its] overall sense of a suit, and may use estimates in calculating and allocating an attorney's time."  *Id.* at 1186.

---

[8] The Court will only reconsider the amount of the damages ordered and will not disturb the rulings on the related matters of joint and several liability or on the reasonableness of the hourly rate charged.

Having reviewed the voluminous billing entries spanning four years, and in taking into account its overall sense of the suit, the Court determines that the following categories of fees would not have been incurred by Plaintiffs but-for the conduct of Defendants. The Court has assigned the amount of fees that it will award in each category based on Plaintiffs' billing entries. (Doc. 265-1).

| Category of Fees | Awarded Amount |
|---|---|
| Plaintiffs' First Motion for Sanctions and Reply to the First Motion for Sanctions (Docs. 48 and 57) | $20,000 |
| Plaintiffs' Second Motion for Sanctions and Reply to the Second Motion for Sanctions (Docs. 103 and 124) | $21,000 |
| Settlement Discussions post-spoliation | $4,000 |
| Plaintiffs' Response to Defendants' Motion to Strike Expert Cardwell (Doc. 142) | $8,300 |
| Evidentiary Hearings related to spoliation and sanctions – March 2, 13, and 22, 2018 | $40,400 |
| Entries associated forensic expert, Mr. Cardwell: reviewing information found on Clawson's computer; ESI related to the spoliation; research related to spoliation and ESI | $40,000 |
| Entries related specifically to "Clawson's perjury" and "Supplemental Affidavit Perjury" | $4,000 |
| Plaintiffs' Response to Defendants' Motion for Reconsideration of Sanction/Default Order | $2,100 |
| Plaintiffs' entries related to reviewing and Responding to Defendants' Motions to Set Aside the Default | $14,000 |
| **TOTAL** | **$153,800** |

The Court finds that the aforementioned fees accrued by Plaintiffs arose as a direct result of Clawson's conduct. This includes the need to file sanctions motions, the hiring of the forensic expert, responding to Defendants' Motion to Strike the expert, the three-days of evidentiary hearings, and research related to the perjured affidavit and spoliation. Therefore, the Court will award Plaintiffs $153,800 in attorneys' fees, finding that these fees would not have been incurred but-for Clawson's and Defendants' conduct.[9]

---

[9] This award remains assessed against all Defendants, Mr. Barton, Ms. Lancero, and the

The Court also found extensive additional bad conduct that arose after the initial spoliation of evidence. The Court noted counsels' and Defendants' improper characterization of Court filings. (*Id.*) The Court found that the BurnsBarton attorneys "facilitated and continued to cover up Clawson's fraud and their own irresponsible conduct." (Doc. 222 at 23). This continued throughout three days of federal court proceedings on the misconduct and has been discussed at length in prior orders. (Docs. 191, 222, and 256). The hearings were conducted after notice was given to all parties that the Court would take evidence and hear testimony on the allegations raised in Plaintiffs' First and Second Motions for Sanctions. (Doc. 145).[10] The conduct included overwhelming evidence that attorney Lancero misled the Court at best, and lied to the Court under oath at worst. Mr. Barton and Ms. Lancero acknowledged this fact when stating in a Court filing after her testimony that, "given the situation," Lancero "made inaccurate statements, without intending to do so." (Doc. 238 at 6). The Court also found that "the

_____

BurnsBarton Law Firm, jointly and severally.

[10] The Court's Order set "Oral Argument as to Plaintiffs' Motion for Default Judgment and Second Motion for Sanctions for the same date and time. The parties shall have any necessary witnesses available and present at the hearing to testify and be ready to offer any necessary exhibits." (Doc. 145). Plaintiffs noticed Mr. Barton and Ms. Lancero as witnesses, including an extensive list of topics on which they intended to question them: "Mr. Barton is anticipated to testify regarding his knowledge regarding Defendants' failure to preserve evidence, his interactions with Defendants' with regard to the drafting of Defendant Clawson's declaration and the amendment thereof, the circumstances regarding the drafting of Defendants' opposition briefs to the Plaintiffs' motions for sanctions, and the Defendants' representations to counsel regarding their search for, preservation of, and production of documents, including, but not limited to, the existence of the "Southern Arizona Plan" and whether such plan was ever formulated. Mr. Barton is also expected to testify regarding: 1) the identities of every defense counsel who purportedly acted in error by incorrectly choosing the word "formulating" when counsel "should have written" the word "finishing" [Doc. 115, p 4]; 2) whether, when, and how Defendants told their counsel that the Accurate Southern Arizona Plan had "never" been formulated, started, created, and/or never existed at any time in any form (or words to that effect); 3) whether, when and how defense counsel came to learn that the Accurate Southern Arizona Plan had, in fact, been started, created, or existed at any time in any form; 4) whether, when and how Defendants told their counsel that the Accurate Southern Arizona Plan had not been "finished" (or words to that effect) and what, if any, information or questions defense counsel asked their clients in response; and 5) why defense counsel represented and continued to represent to the Court that the Accurate Southern Arizona Plan had never been formulated if defense counsel knew at any time of its existence in any form." (Doc. 151 at 20-22). The same paragraph of topics was listed under Plaintiffs' notice to Ms. Lancero. Barton and Lancero were thus on notice of the potential that they could be called as witnesses. (*Id.*)

briefing submitted and the testimony at the hearings are clear and convincing evidence that Ms. Lancero and Mr. Barton facilitated and continued to cover up Clawson's fraud and their own irresponsible conduct." (Doc. 222 at 22-23).

Moreover, Lancero was afforded protections equivalent to those afforded to criminal defendants. Namely, she had notice that Plaintiffs intended to call her to testify, she publicly affirmed understanding of the oath, she agreed to testify truthfully under penalty of perjury to the misconduct at issue, and she was questioned by her experienced co-counsel, David Barton, who also competently objected to questions by Plaintiffs' counsel. After refusing to admit that her conduct was wrong, she came up with an alternate version of events to explain her conduct. This story, that she believed the spoliated evidence to be just some "words on a page," is a contradiction to reality. Mr. Barton later admitted in a Court filing that Ms. Lancero did not answer truthfully, "without intending to do so." (Doc. 238 at 6). That filing claims that Barton and Lancero "*immediately* realized that Ms. Lancero had misspoken." (*Id.*) (emphasis added). The Court intended to allow Ms. Lancero to re-take the stand on the second day of testimony, which would have allowed her to attempt to correct any unintended misstatements she allegedly made. Lancero did not appear on the second day of hearing due to illness. (Doc. 174). The Court also expected Lancero to appear on the third day of testimony weeks later, but Lancero never reappeared to correct her admitted "inaccurate statements," leaving the Court with those misstatements and the testimony of her supervisor, Mr. Barton. That counsel "consulted with ethics attorneys" regarding Lancero's testimony does not change the record before the Court. (Doc. 238).

The Court also found additional fraudulent conduct to include false Affidavits submitted under oath and filed by the BurnsBarton Law Firm, and the filing of a Motion seeking to prevent the forensic examiner's report from being admitted into evidence because it was filed outside the fact discovery deadline.[11] (Doc. 139). All of these actions, done on behalf of Defendants, were committed by Defendants' counsel and to the detriment

---

[11] Had Defendants succeeded in blocking that report, Clawson's spoliation of evidence would never had made it into the record.

of Plaintiffs and the Court.

Based on all of the above, the Court reiterates its previous finding that Ms. Lancero, Mr. Barton, and the BurnsBarton Law Firm intentionally misled the Court to cover-up or minimize the exposure of their client's misconduct.  The Court further finds that adequate procedural guarantees were in place to protect them.  *See Goodyear*, 137 S. Ct. at 1186 (holding that for any additional penalty above and beyond that for losses sustained, "a court would need to provide procedural guarantees applicable in criminal cases, such as a beyond a reasonable doubt standard of proof").  Therefore, as an additional compensatory award to Plaintiffs, and due to the multiple findings of egregious conduct, the Court finds that this is an "exceptional case," and will award additional attorneys' fees to Plaintiffs.  *See Chambers*, 501 U.S. at 45-46 (If a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it is appropriate to assess attorney's fees against the responsible party).  Based on the Court's "overall sense of [the] suit," and the conduct of Defendants' attorneys in this matter in attempting to defile "the very temple of justice," the Court will order an additional attorneys' fees award in the amount of $153,800 to Plaintiffs, jointly and severally, against Ms. Lancero, Mr. Barton, and the BurnsBarton Law Firm.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion to Strike (Doc. 278) is **denied**.

**IT IS FURTHER ORDERED** that Defendants' Motion Regarding the Unenforceability of Covenants (Doc. 275) is **granted in part.**  The allegations related to the employee non-solicitation agreement are unenforceable as a matter of law and are therefore stricken from the Amended Complaint.  Plaintiffs waived their allegations related to the non-competition agreement, and those allegations are also stricken from the Amended Complaint.

**IT IS FURTHER ORDERED** that upon reconsideration of its prior Order filed on September 3, 2019 (Doc. 256), the Court will award the Plaintiffs attorneys' fees in the amount of $153,800.00 jointly and severally against Defendants Troy and Teri Clawson,

Defendant ACS, Attorney David Barton, Attorney Katya Lancero, and the BurnsBarton Law Firm.  The Court will award Plaintiffs attorneys' fees in an additional $153,800.00 jointly and severally against Attorney David Barton, Attorney Katya Lancero, and the BurnsBarton Law Firm.  The prior attorneys' fees order (Doc. 256) is amended as stated herein.

**IT IS FURTHER ORDERED granting** Plaintiffs' Motion for a Damages Hearing (Doc. 257).  Oral Argument on the Motion for Default Judgment and an Evidentiary Hearing as to Damages will be held by video teleconference on July 7, 2020 at 9:00 a.m. These motions are fully briefed.  Plaintiffs will have until Noon to complete the presentation of testimony and argument.  The parties shall have any *necessary* witnesses available and present at the hearing to testify and be ready to offer any *necessary* exhibits. An Order will follow with specific details regarding the hearing and the Court's requirements.

Dated this 14th day of May, 2020.

Honorable Diane J. Humetewa
United States District Judge